# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                    No. CR 95-0014 JB

 SEBASTIAN LEIGH ECCLESTON,

     Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A), filed April 15, 2020 (Doc. 307)("Compassionate Release Motion"); (ii) the Amended Motion for Sentence Modification Pursuant to 18 U.S.C. § 3582(c)(1)(A) and Under the First Step Act and the Cares Act, filed December 14, 2020 (Doc. 335)("Amended Motion"); and (iii) the Defendant Sebastian S. Eccleston's Amended and Supplemental Motion for Reduced Sentence Pursuant to the First Step Act and 18 U.S.C. § 3582, filed February 10, 2021 (Doc. 339)("Second Amended Motion").[2]  The Court held a hearing on April 7, 2021.  See Clerk's Minutes at 1, filed April 7, 2021 (Doc. 353).  The primary issues are: (i) whether Defendant Sebastian Leigh Eccleston has exhausted his administrative remedies,

---

[1]This is an amended version of the Court's Memorandum Opinion and Order, filed June 10, 2021 (Doc. 364)("MOO").  The Court is amending the MOO to address an error on the final page, which stated: "Defendant S. Eccleston's previously imposed federal sentence of 417 months is reduced to 228 months, and he is resentenced to 231 months."  MOO at 107.  The current Memorandum Opinion and Order fixes this sentence, which now reads: "Defendant S. Eccleston's previously imposed federal sentence of 417 months is reduced to 228 months, and he is resentenced to 228 months."

[2]Defendant Sebastian Leigh S. Eccleston's counsel filed the Second Amended Motion, but S. Eccleston, acting pro se, filed the Motion and the Amended Motion.

where S. Eccleston's initial compassionate release request was denied on April 21, 2020; (ii) whether extraordinary and compelling circumstances warrant reduction in S. Eccleston's sentence under the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A) ("First Step Act"); (iii) whether a sentence reduction is consistent with the applicable policy statements that the Sentencing Commission has issued; and (iv) whether a sentence reduction is consistent with the 18 U.S.C. § 3553(a) factors.   The Court concludes that: (i) S. Eccleston has exhausted his administrative remedies regarding the Amended Motion and the Second Amended Motion, but not regarding the Motion, because S. Eccleston's initial compassionate release request was denied after he filed the Motion, but more than thirty days before S. Eccleston filed the Amended Motion and the Second Amended Motion; (ii) S. Eccleston's case presents extraordinary and compelling circumstances, because, although neither S. Eccleston's medical concerns nor the changes to 18 U.S.C. § 924(c)'s stacking provisions are extraordinary and compelling, the following circumstances, considered together, are extraordinary and compelling and favor reducing his sentence: (a) S. Eccleston's believed reasonably, when he signed the State and Federal Plea Agreements, that his State and federal prison sentences would run concurrently, however, he was sentenced consecutively; (b) the Court finds, by a preponderance of the evidence, that S. Eccleston will not reoffend; (c) S. Eccleston has made impressive efforts to rehabilitate himself while incarcerated, including obtaining a college degree and improving his problems with mental health and drugs; (d) S. Eccleston's has no prison disciplinary history; (e) S. Eccleston was eighteen when he committed the underlying offense and has been incarcerated for twenty-six years; and (f) S. Eccleston has displayed consistent remorse for his actions; (iii) the Sentencing Commission's policy statements are a neutral factor, because there are currently no applicable Sentencing Commission policy statements; and (iv) a sentence of 228 months is consistent with § 3553(a),

because it is sufficient, but not greater than necessary, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from S. Eccleston, and to provide S. Eccleston with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  Accordingly, (i) the Motion is denied; (ii) the Amended Motion is granted in part and denied in part; (iii) the Second Amended Motion, is granted in part and denied in part; and (iv) Defendant S. Eccleston's previously imposed sentence of 417 months is reduced to 228 months, which the Court derives by subtracting the time S. Eccleston served in State prison from his federal sentence.[3]

## FINDINGS OF FACT

S. Eccleston committed a series of crimes from when he was fourteen to nineteen years old, some of which resulted in his existing federal sentence.  See Presentence Report, filed June

---

[3]S. Eccleston was in State custody primarily from January 3, 1995 to January 28, 2011 (16 years, 25 days or 192 months, 25 days), but was out of State custody from March 28, 1995 to August 1, 1995 (4 months, 4 days), because he escaped from State prison during that time.  See Presentence Report ¶ 56, at 12, filed June 29, 2020 (Doc. 314).  S. Eccleston, therefore, served 188 months, 21 days in State custody.  Rounding to the nearest month, the Court subtracts 189 months from S. Eccleston's 417 month federal sentence, for a new sentence of 228 months.  It appears, though it is not evident from the briefing the parties submitted, that the BOP may have credited a portion, though not all, of S. Eccleston's State sentence towards his federal sentence.  Compare Inmate Skills Development Plan at 10 (dated Oct. 16, 2014), filed Dec. 19, 2014 (Doc. 233)(stating that, on October 16, 2014, S. Eccleston's "controlling sentence began" on January 28, 2011, but that his "time served/jail credit/inoperative time" is "8 years 3 months 10 days") with United States v. S. Eccleston, 521 F.3d 1249, 1254 (10th Cir. 2008)("We do not hold that consecutive sentences were required, and we have no occasion to decide whether concurrent sentences are consistent with the federal sentence.").  It's not clear if, today, the BOP considers any portion of S. Eccleston's State sentence to be credited against his federal sentence.  To clarify his new sentence: no portion of S. Eccleston's State sentence should be credited towards his new federal sentence of 228 months, because his new federal sentence is crafted to fully credit the time S. Eccleston served in State custody against his federal sentence, as if his State and federal sentences had run concurrently.

29, 2020 (Doc. 314)("PSR").  The Court first summarizes S. Eccleston's background, including his criminal history, before he was sentenced.  Second, the Court makes findings of fact regarding S. Eccleston's federal offense, carjacking.  Third, the Court makes findings of fact regarding COVID-19 and S. Eccleston's health problems.  Fourth, the Court makes findings of fact about S. Eccleston's time in prison, including his rehabilitative efforts.  Last, the Court makes findings of fact regarding S. Eccleston's future plans.  S. Eccleston "bears the burden of proof by a preponderance of the evidence" to demonstrate that his sentence should be reduced.  United States v. Grasha, 489 F. Supp. 3d 403, 406 (W.D. Pa. 2020)(Flowers, J.)(collecting cases).

      **1.**    **S. Eccleston's Background Before Federal Sentencing.**

      1.    "S. Eccleston was born on February 20, 1976, at Vandenberg Air Force Base in Santa Barbara, California . . . ."  PSR ¶ 58, at 13.

      2.    S. Eccleston's parents divorced when S. Eccleston was approximately three years old, because of "incompatibility" and infidelity by S. Eccleston's father.  PSR ¶ 58, at 13.

      3.    S. Eccleston "became depressed after his parents divorced."  PSR ¶ 67, at 15.

      4.    Following the divorce and until S. Eccleston was thirteen years old, he lived with his mother, Maria Soledad Anton, in Maryland and Virginia.  See PSR ¶ 62, at 14.

      5.    While Anton was working, S. Eccleston "and his brothers would be out in the streets doing whatever they wanted."  PSR ¶ 67, at 15.

      6.    From ages five to age seven, S. Eccleston's stepfather physically abused him.  See PSR ¶ 67, at 15.

      7.    S. Eccleston's stepfather also abused drugs.  See PSR ¶ 67, at 15.

      8.    S. Eccleston was then "sexually abused by an eighteen-year-old cousin when he was approximately seven years old"; the sexual abuse continued until S. Eccleston was twelve.

PSR ¶ 66, at 15.

9.      S. Eccleston told his parents about the sexual abuse, but "they did not believe him." PSR ¶ 66, at 15.

10.     When S. Eccleston was nine years old, he "began abusing drugs by inhaling gasoline . . . and smoking marijuana." PSR ¶ 72, at 16.

11.     From ages eleven through fifteen, S. Eccleston abused gasoline regularly. See PSR ¶ 72, at 16.

12.     S. Eccleston also "experimented with cocaine." PSR ¶ 72, at 16.

13.     When S. Eccleston was thirteen, he was "raped by an individual who was intoxicated." PSR ¶ 66, at 15.

14.     S. Eccleston's father, Gregory Eccleston, "attempted to have medication prescribed to his son through a psychiatrist," but Anton "refused to sign the authorization." PSR ¶ 69, at 15.

15.     G. Eccleston then obtained custody of S. Eccleston when he was thirteen, and S. Eccleston moved to Albuquerque to live with G. Eccleston, where S. Eccleston lived primarily until his arrest for the offense in this case. See PSR ¶ 62, at 14.

16.     S. Eccleston had initially a difficult relationship with his father; he "would not obey his father, because his father had not been a part of his life . . . . [H]e lost respect for his father because he never did things fathers and sons do and . . . his father never expressed love for him." PSR ¶ 59, at 13.

17.     S. Eccleston would "not accept[] discipline" from his father "when he did something wrong and would run away from home." PSR ¶ 60, at 13.

18.     S. Eccleston "grew up not letting anyone tell him what to do . . . because he did what he wanted since he was very young." PSR ¶ 67, at 15.

19.     From ages thirteen to seventeen, S. Eccleston was also "in and out of psychiatric institutions," including: (i) three stays in Heights Psychiatric Hospital in Albuquerque; (ii) one stay in Memorial Hospital in Albuquerque; and (iii) one stay at the Psychiatric Institution of Richmond, Virginia; S. Eccleston's "stays at the hospitals averaged between five and six months." PSR ¶¶ 65-66, at 15.

20.     During his psychiatric hospital stays, S. Eccleston was diagnosed as "manic depressive.[4]" PSR ¶¶ 66, at 15.

---

[4]Manic depression now is called bipolar disorder. See Jay W. Marks MD, Medical Definition of Manic-depression, MedicineNet (June 3, 2021), https://www.medicinenet.com/manic-depression/definition.htm. Bipolar disorder

iI]s a mental illness, specifically one of the affective (mood) disorders. It is characterized by severe mood swings, at least one episode of mania and may include repeated episodes of depression. . . . The number of individuals with bipolar disorder who commit suicide is 60 times higher than that of the general population. There seems to be no increase in involvement with violent crime for people with bipolar disorder compared to the general population except for those bipolar disorder sufferers that also suffer from an alcohol or other substance use disorder. People who have bipolar disorder are at a higher risk of also suffering from substance abuse such as alcoholism as well as other mental health problems. . . . Males may develop bipolar disorder earlier in life compared to females.

. . . .

Symptoms of the manic episode of early onset bipolar disorder in childhood or adolescence tend to include outbursts of anger, rage, and aggression, as well as irritability, as opposed to the expansive, excessively elevated mood seen in adults. The adolescent with bipolar disorder is more likely to exhibit depression and mixed episodes with rapid changes in mood. Despite differences in the symptoms of bipolar disorder in teens and children compared to adults, many who are diagnosed with certain kinds of pediatric bipolar disorder continue to have those symptoms as adults. . . . [M]en with bipolar disorder are more at risk for having an alcohol or other substance use disorder compared to women with the mood disorder. . . . Although a major depressive episode is not required for the diagnosis of bipolar disorder, such episodes often alternate with manic episodes. In fact,

21.     Also between ages thirteen and seventeen, S. Eccleston "would use LSD on an occasional basis." PSR ¶ 72, at 16.

22.     On May 23, 1990, when S. Eccleston was fourteen years old, he "and co-Defendants pulled the victim's pants down and then took a picture of the victim"; as a result, S. Eccleston was placed on "unofficial probation." PSR ¶ 52, at 11.

23.     S. Eccleston did not finish high school; he dropped out when he was fifteen. See PSR ¶ 75, at 16.

24.     "[T]he highest grade he completed was the tenth grade." PSR ¶ 75, at 16.

25.     On March 20, 1991, when S. Eccleston was fifteen years old, he was arrested for commercial burglary in Albuquerque. See PSR ¶ 49, at 9.

26.     S. Eccleston was sentenced to six months' probation on April 25, 1991. See PSR ¶ 49, at 9.

27.     Between 1992 and 1994, S. Eccleston "had a relationship with Erica Sanchez."

---

persistent sadness tends to occur more often than mania in many people with bipolar disorder.

Characteristics of depressive episodes (bipolar depression) include a number of the following symptoms: persistently depressed or irritable mood; feelings of apprehension; frequent crying, inability to feel pleasure; loss of interest in previously pleasurable activities; apathy, low motivation; increased or decreased appetite, weight loss or weight gain, difficulty falling asleep; excess sleepiness, agitation or lack of activity; fatigue/low energy; feelings of worthlessness; lack of concentration; slowness in activity and thought; inappropriate feelings of guilt; hopelessness; thoughts of death, self-harm or suicidal thoughts, plans, or actions.

Roxanne Dryden-Edwards, MD, Bipolar Disorder (Mania), MedicineNet (Dec. 2, 2019), https://www.medicinenet.com/bipolar_disorder/article.htm.

PSR ¶ 63, at 14.

28.     S. Eccleston and Sanchez have a child, Fabian Diego Sanchez.  See PSR ¶ 63, at 14.

29.     During the relationship, S. Eccleston worked at Burritos Chewy in Albuquerque as a cook.  See PSR ¶ 76, at 17.

30.     S. Eccleston and Sanchez separated because S. Eccleston "was living on the streets and due to his incarceration on the instant offense."  PSR ¶ 63, at 14.

31.     From 1993 to 1994, S. Eccleston was a member of Albuquerque's Uptown Kings Gang.  See PSR ¶ 57, at 12.

32.     S. Eccleston "really did not want to be in a gang," but "the gang would sometimes give him a place to stay."  PSR ¶ 57, at 12.

33.     Around the same time, S. Eccleston also was "addicted to methamphetamine and was injecting one to two quarter grams per day," but "would use whatever amount of methamphetamine he could obtain."  PSR ¶ 72, at 16.

34.     When S. Eccleston was abusing methamphetamine, "he was very paranoid and would stay awake for a week at a time."  PSR ¶ 72, at 16.

35.     S. Eccleston stole $1,800.00 from a woman with whom he was living and used the money to purchase a car.  See PSR ¶ 50, at 9-10.

36.     On July 13, 1993, when S. Eccleston was seventeen years old, S. Eccleston was arrested for "Embezzlement Over $250 but Less Than $2,500."  PSR ¶ 50, at 9-10.

37.     S. Eccleston was placed on probation for this offense, and after two probation violations, he was "committed to the Youth Diagnostic and Development Center for a period of one year."  PSR ¶ 50, at 9-10.

38.     On September 12, 1994, when S. Eccleston was eighteen years old, he was arrested for evading arrest while in a vehicle that had been reported stolen.  See PSR ¶ 54, at 11.

39.     This charged was dismissed pursuant to a plea agreement.  See PSR ¶ 54, at 11.

40.     On December 13, 1994, S. Eccleston "was a passenger in a vehicle," PSR ¶ 51, at 10, when "they became involved in a traffic dispute with people in another vehicle," Reply at 10.

41.     S. Eccleston "shot the eighteen-year-old victim, who later died."  PSR ¶ 51, at 10.[5]

42.     On December 15, 1994, S. Eccleston and his co-Defendant, Martinez, committed the underlying federal offense.  See PSR ¶ 9, at 3.

43.     S. Eccleston and Martinez were in a Motel 6 parking lot in Albuquerque when they confronted Robert Boyle as he was exiting his car.  See PSR ¶ 9, at 3.

44.     Martinez approached Boyle, "racked the action of a shotgun, pointed the weapon at the victim's head and ordered him out of the vehicle."  PSR ¶ 9, at 3.

45.     Boyle heard another sound towards the car's rear that he "associated with a firearm being chambered," and, when Boyle turned, he saw S. Eccleston pointing a second firearm at him. PSR ¶ 9, at 3.

46.     After Boyle fled, S. Eccleston and Martinez both got into Boyle's car and drove away.  See PSR ¶ 9, at 3.

---

[5]S. Eccleston contends that he did not intend to shoot the victim but, instead, shot a gun at the vehicle's tires, which ricocheted off the tire and hit one of the vehicle's occupants.  See Reply at 10.  At his State Sentencing hearing, S. Eccleston also told Judge Allen, who had more access to the relevant evidence than does the Court, that he "never meant to shoot" the victim.  State Sentencing Tr. at 8:5-24 (S. Eccleston).  State Judge Allen told S. Eccleston that he was "a liar for saying that you didn't mean to hurt anybody or didn't want to hurt anybody."  State Sentencing Tr. at 9:13-16 (Allen, J.).  The Court, therefore, does not accept S. Eccleston's one-sided version of events, given that State Judge Allen characterized them as lies at the State Sentencing hearing.

47.     Shortly thereafter, Albuquerque Police Department ("APD") officers responded to an armed-robbery call at another Albuquerque motel.  PSR ¶ 10, at 3.

48.     S. Eccleston and Martinez approached the two victims -- David Henkemeyer and Karen Kuepers, who were in the motel's parking lot -- in a white car and demanded their money. See PSR ¶ 10, at 3.

49.     S. Eccleston held and pointed a firearm at Kuepers while he took her purse.  See PSR ¶ 10, at 4.

50.     S. Eccleston then turned his gun towards Henkemeyer and asked for his wallet.  See PSR ¶ 10, at 4.

51.     Henkemeyer heard Martinez cock a shotgun around the same time.  See PSR ¶ 10, at 4.

52.     Henkemeyer then "threw his wallet at S. Eccleston."  PSR ¶ 10, at 4.

53.     S. Eccleston and Martinez then drove away in the vehicle they had stolen from Boyle.  See PSR ¶ 10, at 4.

54.     While APD officers were taking the armed robbery report, Bernalillo County Sheriff's Office ("BCSO") deputies attempted to stop a vehicle that matched the description of S. Eccleston and Martinez' vehicle.  See PSR ¶ 11, at 4.

55.     After a "high speed pursuit," the vehicle crashed, and the occupants fled.  PSR ¶ 11, at 4.

56.     BCSO deputies apprehended Martinez, but S. Eccleston escaped.  See PSR ¶ 11, at 4.

57.     APD officers took all three robbery victims to the crash site, where the victims "positively identified the vehicle" and found some of their property in the vehicle.  PSR ¶ 11, at 4.

58.    BCSO deputies also found a shotgun and eight twelve-gauge shotgun rounds in the crashed vehicle.  See PSR ¶ 12, at 4.

59.    Boyle then positively identified Martinez.  See PSR ¶ 12, at 4.

60.    Federal agents later interviewed the sales manager for the dealership that sold the car that S. Eccleston and Martinez stole, and the sales manager confirmed that the vehicle was not manufactured in the State of New Mexico.  See PSR ¶ 15, at 5.

61.    At the time of the crimes, S. Eccleston was undergoing "substance abuse issues" and "mental health issues."  Tr. at 29:4-9 (McConnell).

62.    S. Eccleston had "been awake for days and was taking a lot of alcohol and methamphetamine which affected [his] judgment."  PSR ¶ 22, at 6.

63.    Because S. Eccleston was eighteen when he committed the offense, his brain was not developed fully and his impulse control was below that of an older adult.  See Sara B. Johnson, Robert W. Blum, & Jay N. Giedd, Adolescent Maturity and the Brain: The Promises and Pitfalls of Neuroscience Research in Adolescent Health Policy, 45 J. Adolescent Health 216-21 (2009)("There is little empirical evidence to support age 18, the current legal age of majority, as an accurate marker of adult capacities.").

64.    Keupers lost $80.00, Henkemeyer lost $50.00, and Boyle had no financial losses, given that he was driving a rental vehicle which later was recovered.  See PSR ¶ 17-19, at 5.

65.    Henkemeyer and Keupers both had anxiety and nightmares as a result of the robbery.  See PSR ¶ 17-18, at 5.

66.    Boyle "felt very helpless when the incident occurred and . . . it was a very scary experience."  PSR ¶ 19, at 5.

67.    Boyle has not suffered any long-term problems as a result of the crime.  See PSR

¶ 19, at 5

68.     The carjacking was violent, scared the victims, and resulted in loss of property.  See PSR ¶ 17-19, at 5.

69.     None of the victims were harmed physically nor believed they needed mental health counseling as a result of the incident.  See PSR ¶ 17-19, at 5.

70.     On March 28, 1995, S. Eccleston "and another inmate escaped from the Bernalillo County Detention Center by using a homemade rope made from bedsheets."  PSR ¶ 56, at 12.

71.     "They lowered themselves down to the mechanical room."  PSR ¶ 56, at 12.

72.     "Once in the mechanical room area, they had access to tools and propane torches."  PSR ¶ 56, at 12.

73.     "The defendant and co-Defendant got into the north air conditioning ducts that led to the north roof."  PSR ¶ 56, at 12.

74.     "Using the propane torch and hacksaw, S. Eccleston and co-Defendant cut or sawed the outer bars on the north air conditioner outlet and escaped."  PSR ¶ 56, at 12.

75.     S. Eccleston was eventually arrested in Norwich, New York, and extradited to New Mexico on August 1, 1995.  See PSR ¶ 56, at 12.

76.     S. Eccleston's charge for escape from jail was dismissed pursuant to his State Plea Agreement.  See PSR ¶ 56, at 12.

77.     S. Eccleston "accept[ed] responsibility for the offenses of conviction."  PSR ¶ 23, at 6.

78.     When S. Eccleston signed his Federal Plea Agreement and State Plea Agreement regarding the aforementioned offenses, he believed reasonably that his federal and state sentences would run concurrently based on advice from his lawyer and the State Plea Agreement's text.  See

State Plea Agreement at 1; PSR ¶ 51, at 10; Federal Sentencing Tr. at 14:1-4 (Hansen, J.), State Sentencing Tr. at 6:24-7:1 (Storment); State J&C at 2; S. Eccleston Aff. ¶ 8, at 2; Letter from Reginald J. Storment at 3 (dated March 1, 2021), filed March 3, 2021 (Doc. 343)("Storment Letter"); Tr. at 36:5-14 (S. Eccleston).

79.     S. Eccleston tried to commit suicide after he was charged with murder in the State case, and, as a result "has a four-inch scar on his left wrist." PSR ¶ 64, at 14.

**2.     Carjacking in New Mexico.**

80.     In Albuquerque in 2016, there were 1,957 instances of robbery and 7,710 auto-thefts. See Uniform Crime Reports, City of Albuquerque, https://www.cabq.gov/police/public-reports/annual-reports/uniform-crime-reports (last visited April 23, 2021).

81.     In Albuquerque, the number of robberies ranged between 940 and 1957 from 2008 to 2016, while the number of automobile thefts ranged from 2,743 to 7,710 from 2008 to 2016. See Uniform Crime Reports, City of Albuquerque, https://www.cabq.gov/police/public-reports/annual-reports/uniform-crime-reports (last visited April 23, 2021).

82.     In 2019, Albuquerque was ranked second in the nation for carjackings, and in 2018 Albuquerque was ranked first. See 2019 Hot Spots Vehicle Theft Report, National Insurance Crime Bureau, https://www.nicb.org/media/2083/download (last visited May 21, 2021).

83.     In 2019, Albuquerque's vehicle theft rate was 697.05 per 100,000. See 2019 Hot Spots Vehicle Theft Report, National Insurance Crime Bureau, https://www.nicb.org/news/news-releases/2019-hot-spots-vehicle-theft-report (last visited May 21, 2021).

**3.     S. Eccleston's Health and COVID-19.**

84.     Currently, S. Eccleston is a "mostly healthy 45-year-old." Second Amended Motion at 28.

85.     S. Eccleston has asthma, and he has contracted bronchitis and pneumonia in the past.  <u>See</u> Motion at 2; Second Response at 16.

86.     S. Eccleston has hepatitis C.  <u>See</u> Motion at 3.

87.     S. Eccleston has hypertension, also known as high blood pressure.  <u>See</u> Second Response at 13.

88.     One in every three adults has high blood pressure, and S. Eccleston "does not require any medication to regulate his blood pressure."  Second Response at 13.  <u>See</u> Sebastian S. Eccleston's Sealed Supplement to Motion for Reduced Sentence Pursuant to the First Step Act and 18 U.S.C. § 3582 at 23, filed March 3, 2021 (Doc. 342)("Medical Records Supplement")(noting that S. Eccleston's hypertension is treated with "diet, exercise," and weight "loss").

89.     The BOP manages S. Eccleston's health conditions well.  <u>See</u> Second Response at 12, 17; Medical Records Supplement at 1-31.

90.     During the COVID-19 pandemic, the BOP has implemented "modified operations to maximize social distancing as much as practicable."  Second Response at 3.

91.     There has been a high volume of COVID-19 cases in BOP facilities.  <u>See</u> Reply at 2.

92.     In the United States, almost ten percent of the population to date has contracted COVID-19.   <u>See</u>  <u>COVID Data Tracker</u>, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#global-counts-rates (last visited May 20, 2021)(noting that, as of May 20, 2021, there have been 32,825,625 COVID-19 cases in the United States).

93.     S. Eccleston contracted COVID-19 while in BOP custody.  <u>See</u> Reply at 4; Medical Records Supplement at 24.

94.     S. Eccleston continues to suffer from long haul COVID-19 symptoms.[6]  See Reply at 5.

95.     FCI Fort Dix, where S. Eccleston is incarcerated currently, has 2,848 total inmates, and 1,485 inmates -- more than half of the total inmate population -- have been vaccinated fully against COVID-19.     See   COVID-19: Coronavirus,   Federal   Bureau   of   Prisons, https://www.bop.gov/coronavirus/ (last visited June 4, 2021); FCI Fort Dix, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/ftd/ (last visited June 4, 2021).

96.     At Fort Dix, 1,968 inmates have tested positive for COVID-19.  See COVID-19: Coronavirus, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 4, 2021).

97.     S. Eccleston will not contract COVID-19 again while incarcerated, because he has contracted COVID-19 already and the vaccine is becoming increasingly available.  See COVID-19: Coronavirus, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last June 4, 2021); FCI Fort Dix, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/ftd/ (last visited May 20, 2021).

98.     Persons with moderate to severe asthma and pulmonary hypertension "can [be] . . . more likely to get severely ill from COVID-19."  Centers for Disease Control and Prevention                       (May                       13,                       2021),

---

[6]Long-haul COVID-19 symptoms include "mood disorders, fatigue, and perceived cognitive impairment resulted in severe negative impacts on resumption of functional and occupational activities in patients experiencing prolonged effects."  Greg Vanichkachorn et al., Post COVID-19 Syndrome (Long Haul Syndrome): Description of a Multidisciplinary Clinic at the Mayo Clinic and Characteristics of the Initial Patient Cohort, Mayo Clinic Proceedings (May 11, 2021), available at https://www.mayoclinicproceedings.org/article/S0025-6196(21)00356-6/fulltext.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

99.     Even if S. Eccleston contracts COVID-19 again, the Court finds by a preponderance of the evidence that S. Eccleston does not have any medical conditions that make him more likely to become severely ill if he contracts COVID-19 again -- his medical records do not classify his asthma as moderate to severe, and they do not classify his hypertension as pulmonary.  See Medical Records Supplement at 1-31; People with Certain Medical Conditions, Centers for Disease Control and Prevention (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

100.    If S. Eccleston contracts COVID-19 again, he will not become severely ill.  See Medical Records Supplement at 1-31; People with Certain Medical Conditions, Centers for Disease Control and Prevention (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; Reinfection with COVID-19, Centers for Disease Control and Prevention (Oct. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html [https://perma.cc/W54E-WTZ3] (noting that, although "cases of reinfection with COVID-19 have been reported," they "remain rare").

**3.      S. Eccleston's Time in Prison.**

101.    S. Eccleston entered prison with a tenth-grade education.  See PSR at 1 (no paragraph numbering); PSR ¶ 75, at 16.

102.    In prison, S. Eccleston completed his high school diploma, see New Mexico State Board of Education Diploma at 14 (dated March 8, 1996), filed December 14, 2020 (Doc. 335),

and received an Associate of Theology degree from Titus Baptist Seminary, see Titus Baptist Seminary Diploma at 13 (dated June 3, 2017), filed December 14, 2020 (Doc. 335).  See also Amended Motion at 5 (stating that S. Eccleston "accomplished a college degree" while in prison).

103.    S. Eccleston finished the BOP's Nonresidential Drug Abuse Program.  See Marcus R. Betts Letter at 1 (dated May 27, 2020), filed Feb 10, 2021 (Doc. 339-5)("Betts Letter").

104.    While in drug treatment, S. Eccleston "was active in all treatment groups disclosing about his substance abuse and criminal history."  Betts Letter at 1.

105.    S. Eccleston "was very candid regarding the negative impact his substance use and criminal activity has had on him, his family, and society as a whole."  Betts Letter at 1.

106.    S. Eccleston "often expressed remorse for these things and developed several plans of action to continue to maintain his sobriety while incarcerated and sustain it upon his release." Betts Letter at 1.

107.    S. Eccleston also "served in a mentor like capacity for the other participants providing them with supportive constructive feedback."  Betts Letter at 1.

108.    "He helped to create a positive uplifting atmosphere encouraging healthy choices and decisions."  Betts Letter at 1.

109.    S. Eccleston "has demonstrated cognitive and behavioral changes in line with offenders who have successfully reentered society as productive citizens."  Betts Letter at 1.

110.    S. Eccleston's counselor with the BOP recommends S. Eccleston's release "based on his rehabilitative progress."  Betts Letter at 1.

111.    S. Eccleston has taken courses through the BOP to prepare himself for reentry into society, including: (i) a mock job fair; (ii) a job fair preparation course; (iii) a release procedures course; (iv) an employment skills course; (v) a substance relapse prevention course; (vi) a victim

impact counseling program; (vii) a job preparation workshop; (viii) a drug relapse workshop; (ix) anger management; (x) stress management; and (xi) a parenting program. See Inmate Needs Plan at 16 (dated July 17, 2020), filed December 14, 2020 (Doc. 335)("Inmate Needs Plan").

112.    S. Eccleston has taken educational and vocational classes from the BOP including coursework in history, Spanish, and commercial wiring. See Inmate Needs Plan at 16.

113.    S. Eccleston has involved himself with programming from the American Friends Service Committee ("AFSC") Prison Watch,[7] see Letter from Bonnie Kerness at 5 (dated July 31, 2020), filed February 10, 2021 (Doc. 339-5)("Kerness Letter"), and Fair Shake,[8] Sue Kastensen Letter at 4 (dated Aug. 19, 2020), filed February 10, 2021 (Doc. 339-5)("Kastensen Letter")

114.    S. Eccleston worked for years with a writing coach outside of prison to improve his writing abilities. See Letter from Dave Trottier at 6 (dated July 30, 2020), filed February 10, 2021 (Doc. 339-5)("Trottier Letter").

115.    S. Eccleston has been incarcerated in "ten different prisons in five different states."

---

[7]The AFSC is "a Quaker organization that promotes lasting peace with justice, as a practical expression of faith in action." About Us, AFSC, https://www.afsc.org/about-us (last visited June 2, 2021). Within the AFSC, the Prison Watch "empowers individuals harmed by criminal justice policies and violence to heal and transform the conditions under which they live. We recognize and advance the worth and dignity of all people in and around the criminal justice system." Prison Watch, AFSC, https://www.afsc.org/new-jersey-prison-watch (last visited April 27, 2021). Kerness is listed as the Prison Watch's primary contact. See Prison Watch, AFSC, https://www.afsc.org/new-jersey-prison-watch (last visited June 2, 2021).

[8]Kastensen is Fair Shake's president. See About Us, Fair Shake, https://www.fairshake.net/about-fair-shake/about-us/ (last visited April 27, 2021)("Fair Shake About Us"). Fair Shake is "dedicated to supporting the successful reintegration of formerly incarcerated people into society." Fair Shake About Us. Its "Mission" is to increase "increasing reentry success through personal and community focused ownership and engagement opportunities for currently and formerly incarcerated individuals in connection with families, employers, property managers, corrections and communities." Fair Shake About Us.

Amended Motion at 4-5.

116.    S. Eccleston has no prison disciplinary history.  <u>See</u> Motion at 3; Amended Motion at 5; Betts Letter at 1.

117.    S. Eccleston is located in a low security facility.  <u>See</u> Tr. at 28:4-17 (McConnell).  <u>See</u> <u>FCI Fort Dix</u>, Bureau of Prisons, https://www.bop.gov/locations/institutions/ftd/ (last visited June 4, 2021)(stating that FCI Fort Dix is "[a] low security federal correctional institution with an adjacent minimum security satellite camp"),

118.    S. Eccleston has paid restitution to the carjacking's victims.  <u>See</u> Tr. at 32:18-20 (McConnell).

119.    S. Eccleston has begun, and will soon complete, his certification as a dental assistant.  <u>See</u> Tr. at 35:14-17 (S. Eccleston); Second Response at 3.

**4.      <u>S. Eccleston's Future if Released.</u>**

120.    S. Eccleston will remain involved in church and go to mental health counseling if released.  <u>See</u> Tr. at 37:1-16 (S. Eccleston).

121.    S. Eccleston will reside with his seventy-year-old father, G. Eccleston.  <u>See</u> Amended Motion at 7; Tr. at 35:15-36:4 (S. Eccleston).

122.    G. Eccleston lives on a seventy-acre farm in upstate New York.  <u>See</u> Addendum Pursuant to 18 U.S.C. § 3582(c)(1)(A) and CARES Act at 3, filed June 22, 2020 (Doc. 313)("Third Supp.").

123.    S. Eccleston "would have full medical coverage with this father . . . ."  Third Supp. at 3.

124.    S. Eccleston will work as a dental hygienist if released.  <u>See</u> Amended Motion at 7.

125.    S. Eccleston will not reoffend if released.  <u>See</u> Tr. at 28:4-17 (McConnell).[9]

126.    The USPO approved S. Eccleston's Release Plan.  <u>See</u> Second Amended Motion at 28-29.

## PROCEDURAL BACKGROUND

A federal Grand Jury issued a ten-count Second Superseding Indictment on July 6, 1995.

---

[9]The United States argues that S. Eccleston is a danger to society.  <u>See</u> First Response at 5-6.  The Court agrees that he was, but, having evaluated relevant U.S.S.G. statistics, concludes by a preponderance of the evidence that S. Eccleston will not reoffend.  In a recent study, the Sentencing Commission explained that offenders who had served sentences longer than 120 months were thirty to forty-five percent less likely to recidivate than offenders who had served shorter prison terms.  <u>See</u> <u>Length of Incarceration and Recidivism</u> at 30, United States Sentencing Commission (April 2020).  S. Eccleston has served already over 300 months in prison.  In addition, when studying age and recidivism, the Sentencing Commission concludes that "[a]ge exerted a strong influence on recidivism across all sentence length categories.  Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed."  United States Sentencing Commission, <u>The Effects of Aging on Recidivism Among Federal Offenders</u> at 3, (Dec. 2017)("<u>Aging and Recidivism</u>").  Moreover, "[i]n general, the Commission found that total adult arrests for federal offenders were highest in the 20-24 age group, and declined sharply thereafter."  <u>Aging and Recidivism</u> at 11.  Offenders between forty and forty-nine, like S. Eccleston, years old had an average of 43.2% recidivism rate.  <u>Aging and Recidivism</u> at 22.  Offenders between forty and forty-nine who, like S. Eccleston, had completed college had an average 21.2% recidivism rate.  <u>See</u> <u>Aging and Recidivism</u> at 22.  Five years after release, 32.5% of offenders over forty years old had been rearrested.  <u>See</u> <u>Aging and Recidivism</u> at 27.  Additionally, according to the National Institute of Justice, "the prevalence of offending tends to increase from late childhood, peak in the teenage years (from 15 to 19) and then decline in the early 20s."  <u>From Juvenile Delinquency to Young Adult Offending</u>, National Institute of Justice (March 10, 2014), https://nij.ojp.gov/topics/articles/juvenile-delinquency-young-adult-offending.  S. Eccleston's primary offenses occurred when he was eighteen.  <u>See</u> PSR ¶ 10, at 5.  Moreover, "[s]ection 924(c) offenders," like S. Eccleston, "generally recidivated less frequently, for less serious crimes, and after a longer crime-free period than other firearms offenders."  United States Sentencing Commission, <u>Recidivism Among Federal Firearm Offenders</u> at 2, (June 27, 2019)("<u>Firearm Offender Recidivism</u>").  The aforementioned factors all weigh in favor of the Court's finding, by a preponderance of the evidence, that S. Eccleston will not reoffend.

See Second Superseding Indictment at 1, filed July 7, 1995 (Doc. 34)("Indictment").   The

Indictment charges S. Eccleston with: (i) carjacking in violation of 18 U.S.C. § 2119(1), and aiding

and abetting carjacking in violation of 18 U.S.C. § 2; (ii) three counts of using and carrying a

firearm during the carjacking in violation of 18 U.S.C. § 924(c); (iii) five counts of interference

with commerce by threats of violence against Boyle in violation of 18 U.S.C. 1951(a), and aiding

and abetting the interference in violation of 18 U.S.C. § 2; and (iv) against Martinez only,

possession of an unregistered firearm in violation of  26 U.S.C. §§ 5861(d) and 5485(a)(2).  See

PSR ¶ 3, at 2.  On May 3, 1996, S. Eccleston pled guilty to four counts: (i) carjacking in violation

of 18 U.S.C. § 2119(1), and aiding and abetting in violation of 18 U.S.C. § 2; (ii) "us[ing] and

carry[ing] a firearm . . . during and in relation to a crime of violence," carjacking, in violation of

18 U.S.C. §§ 924(c) and 2119(1), and aiding and abetting in violation of 18 U.S.C. § 2;

(iii) "obstruct[ing], delay[ing] and affect[ing], and attempt[ing] and conspir[ing] to obstruct, delay

and affect commerce . . . by robbery . . . in that [S. Eccleston] did unlawfully take and obtain

personal property" from Kuepers "by means of actual and threatened violence, and fear of injury,

in violation of 18 U.S.C. 1951(a) and aiding and abetting in violation of 18 U.S.C. 2"; and

(iv) "us[ing[ and carry[ing] a firearm . . . during and in relation to a crime of violence," in violation

of 18 U.S.C. §§ 1951(a) and 924(c) and aiding and abetting in violation of 18 U.S.C. § 2.   Plea

Agreement ¶ 7, at 4-5, filed May 3, 1996 (Cr. Doc. 70).  See PSR ¶ 3, at 2.  On December 21,

1994, S. Eccleston was arrested for "first degree murder" and "conspiracy to commit first degree

murder."  PSR ¶ 51, at 10.

### 1.    The Plea Agreements.

S. Eccleston signed his State Plea Agreement and his federal Plea Agreement on the same

day.  It is unclear which agreement he signed first.  S. Eccleston's State Plea Agreement addressed

his murder charges, and his federal Plea Agreement addressed his carjacking charges.

        a.      **The State Plea Agreement**.

On May 3, 1996, S. Eccleston signed a Plea Agreement in State court.  See Plea and Disposition Agreement (dated May 3, 1996), filed May 24, 2021 (Doc. 360)("State Plea Agreement").  S. Eccleston pled guilty to "first degree murder (depraved mind)" and "conspiracy to commit first degree murder (depraved mind)."  State Plea Agreement at 1.  S. Eccleston made the agreement "according to the . . . condition[]" that the "State agrees that the defendant's term of imprisonment shall run concurrently with any other terms of imprisonment he receives as a result of the presently pending charges in Federal Court."  State Plea Agreement at 1.  Under the agreement, S. Eccleston agreed to serve "life and may receive an additional period of incarceration of up to nine years."  State Plea Agreement at 2.

        b.      **The Federal Plea Agreement**.

S. Eccleston signed the federal Plea Agreement on the same day that he signed the State Plea Agreement.  See Plea Agreement (dated May 3, 1996), filed May 24, 2021 (Doc. 70)("Federal Plea Agreement").  S. Eccleston agreed "to plead guilty to Counts I, II, V and VI of a ten-count Second Superseding Indictment."  Federal Plea Agreement ¶ 3, at 2.  The Federal Plea Agreement agreed that S. Eccleston is entitled to a 3-level reduction for acceptance of responsibility.  See Federal Plea Agreement at 5-6.  The agreement further states that it is "limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities."  Federal Plea Agreement ¶ 7(e), at 7.

        2.      **The Federal Plea Hearing**.

On May 3, 1996, the Honorable LeRoy Hansen, then-United States District Judge for the United States District Court for the District of New Mexico, accepted S. Eccleston's Plea

Agreement.  See Transcript of Proceedings at 1:1 (taken May 3, 1996), filed September 29, 1996

(Doc. 279)("Federal Plea Tr.").  After ensuring that S. Eccleston reviewed and understood the Plea

Agreement, Judge Hansen stated:

> [T]he government has an obligation to prove . . . that on or about December
> 15th, 1994, in Albuquerque, . . . New Mexico, that you . . . did unlawfully, in Count
> V, obstruct, delay, and affect and attempt and conspire to delay, and affect
> commerce as that term is defined in 18 U.S. Code, Section 1951, and the movement
> of articles and commodities in such commerce by robbery, as that term is defined
> therein that you did unlawfully take and obtain personal property consisting of
> jewelry, personal checks, a purse, a wallet, a camera, and credit cards from the
> person and in the presence of Karen Kuepers against her will by means of actual
> and threatened force, violence, and fear of injury, immediate and future, to her
> person and a person in her company, that is, the threat that if Karen Kuepers did
> not give defendant property, you were going to injure or kill her and David
> Henkemeyer, and in Count VI that you did use and carry a firearm made from a
> Remington Shotgun . . . , which weapon as modified has a barrel of less than 18
> inches in length, during and in relation to a crime of violence for which you may
> be prosecuted in a court of the United States, namely, the charge in Count V that I
> have reviewed with you.

Federal Plea Tr. at 10:10-11:20 (Hansen, J.).  S. Eccleston responded that, after the carjacking, the

car did not have any gas, so he

> went to another motel, and that's where I got out with a pistol and held up a lady
> and a guy and asked them for the guy's wallet and the lady's purse and -- but I
> didn't have a Remington shotgun in my possession as it says here.  I had a pistol,
> an automatic pistol.  And that's what happened.  That's what I'm pleading to.

Federal Plea Tr. at 12:10-15 (S. Eccleston).  Judge Hansen then asked S. Eccleston if he "did take,

then, the personal property from the two people at the second motel?"  Federal Plea Tr. at 13:19-

20 (Hansen, J.).   S. Eccleston responded affirmatively.   See Federal Plea Tr. at 13:22 (S.

Eccleston).

Judge Hansen then asked the United States what it would prove at trial.  See Federal Plea

Tr. at 14:3 (Hansen, J.).  The United States responded that it could prove at trial that, about a half-

hour after the carjacking,

> two Oregon residents, . . . Kuepers and . . . Henkemeyer, were robbed at gun point
> in the parking lot of another motel.  Ms. Kuepers had an individual identified as
> Mr. Martinez, Mr. S. Eccleston's co-defendant, come up to her, point a sawed-off
> shotgun at her, chamber a[ ]round once again and take her purse, telling her to give
> him her purse.  The second individual, who, in this case, was positively identified
> as Mr. S. Eccleston, went up to Ms. Kuepers' companion, Mr. Henkemeyer, took
> his wallet at gunpoint at the same time that his companion and co-defendant,
> Mr. Martinez, got back into the white rental car and drove off.

Federal Plea Tr. at 14:24-15:11 (Kimball).  The United States continued: "For all of these reasons,

the United States contends that we could prove that Mr. S. Eccleston either committed or aided

and abetted in the commission of these crimes within the meaning of Section 2 of Title 18, United

States Code."  Federal Plea Tr. at 16:15-19 (Kimball).  S. Eccleston agreed with the United States'

characterization of the offenses.  See Federal Plea Tr. at 16:20-22 (Hansen, J; S. Eccleston).  S.

Eccleston then pled guilty to Counts I, II, V, and VI.  See Federal Plea Tr. at 16:23-25 (Hansen,

J.; S. Eccleston).  Judge Hansen accepted S. Eccleston's guilty plea.  See Federal Plea Tr. at 17:9

(Hansen, J.).

### 3.    The PSR.

The United States Probation Office ("USPO") calculated S. Eccleston's base offense level

as 23 and his criminal history category as III, resulting in a United States Sentencing Guidelines

Manual ("U.S.S.G." or "Guidelines") imprisonment range of 57 to 71 months.   See PSR ¶ 85, at

18.  Regarding Count II, there was a mandatory 120-month consecutive sentence, and, as to Count

VI, there was a mandatory 240-month consecutive sentence, because Count V is S. Eccleston's

second or successive conviction for using a firearm during a crime of violence.  See PSR ¶ 88,

at 19.

### 4.    The Federal Sentencing.

On October 29, 1996, at 11:03 a.m., Judge Hansen sentenced S. Eccleston.  See Transcript

of Proceedings at 3:2 (taken October 29, 1996)(Hansen, J.), filed February 5, 1997 (Doc.

267)("Federal Sentencing Tr."). S. Eccleston's counsel, Mr. Reginald Storment, acknowledged, "that, . . . given the state of the case law, this Court can[not] do anything other than what was recommended in the presentence report as to the 924(c) counts." Federal Sentencing Tr. at 7:3-6 (Storment). The United States responded that Martinez' racking and brandishing the shotgun at Boyle "fits exactly the talk about brandishing or using a firearm that is in the <u>Bailey</u> decision." Federal Sentencing Tr. at 7:5-7 (Kimball). The United States further asserted that, "while [Martinez] was holding a gun on these people, [S. Eccleston] was aiding and abetting his action, first in carjacking the car from Mr. Boyle, and second, in stealing the belongings of the two tourists[.]" Federal Sentencing Tr. at 7:6-9 (Kimball). The United States thus argued that, "even after <u>Bailey</u>, when you're talking about using a firearm, you're still subject to the penalties of 924(c) if you aid and abet somebody who used a firearm and you knew it." Federal Sentencing Tr. at 8:16-19 (Kimball). The United States asserted that S. Eccleston admitted to knowing about the firearms, thus satisfying the United States' asserted knowledge test for aiding and abetting. <u>See</u> Federal Sentencing Tr. at 8:22-24 (Kimball).

> S. Eccleston then addressed Judge Hansen:

> I realize, as my lawyer said, you know, I had a -- I am very remorseful for the pain and the suffering that I put the victims of these crimes through. And, you know, I have to accept the consequences for the crimes, you know, that I have committed and, you know, I will accept them gracefully, Your Honor, you know. And, you know, I want to apologize, you know. I know the victims aren't here I'm not sure if they are or not. I'm deeply sorry for you know, for my actions and . . . I hope maybe, you know, my . . . example will show other people or other kids or teenagers, you know, that, you know, crime and drugs, all that, is just the wrong way to go, you know.

Federal Sentencing Tr. at 12:11-24 (S. Eccleston).

> Judge Hansen then accepted the PSR's factual findings and concluded that, as to Counts I and V, the Guidelines imprisonment range is 57 to 71 months, and that mandatory sentences of

120 months and 240 months applied to Counts II and VI, respectively.  <u>See</u> Federal Sentencing Tr. at 13:6-9 (Hansen, J.).  Judge Hansen applied these latter sentences to run consecutively to each other and to the Counts I and V sentences.  <u>See</u> Federal Sentencing Tr. at 13:9-11 (Hansen, J.). Judge Hansen then sentenced S. Eccleston to 417 months imprisonment.  <u>See</u> Federal Sentencing Tr. at 14:4-5 (Hansen, J.).

5. **The State Sentencing Hearing.**

Later that same day, on October 29, 1996, at 1:35 p.m., the Honorable Frank H. Allen, Judge of the Second Judicial District, State of New Mexico, sentenced S. Eccleston.  <u>See</u> Transcript of Hearing at 2:2 (Allen, J.)(taken Oct. 29, 1996), filed May 25, 2021 (Doc. 364)("State Sentencing Tr.").    Mr. Storment  informed  State  Judge  Allen  that  S.  Eccleston  "this  morning  was sentenced . . . in federal court to a term of approximately 34 years."  State Sentencing Tr. at 5:16-24 (Storment).  Mr. Storment noted that S. Eccleston was remorseful for his crime, and that "part of the plea agreement was that the sentence in this case be run concurrently to the federal time." State Sentencing Tr. at 6:23-7:1 (Storment).  Mr. Storment asked State Judge Allen to give S. Eccleston "the opportunity to get out at some reasonable point in time, have some light at the end of the tunnel . . . ."  State Sentencing Tr. at 7:13-23 (Storment).  S. Eccleston then addressed personally the victim's family and friends:

> I deeply regret my actions for what I've done.  Lord knows that I never meant to harm anyone that evening. It was just -- I never meant to hurt Ricky.  I never meant to shoot him.  I never meant to hurt him.  And I want all of you to know that, that it was an accident, and that -- I mean, I'm not the monster that people make me out to be.  I'm not a heartless killer, you know.  You know, it was an accident, man. Every night, you know, I'm sorry for your pain and I feel for all of you, you know. I have a heart.  I feel for all of you . . .  I mean, I don't think saying sorry is enough for anything.

State Sentencing Tr. at 8:5-24 (S. Eccleston).  State Judge Allen then told S. Eccleston: "I think of

you as being a coward, a monster -- as you indicated -- and a liar for saying that you didn't mean

to hurt anybody or didn't want to hurt anybody."  State Sentencing Tr. at 9:13-16 (Allen, J.).  After

a short dialogue with S. Eccleston, State Judge Allen stated the sentence:

> It will be the judgment and sentence of the Court that you be sentenced to the
> department of corrections as to -- for first degree murder, depraved mind murder,
> life imprisonment; and for conspiracy to commit depraved mind murder, nine years.
> They'll run consecutive to each other for a total of nine years -- for a total of life
> plus nine years.  And your sentence will run concurrent with that which you're
> serving in the federal penitentiary.

State Sentencing Tr. at 10:5-13 (Allen, J.).

### 6.       The State Judgment, Sentence and Commitment.

On November 7, 1996, S. Eccleston's State Judgment, Sentence and Commitment was filed

in State court.  See Judgment, Sentence and Commitment (dated Nov. 7, 1996), filed May 24, 2021

(Doc. 361)("State J&C").  The State J&C indicates that S. Eccleston:

> is sentenced to the custody of the Corrections Department to be imprisoned for the
> term of LIFE IMPRISONMENT as to the alternative to Count 1 and nine (9) years
> as to the alternative to Count 2 to run consecutive to one another and concurrent
> with Federal Prison Sentence defendant is now serving.

State J&C at 2 (capitals in original).  State Judge Allen signed the State J&C.  See State J&C at 2.

### 7.       The State Habeas Order.

State Judge Allen granted in part and denied in part S. Eccleston's 1999 petition for habeas

corpus.  See Order Re: Petition for Habeas Corpus at 1 (dated Sept. 17, 1999), filed May 24, 2021

(Doc. 362)("State Habeas Order").   State Judge Allen explains that S. Eccleston "pled to

Conspiracy to Commit First Degree Murder (Depraved Mind) which is a nonexistent crime."  State

Habeas Order at 1.  Accordingly, State Judge Allen amended the State J&C "to delete this charge

and indicate that he should serve a life sentence for his plea and conviction of First-Degree Murder

(Depraved Mind)."   State Habeas Order at 1.  See Stipulated Order to Amended Judgment and

Sentence (dated Nov. 4, 1999), filed May 24, 2021 (Doc. 363)("As per order of District Court Judge Frank H. Allen . . . the Conspiracy to Commit First Degree Murder (Depraved Mind) charge shall be deleted.").

### 8.     The State Reduction in Sentence.

On January 25, 2011, S. Eccleston returned "to State of New Mexico 2nd Judicial District Courthouse and plead to Second-degree murder and sentenced to 16 years." <u>See</u> Affidavit of Sebastian S. Eccleston ¶ 7, at 1 (dated June 3, 2019), filed February 5, 2021 (Doc. 339-2)("S. Eccleston Aff."). <u>See</u> Register of Actions in State of New Mexico v. S. Eccleston Sebastian at 2, filed February 10, 2021 (Doc. 339-1)("State Court Docket")(stating that, on January 25, 2011, S. Eccleston plead guilty to murder in the second degree). S. Eccleston was then "taken into custody by the U.S. Marshals Service on January 27, 2011 and delivered to the federal Bureau of Prisons." S. Eccleston Aff. ¶ 7, at 1-2. S. Eccleston's plea to second-degree murder replaced his first-degree murder plea for his 1994 offense. <u>See</u> State Court Docket at 1-3.

### 9.     The Motion.

In his first compassionate release Motion, S. Eccleston asks the Court "grant his motion and release the defendant to home confinement . . . ." Motion at 1. S. Eccleston seeks compassionate release "due to the current pandemic COVID-19." Motion at 2. S. Eccleston notes that he "has a long history of resp[ir]atory conditions i.e. pneumonia, bronchitis and asthma." Motion at 2. S. Eccleston also asserts that, in 2017, he "was placed in an isolation cell to be quarantined when he developed pneumonia and had to be treated with antibiotics." Motion at 2. S. Eccleston then states that he "has hepatitis C and his immune system is compromised." Motion at 3. S. Eccleston avers that he "has no disciplinary history in prison and poses no threat or risk to the community." Motion at 3. S. Eccleston also includes a copy of his request for medical records.

See Motion at 4.

**10.    The First Supplement.**

S. Eccleston supplemented the Motion on April 27, 2020.  See Addendum to Petitioner's Motion for Compassionate Release Under 18 U.S.C. 3582 and the Cares Act (dated April 22, 2020), filed April 27, 2020 (Doc. 309)("First Supp.").  S. Eccleston attaches his request to the prison's Assistant Warden, dated April 21, 2020.  See First Supp. at 2.  In the request, S. Eccleston states that he is "requesting review under the CARES Act due that I am a chronic care inmate." First Supp. at 2.  The Inmate Request indicates that it was "denied by Ms. Smith C.M. 4-21-20 3:30 p.m."  First Supp. at 2.

**11.    The First Response.**

The United States responds to the Motion.  See United States' Response to Defendant's Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3852(c)(1)(A), filed April 29, 2020 (Doc. 310)("First Response").   The United States explains that it is skeptical of S. Eccleston's Motion, because it "is speculative in nature and does not allege that he is currently suffering from any symptoms."  First Response at 5.  The United States continues that it is unsure whether S. Eccleston has exhausted his administrative remedies.  See First Response at 5.  The United States then argues that, even if S. Eccleston has exhausted his administrative remedies, he should not be released because he is a danger to the community.  See First Response at 5-6.

**12.    The Second Supplement.**

S. Eccleston again supplements the Motion.  See Letter from Sebastian S. Eccleston at 1 (dated May 22, 2020), filed June 4, 2020 (Doc. 312)("Second Supp.").  S. Eccleston states that his life is in danger, because "the Administration here at Fort Dix FCI moved 34 inmates from one quarantined unit" to another "without testing these inmates for COVID-19."  Second Supp. at 1.

S. Eccleston states "[i]f an outbreak occurs it is the same as subjecting me to the death penalty with my pre-existing conditions."  Second Supp. at 1.  S. Eccleston attaches an inmate complaint form further describing the situation, as well as a request for medical records S. Eccleston filed with the BOP.  See Second Supp. at 1.  S. Eccleston writes that he did not receive a response to his medical records request, noting that "I am being told only attorneys can obtain medical records."  Second Supp. at 3.

### 13.    **The Third Supplement.**

S. Eccleston again supplements the Motion.  See Third Supp. at 1.  S. Eccleston submits "medical records documenting Petitioner's history of pneumonia, hepatitis C and secondary resp[ir]atory infections and chest X-rays."  Third Supp. at 1.  S. Eccleston asks to be "released to . . . live with his father, retired U.S.A.F. Chief Master Sgt. Gregory S. Eccleston, who has 70 acres of land in upstate New York.  Petitioner would have full medical coverage with his father and also work for his father who lives alone on the property."  Third Supp. at 3.

### 14.    **The Amended Motion.**

S. Eccleston amended his Motion.  See Amended Motion at 1.  S. Eccleston asks the Court to "reduce his sentence from 417 months to 297 months and also consider allowing the defendant to serve out the remainder of his sentence on supervised release based on his pending 18 U.S.C. 3582 (C)(1)(A) motion under the CARES ACT."  Amended Motion at 1.  S. Eccleston argues that, of the four "extraordinary and compelling reasons to reduce a sentence" that the Sentencing Commission identifies, he qualifies for the fourth category.  Amended Motion at 1-2.  S. Eccleston argues that he was "a first-time offender charged with aiding and abetting the principal," but that his sentence "was enhanced under 18 U.S.C. 924(c)(1)(C)'s recidivist clause intended to punish repeat offenders."  Amended Motion at 3.  S. Eccleston asserts that the First Step Act amended

"18 U.S.C Sec. 924(c) to punish true recidivist offenders not subsequent 924(c) offenses that arose from the same prosecution as the first 924(c) conviction."  Amended Motion at 3.  S. Eccleston contends that "it has been almost three decades since these crimes occurred and Mr. S. Eccleston has made extraordinary progress in his rehabilitative efforts despite the mental and, emotional health chall[e]nges he faced and being incarcerated in over ten different prisons in five different States."  Amended Motion at 4-5.  S. Eccleston argues that he "has been a model prisoner" and "accomplished a college degree" during his incarceration.  Amended Motion at 5.  S. Eccleston concludes that he "has come a long way from the troubled and impulsive teenager he was when the crimes for which he is currently incarcerated were committed."  Amended Motion at 6.

S. Eccleston explains that, although counsel assisted S. Eccleston with writing this Motion, counsel "was not granted authorization to file on behalf of Mr. S. Eccleston."  Amended Motion at 6.  S. Eccleston also insists that he has exhausted his administrative remedies.  See Amended Motion at 6.  S. Eccleston states that "[f]ederal probation in New York State have been to Mr. S. Eccleston's father's residence and interviewed him and have approved the Supervised Release Plan if this Court is willing to grant the motion and modify term of imprisonment."  Amended Motion at 6.  If released, S. Eccleston asserts that he plans to become certified and work as a dental assistant.  See Amended Motion at 7.

### 15.    The Second Amended Motion.

S. Eccleston's current counsel, Ms. Alicia McConnell, filed the Second Amended Motion.  See Second Amended Motion at 1.  S. Eccleston "requests that the Court reduce his sentence to time-served and order his release to reside with his father in New York while completing his term of supervised release."  Second Amended Motion at 1.  S. Eccleston then explains his sentence:

Mr. S. Eccleston pleaded under the prior statutory construction of 18 U.S.

Code § 924(c)("924(c)").  At the time of Defendant's plea, 924(c) required a person found to be in the possession of a shotgun in relation to a crime of violence and/or drug trafficking to be sentenced to a mandatory minimum of five (10) years, with each additional 924(c) violation carrying a mandatory minimum of twenty (20) years.  As Mr. S. Eccleston was simultaneously pleading to two separate instances under 924(c)(Counts two and six), he was sentenced to a total of thirty (30) years -- ten (10) years for the first instance, and twenty (20) years for the second instance -- each to be run consecutively to the 57 months he received for Counts one and five.  Thus, his total term of imprisonment amounted to 417 months.  Mr. S. Eccleston's co-defendant in this case, Martinez, received a sentence of 198 months.

Second Amended Motion at 2-3.  S. Eccleston argues that if "he received concurrent credit on both his state and federal sentences as was intended, Mr. S. Eccleston would now have nearly twenty-five years of his federal sentence complete."  Second Amended Motion at 3.

S. Eccleston next summarizes his efforts to exhaust his administrative remedies before filing his Motion:

Mr. S. Eccleston's former counsel submitted a request for compassionate release.  In response, the warden at Fort Dix stated that the request should be resubmitted under a more specific category, and that Mr. S. Eccleston could submit that request.  *See* [Amended Motion] at 21-22.  S. Eccleston did so on July 16 and 21, 2020, and did not receive any response from the warden to his requests.  *See* [Inmate Request to Staff, filed February 5, 2021 (Doc. 338-3)].  Therefore, because 30 days have lapsed since his request to the Warden, this Court has had the authority to decide a compassionate release motion from Mr. S. Eccleston.  18 U.S.C. § 3582(c)(1)(A).

Second Amended Motion at 5.

S. Eccleston contends that the Sentencing Commission's policy statement does not "govern motions by defendants," because "it would eviscerate Congress' intent in the FSA to empower defendants to move for compassionate release just as the BOP can."  Second Amended Motion at 7.  S. Eccleston further insists that Congress, in passing the First Step Act, hoped to "increase the use of compassionate release and to diminish the BOP's outsized role in the process."  Second Amended Motion at 8.  S. Eccleston therefore observes that, "beyond the statutory limitation in 28 U.S.C. § 994(t) that '[r]ehabilitation . . . alone shall not be considered an extraordinary and

compelling reason', 'a district court's discretion in this area -- as in all sentencing matters -- is broad.'"  Amended Motion at 10 (quoting United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020)).

S. Eccleston avers that the following factors are extraordinary and compelling circumstances which support his Motion: (i) his "pre-existing conditions and Covid-19," Amended Motion at 10; (ii) the worsening COVID-19 situation at FCI Fort Dix, where S. Eccleston is housed currently, see Amended Motion at 12; (iii) that S. Eccleston "has endured more than enough punishment -- far greater than what a similar sentence would entail today and in normal times," Amended Motion at 19; (iv) that "if sentenced today, Mr. S. Eccleston would receive a far shorter sentence as a result of the First Step Act's changes to 924(c) stacking," Amended Motion at 19; (v) S. Eccleston's "extraordinary efforts and success at rehabilitation," Amended Motion at 23.

S. Eccleston then contends that he "does not pose a danger and had an appropriate release plan." Amended Motion at 28.  S. Eccleston maintains that he has a definitive plan for his release. See Second Amended Motion at 28.

> When he is released, Mr. S. Eccleston plans to live with his father in upstate New York.  His father is a retired Air Force veteran whom the United States Probation Office has already interviewed.  The Probation Office in the District of New York has visited and inspected his father's home and has approved Mr. S. Eccleston's release plan.  [Email from Nicholas Hart to Carter Harrison, filed October 16, 2020 (Doc. 321-3)]  In response to the recommendations of that office, the New Mexico Probation Office prepared and submitted modifications to Mr. S. Eccleston's conditions of supervised release.  [Amended Motion at 25-26]  Moreover, although Mr. S. Eccleston does not pose any risk of danger, should the Court have any concerns in this respect, any potential issues could be ameliorated by putting Mr. S. Eccleston on home detention with location monitoring.  He will be under the supervision of Probation and would, face a return to custody if he were to fail to comply with any of his conditions.

Second Amended Motion at 28-29.  S. Eccleston continues that his first-degree murder conviction

in state court was later reduced to second-degree murder.[10]  See Second Amended Motion at 29.

S. Eccleston then contends that his previous crimes "'alone do[] not automatically make him a

threat to public safety.  Rather, courts must evaluate these cases holistically.'"  Second Amended

Response at 29 (quoting United States v. Pompey, No. CR 97-0638 RB, 2020 WL 3972735, at *4

(D.N.M. July 14, 2020)(Brack, J.)).  S. Eccleston argues that his lack of disciplinary history in

prison, coupled with his rehabilitative efforts, "demonstrate his commitment to move past that part

of  his life and improve himself for the better."  Second Amended Response at 29-30.  In

---

[10]New Mexico defines first- and second-degree murder as follows:

A.  Murder in the first degree is the killing of one human being by
another without lawful justification or excuse, by any of the means
with which death may be caused:

(1)  by any kind of willful, deliberate and premeditated killing;

(2)  in the commission of or attempt to commit any felony; or

(3)  by any act greatly dangerous to the lives of others, indicating
a depraved mind regardless of human life.

Whoever commits murder in the first degree is guilty of a capital
felony.

B.  Unless he is acting upon sufficient provocation, upon a sudden quarrel or in
the heat of passion, a person who kills another human being without lawful
justification or excuse commits murder in the second degree if in
performing the acts which cause the death he knows that such acts create a
strong probability of death or great bodily harm to that individual or another.

Murder in the second degree is a lesser included offense of the crime of murder in
the first degree.

Whoever commits murder in the second degree is guilty of a second-degree felony
resulting in the death of a human being.

N.M.S.A. § 30-2-1.

conclusion, S. Eccleston asks the Court to release him "to his father's home in New York to begin serving his term of supervised release on any conditions that the Court deems necessary and appropriate."  Second Amended Motion at 30.

### 16.     **The Fourth Supplement.**

S. Eccleston's counsel filed additional medical records.  See Sebastian S. Eccleston's Sealed Supplement to Motion for Reduced Sentence Pursuant to the First Step Act and 18 U.S.C. § 3582, filed March 3, 2021 (Doc. 342)("Fourth Supp.").  The medical records are dated July 7, 2020 through March 1, 2021.  See Fourth Supp. at 3.

### 17.     **The Fifth Supplement.**

S. Eccleston again supplements the Second Amended Motion.  See Sebastian S. Eccleston's Supplement to Motion for Reduced Sentence Pursuant to the First Step Act and 18 U.S.C. § 3852, filed March 3, 2021 (Doc. 343)("Fifth Supp.").  The Fifth Supplement attaches a letter from Mr. Storment, S. Eccleston's counsel "during the time of Mr. S. Eccleston's charges and sentencing . . . ."  Storment Letter at 3.  The letter, from Mr. Storment, states that Mr. Storment represented "to Mr. S. Eccleston during plea negotiations and discussions that it was my understanding and intent that his state and federal sentences would run concurrently."  Storment Letter at 3.

### 18.     **The Second Response.**

The United States asks the Court to deny S. Eccleston's Motion.  See United States' Sealed Response to Defendant's Amended Motion for Compassionate Release at 1, filed March 3, 2021 (Doc. 344)("Second Response").  The United States explains that S. Eccleston's anticipated release date is February 17, 2036, and that "he has served approximately 72%" of his federal prison term.  Second Response at 2.  The United States then contends that S. Eccleston's COVID-19-related

arguments are not extraordinary and compelling.  See Second Response at 2.  The United States

also maintains that S. Eccleston "has an extensive violent criminal history, including committing

a crime of violence by shooting an eighteen-year-old victim from the passenger side of a vehicle,

and committing robbery and carjacking while armed with a gun; consequently he poses a

significant danger to the community."  Second Response at 2.  The United States then explains

that, "in Second Response to the pandemic, BOP has taken significant measures to protect the

health of the inmates in its charge, including implementing modified operations to maximize social

distancing as much as practicable."  Second Response at 3.  The United States insists that S.

Eccleston bears the burden of proof, and must demonstrate that he exhausted his administrative

remedies, and that extraordinary and compelling reasons support his release.  See Second Response

at 8.

Regarding S. Eccleston's health-based arguments, the United States insists that S.

Eccleston "contracted COVID-19, remained asymptomatic, and recovered from the virus."

Second Response at 9.  The United States then describes S. Eccleston's experience with COVID-

19:

> Defendant was asymptomatic during quarantine, then complained of
> symptoms after release from quarantine.  On January 05, 2021, Defendant
> complained of loss of taste and smell, coughing, headache, fever, and shortness of
> breath.  However, medical personnel found that Defendant's vital signs were stable,
> he had no fever, his oxygen saturation was at 97%, and his breath sounded clear
> bilaterally. . . . He was prescribed Tylenol. . . . On February 2, 2021, Defendant
> had no fever, no shortness of breath, no chest pain, no cough, no abdominal pain,
> no chills, no fatigue, and no nausea or vomiting. . . . Moreover, Defendant's pulse
> rate was normal, his blood pressure was normal, and his oxygen saturation was
> 99%.

Second Response at 10-11.  The United States submits that S. Eccleston's medical conditions are

not serious, "are well managed within BOP, and are not a sufficient basis for compassionate

release." Second Response at 12.  Regarding S. Eccleston's high blood pressure, the United States contends that one in every three adults has high blood pressure, and S. Eccleston "does not require any medication to regulate his blood pressure."  Second Response at 13.  The United States next provides a list of cases in which district courts have not concluded that inmates with health conditions similar to S. Eccleston's warranted compassionate release.  See Second Response at 14-16 (collecting cases).  With respect to S. Eccleston's respiratory difficulties, the United States observes that S. Eccleston "attempts to generalize respiratory issues to include pneumonia, which occurred twice in Defendant's past, and bronchitis, which is absent from Defendant's medical records.  The CDC website does not list the aforementioned conditions as conditions that place people in an increased risk category for severe complications from the virus."  Second Response at 16.  In sum, the United States asserts that S. Eccleston's "medical ailments are well-controlled and do not present any impediment to his ability to provide self-care within the institution." Second Response at 17.

The United States then addresses the § 3553(a) factors.  See Second Response at 17-18. The United States contends that S. Eccleston remains a danger to the community.  See Second Response at 17 (citing United States v. Chambliss, 948 F.3d 691, 694 (5th Cir. 2020)).  The United States contends that S. Eccleston "has significant violence in his background."  Second Response at 18.  The United States emphasizes that S. Eccleston's "criminal history is violent and murderous."  Second Response at 18.  The United States further argues that the cases upon which S. Eccleston relies are distinguishable, because "the inmates were suffering from severe medical conditions, had served the vast majority of their sentence, and/or they did not have violent criminal history."  Second Response at 19 (collecting cases).  The United States counters that "numerous judges have denied compassionate release after considering the violence of the defendant."

Second Response at 20. The United States maintains that, although S. Eccleston's "efforts to better himself are commendable, 'rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of' compassionate release.'"  Second Response at 21 (quoting U.S.S.G. § 1B1.13 n.3, and citing United States v. Saldana, 807 F. App'x 816, 820 (10th Cir. 2020)).  The United States avers that S. Eccleston's "arguments ignore the facts justifying his sentence, including his violence, his violent use of firearms, his willingness to steal cars at gunpoint, and his willingness to kill another human."  Second Response at 21.  The United States further states that reducing S. Eccleston's sentence would create a sentencing disparity:

> Defendant argues that he faces a far harsher sentence than other carjackers along with his other three counts. . . . Defendant's argument is simply not accurate. Defendant is a violent offender with a criminal history category of III, and a guideline imprisonment range of 447-468. . . .  This Court granted Defendant a significant sentence reduction from his guideline range when it imposed a sentence of 417 months.[11]  Considering Defendant's extensive violent criminal history, Defendant's 417-month sentence is consistent with his § 3553(a) factors.

Second Response at 23.  Consequently, the United States again asks the Court to deny S. Eccleston's motion for sentence reduction.  See Second Response at 23.

19.     **The Reply**.

S. Eccleston has filed a Reply to the United States' Second Response.  See Sealed Reply in Support of Defendant Sebastian S. Eccleston's Amended and Supplemental Motion for Reduced Sentence Pursuant to the First Step Act and 18 U.S.C. § 3582, filed March 17, 2021 (Doc. 347)("Reply").  S. Eccleston first disputes the United States' contention that the BOP's attempts

---

[11]The United States calculates incorrectly S. Eccleston's sentencing range.  S. Eccleston had a mandatory 120 month sentence as to Count II, a mandatory 240 month sentence as to Count VI, and a Guideline range of 57-71 months as to the remaining counts.  These federal sentences were required to run consecutively.  S. Eccleston's Guideline range, therefore, was 417 (120 + 240 + 57) to 431 (120 + 240 + 71) months.  Accordingly, Judge Hansen's imposed sentence, 417 months, was at the bottom of the Guideline range.

to control COVID-19 have been effective, noting that more than a third of prisoners in the BOP have contracted COVID-19.  See Reply at 1-2.  S. Eccleston also contends that the BOP does not provide "adequate medical treatment to those prisoners who have contracted Covid-19 while in its custody."  Reply at 2.  S. Eccleston observes that the high volume of COVID-19 cases in federal prison "shows that, whatever the BOP's actions have been, they have been insufficient."  Reply at 2.  S. Eccleston insists that the United States' assertion that his COVID-19 was asymptomatic is inaccurate.  See Reply at 4.  S. Eccleston maintains that, instead, he continues to suffer from COVID-19 symptoms.  See Reply at 5.  S. Eccleston then explains that the cases upon which the United States relies are "distinguishable and fail to demonstrate that the Court should deny his request."  Reply at 5.  Moreover, S. Eccleston emphasizes that, "although there may be cases in which courts have denied release to inmates suffering from the same, or similar, health concerns as Mr. S. Eccleston, there are just as many cases in which courts have granted them, even to those who have already tested positive for the virus."  Reply at 5.

S. Eccleston next discusses his sentence.  See Reply at 5.  He insists that the United States states incorrectly that he received a variance when he was sentenced initially.  See Reply at 5.  S. Eccleston explains:

> In Mr. S. Eccleston's PSR, Probation calculated his guideline sentence as 57-71 months as to Counts I and V. . . . Count III carried a mandatory sentence of 120 months, and, at the time of the imposition of Mr. S. Eccleston's sentence and under the prior, now inapplicable, version of 924(c), count IV carried a mandatory sentence of 240 months. . . . The sentences for Counts III and IV were required to be run consecutively to the sentence for Counts I and IV. . . . Thus, Mr. S. Eccleston's total guideline range of imprisonment was 417-431 months (57-71 months, added to 120 months, added to 240 months) . . . . The Court imposed a sentence of 417 months, the low end of the guideline range. . . . Because a sentence at the low-end of the guideline range does not constitute a downward variance, the Government's argument against Mr. S. Eccleston's requested sentence reduction that is based on some variance that he purportedly already received is completely without merit.

Reply at 6.[12]   S. Eccleston indicates that he was sentenced before United States v. Booker, 543

U.S. 220 (2005)("Booker"), and that the Sentencing Guidelines therefore bound Judge Hansen at

that time.  See Reply at 6.  S. Eccleston also explains that § 924(c) no longer imposes a mandatory

240-month "consecutive sentence for cases such as his."  Reply at 6.  S. Eccleston emphasizes that

his federal co-Defendant Martinez' sentence was 200 months less than his sentence, although his

co-Defendant had "higher criminal history, being the principal in the crimes alleged, and also being

charged as a felon in possession in addition to the charges that Mr. S. Eccleston faced."  Reply at

6.  S. Eccleston further alleges that he accepted his plea agreement's terms, because he believed

that his federal sentence would run concurrently with his state sentence.  See Reply at 6-7.

S. Eccleston also states that he does not rely solely on his rehabilitative efforts in support

of his Motion.  See Reply at 9.  S. Eccleston insists, however, that his rehabilitative efforts are an

important factor that the Court should consider.  See Reply at 9.  S. Eccleston then argues that he

is not a danger to society.  See Reply at 10.  S. Eccleston notes that no one was injured as a result

of his crimes in this case.  See Reply at 10.  S. Eccleston then summarizes his behavior in his

second-degree murder conviction in state court:

> Mr. S. Eccleston was a passenger in a vehicle with another individual when they
> became involved in a traffic dispute with people in another vehicle.  The driver told
> Mr. S. Eccleston to shoot at the tires of the other vehicle, which he did.  Tragically,
> the bullet went astray and struck the driver of that vehicle.  Mr. S. Eccleston never
> intended to kill anyone, and he has lived with the guilt of this heartbreaking event
> every single day for the past twenty-five years.  Furthermore, the Government
> completely ignores that fact that, as with the charges in this case, that matter
> occurred when Mr. S. Eccleston was just a teenager, and he has already served his
> time for that case.

Reply at 10.  S. Eccleston argues that his rehabilitative efforts demonstrate that he has moved

---

[12]This summary accurately characterizes the federal sentencing range S. Eccleston faced.
See PSR ¶ 85, at 18.

beyond the violent phase of his life.  See Reply at 10.  S. Eccleston further states that, in its Second Response, the United States does not address S. Eccleston's lack of disciplinary history while in custody.  See Reply at 11.  S. Eccleston contends that "this is extraordinary for anyone who has been in BOP custody as long as Mr. S. Eccleston" and notes that he is housed currently in a low-security facility.  Reply at 11.  S. Eccleston concludes that he "is someone whose release now poses no threat to society whatsoever."  Reply at 12.

> **20.**   **The United States' First Supplement.**

The United States supplements the Second Response.  See United States' Supplement to its Response to Defendant's Amended Motion to Reduce Sentence, filed March 18, 2021 (Doc. 348)("United States First Supp.").  The United States notes that most courts that have addressed the issue have held "that U.S.S.G. § 1B1.13 is not applicable to defendant-filed motions . . . ." United States First Supp. at 1.  Nonetheless, the United States contends that "district courts cannot provide relief based on a length of sentence argument on grounds that the policy reasons under the guidelines remain binding for compassionate release motions."  United States First Supp. at 1.

> **21.**   **The United States' Second Supplement.**

The United States filed a Second Supplement to the Second Response.  See United States' Supplemental Notice of Authority, filed March 31, 2021 (Doc. 350)("United States' Second Supp.").  The United States notified the Court regarding a recent case, United States v. McGee, 992 F.3d 1035 (10th Cir. 2021)("McGee").  See United States' Second Supp. at 1.

> **22.**   **The Hearing.**

The Court held a hearing on April 7, 2021.  See Clerk's Minutes at 1.  The United States began by explaining that S. Eccleston has an appeal pending before the Tenth Circuit, which the United States classified as a "procedural or jurisdictional issue."  Tr. at 3:19-25 (Walsh).  The

parties then agreed that the hearing could be held by video.  See Tr. at 3:19-4:13 (Court, McConnell, Walsh).  The Court explained that the proceeding, "which is a felony proceeding, cannot be further delayed without serious harm to the interests of justice."  Tr. at 5:3-6 (Court).  Ms. McConnell,[13] S. Eccleston's counsel, then suggested that the Court could rule on all pending motions in the same opinion.  See Tr. at 8:11-15 (McConnell).  Ms. McConnell then explained that S. Eccleston had filed pro se motions before she had been appointed as his counsel, but asked that the Court rule on both the pro se motions and the motions that she had filed.  See Tr. at 9:8-15 (McConnell).  The Court explained that there were three attorneys of record listed on the matter, but Ms. McConnell replied that she was not aware of any other attorneys being involved in the case.  See Tr. at 9:1-14 (Court, McConnell).  S. Eccleston noted that Mr. Coberly, his previous attorney, had withdrawn from the case.  See Tr. at 10:18-20 (S. Eccleston).  S. Eccleston then explained the situation further:

> I went to Carter Harrison to represent me on that matter.  And, you know, during the process of that there was an interim when I didn't have counsel, and I was -- my concern was that I wouldn't get the issues on record so that's why I filed them pro se, some of them handwritten, because I didn't have access to the library, because of COVID-19.  And so then you ruled on that matter, and then Mr. Harrison was not willing to file a compassionate release, and his partner, Mr. Hart, was actually assisting me.  He wrote to the warden requesting the warden here at Ft. Dix to file under compassionate release on my behalf, which they never answered.  And we requested the compassionate release due to COVID, as well as the First Step Act amended.  So then, actually my mother contacted the federal public defender . . . .  And Kari Converse filed a motion for permanent counsel to you, and then the motion for permanent counsel, and that's when Ms. McConnell was appointed to represent me on compassionate release. . . .  And a lot of the pro se -- and I  apologize your Honor were, you know, for me excessive filing on my behalf.  I was doing my best to inform the Court of the issues that I've been dealing

---

[13]When drafting its opinions and orders, the Court generally refers to the parties by their names, even though it often is their counsel who is speaking and making the arguments. Because S. Eccleston spent a significant amount of time speaking on his own behalf during this hearing, however, the Court uses "S. Eccleston" to refer to the defendant and "Ms. McConnell" to refer to his counsel.

with.  And it's not to, you know, back and forth or overwhelm the Court.

Tr. at 12:1-24 (S. Eccleston).

Ms. McConnell then addressed the jurisdictional issue, and asserted that S. Eccleston's appeal addresses a very different issue than his compassionate release motion presents.  See Tr. at 14:4-8 (McConnell)(citing Garcia v. Burlington N. R. R. Co., 818 F.2d 713 (10th Cir. 1987)).  Ms. McConnell noted, however, that, in a recent, similar case, the Honorable Martha Vásquez, United States District Judge for the United States District Court for the District of New Mexico, concluded that she did not have jurisdiction.  See Tr. at 14:21-25 (McConnell)(citing United States v. Platero, No. CR 18-01819 MV, 2020 WL 7248109 (D.N.M. Dec. 9, 2020)(Vásquez, J.)).  Here, however, Ms. McConnell argued that she was not alleging that S. Eccleston was convicted or sentenced improperly, but instead was asking the Court to reduce his sentence.  See Tr. at 15:5-16 (McConnell).  Ms. McConnell also noted that S. Eccleston filed the Motion in April, 2020, but filed his appeal in August, 2020.  See Tr. at 15:20-16-3 (McConnell).  Accordingly, Ms. McConnell concluded that "under, the controlling law, the Court has jurisdiction to then decide it, because . . . this case does not implicate any aspect of the case that's involved in his appeal."  Tr. at 16:2-5 (McConnell).

Ms. McConnell then addressed the pending motions.  See Tr. at 16:6-25 (Court, McConnell).  First, Ms. McConnell explained that S. Eccleston has satisfied the exhaustion requirements.  See Tr. at 16:14-19 (McConnell).  Ms. McConnell characterized this issue as undisputed, noting that the United States acknowledges S. Eccleston's exhaustion efforts.  See Tr. at 16:13-25 (McConnell).  Next, Ms. McConnell explained that, following McGee, 992 F.3d 1035, the Court may examine "essentially . . . whatever it would like to in determining for itself what constitutes extraordinary and compelling reasons."  Tr. at 16:19-24 (McConnell).  Ms. McConnell

continued that, in United States v. Maumau, 993 F.3d 821 (10th Cir. 2021)("Maumau"), the Tenth Circuit held that "the changes in the First Step Act mandatory minimums in 924(c) are properly considered by the court as evidence of an extraordinary and compelling circumstance that could support early release." Tr. at 18:15-19 (McConnell). Ms. McConnell then described the factors that the Tenth Circuit considers in Maumau, and observed that, there, the Tenth Circuit reduced the defendant's sentence to time served. See Tr. at 18:19-19:16 (McConnell). Ms. McConnell therefore submitted that the primary restriction on the Court's discretion here is that its "decision cannot be based on the rehabilitation alone. It must be a consideration with other factors." Tr. at 20:1-3 (McConnell). Ms. McConnell also noted that the Court likewise should not grant the motion based only upon changes to mandatory minimums since S. Eccleston was sentenced. See Tr. at 20:3-10 (McConnell).

Ms. McConnell then noted that S. Eccleston was eighteen when he committed the underlying offenses, that his brain and impulse control were not developed fully, and that he is forty-five now. See Tr. at 20:11-25 (McConnell)(citing Maumau, 993 F.3d 821). Ms. McConnell continued that S. Eccleston was younger than his co-defendant and had a lower criminal history score, but received approximately double the sentence that the co-defendant received. See Tr. at 21:10-18 (McConnell). Ms. McConnell maintained that, if he were sentenced today, S. Eccleston "would receive a sentence that is ten years shorter than the one he received." Tr. at 21:23-22:5 (McConnell). Ms. McConnell also emphasized that S. Eccleston believed, upon his attorney's advice, that his sentence in federal court would run concurrently with his state sentence. See Tr. at 22:7-18 (McConnell). Ms. McConnell noted that she had submitted a letter from S. Eccleston's counsel when he was convicted of the underlying offense which stated that it "was both his understanding and Mr. S. Eccleston's understanding that his state and federal sentences were to be

run concurrently."  Tr. at 22:23-23:1 (McConnell).   <u>See</u> Storment Letter at 3.   Further,

Ms. McConnell explained that, in S. Eccleston's twenty-five-year prison term, he has no

disciplinary history.  <u>See</u> Tr. at 25:18-22 (McConnell).  Ms. McConnell also elaborated upon S.

Eccleston's rehabilitative efforts in prison and noted that S. Eccleston had submitted "numerous

letters of support from not just family members, but also people who have worked with Mr. S.

Eccleston in the programs that he has been participating in . . . . [T]hey felt he is a good candidate

for early release."  Tr. at 26:9-27:5 (McConnell).  Ms. McConnell then described S. Eccleston's

comprehensive release plan and strong network outside of prison.  <u>See</u> Tr. at 27:6-17 (McConnell).

Ms. McConnell concluded that "taken in conjunction with the changes to the First Step Act, any

further incarceration in this case is . . . unwarranted and it's excessive."   Tr. at 23:24-24:1

(McConnell).

 Ms. McConnell then addressed the COVID-19 argument, alleging that S. Eccleston's

prison has the highest infection rate in the country.  <u>See</u> Tr. at 24:2-6 (McConnell).  Ms. McConnell

said S. Eccleston continues to suffer from long-haul COVID-19 symptoms.[14]  <u>See</u> Tr. at 24:22-

25:4 (McConnell).  Ms. McConnell continued that S. Eccleston's past year in BOP custody was

"harsher than a normal BOP sentence," because of the "conditions that were caused by the

outbreak."  Tr. at 25:11-17 (McConnell).

 Next, Ms. McConnell discussed the primary arguments that the United States makes in the

---

[14]Long-haul COVID-19 symptoms include "mood disorders, fatigue, and perceived
cognitive impairment resulted in severe negative impacts on resumption of functional and
occupational activities in patients experiencing prolonged effects."  Greg Vanichkachorn et al.,
<u>Post COVID-19 Syndrome (Long Haul Syndrome): Description of a Multidisciplinary Clinic at
the Mayo Clinic and Characteristics of the Initial Patient Cohort</u>, Mayo Clinic Proceedings (May
11, 2021), <u>available at</u> https://www.mayoclinicproceedings.org/article/S0025-6196(21)00356-
6/fulltext.

Second Response.  See Tr. at 28:1 (McConnell).  Ms. McConnell argued that S. Eccleston is no

longer a danger to society:

> As far as the risk of danger, I know that in its response the Government seems to
> rely heavily on the fact that they don't think release is appropriate because Mr. S.
> Eccleston poses a danger.  That's just simply not the case, though.  Your Honor,  as
> I mentioned, Mr. S. Eccleston -- this crime occurred when he was eighteen years
> old.   No one was  physically injured.   I don't think . . . he should be judged
> throughout the rest of his life based on one day of poor decision-making ability
> when he was eighteen.  He has changed, he has grown.  His conduct in custody and
> efforts at rehabilitation and education show that.

Tr. at 28:4-17 (McConnell).  Ms. McConnell also explained that S. Eccleston was undergoing

"substance abuse issues," and "mental health issues" when he committed the crime.  Tr. at 29:4-9

(McConnell).  Ms. McConnell emphasized that S. Eccleston's location in a low security facility

demonstrates that he is not dangerous.  See Tr. at 30:4-15 (McConnell).

Ms. McConnell then addressed the § 3553(a) factors in S. Eccleston's case.  See Tr. at

30:16-17 (McConnell).  Ms. McConnell acknowledged that many of these factors overlap with

what she had discussed already and reiterated much of her previous argument.  See Tr. at 30:16-

25 (McConnell).  Ms. McConnell also insisted that continuing S. Eccleston's sentence will not

deter him from committing further crimes.  See Tr. at 31:11-25 (McConnell).  Ms. McConnell also

noted that S. Eccleston had paid restitution in this case already.  See Tr. at 32:18-20 (McConnell).

Ms. McConnell asked that, if the Court does not reduce S. Eccleston's sentence to time served,

that the Court "take off the ten years under 924(c) and reduce it by that amount . . . based on the

changes to the First Step Act."  Tr. at 34:14-19 (Court).

S. Eccleston then addressed the Court.  See Tr. at 35:1-4 (Court, S. Eccleston).  S. Eccleston

explained that he will soon complete his certification as a dental assistant.  See Tr. at 35:14-17 (S.

Eccleston).  He also noted that he would like to spend time with his parents and his son when out

of prison, and would reside with his aging father.  See Tr. at 35:15-36:4 (S. Eccleston).  S.

Eccleston also insisted that his plea agreement was not voluntary, because he did not understand

its conditions.  See Tr. at 36:5-14 (S. Eccleston).  S. Eccleston then expressed remorse for his past

offenses, explaining that he takes responsibility for his choices.  See Tr. at 37:1-15 (S. Eccleston).

He noted that, upon his release, he will continue to remain involved in church and go to counseling.

See Tr. at 37:1-16 (S. Eccleston).

The United States responded to S. Eccleston's expression of remorse, indicating that his

pleadings did not express this remorse.  See Tr. at 37:20-38:11 (Walsh).  The United States insisted

that the Court should not grant S. Eccleston's motion for compassionate release because: (i) he has

not borne his burden to demonstrate extraordinary and compelling circumstances; and (ii) he has

not shown that he will not endanger the community upon release.  See Tr. at 38:11-20 (Walsh).

The United States then noted that COVID-19 is not an issue in this case, because S. Eccleston is

in good health.  See Tr. at 39:2-6 (Walsh).  The United States distinguished this case from

Maumau, explaining that, unlike the defendant there, S. Eccleston was convicted of second-degree

murder.  See Tr. at 39:1-12 (Walsh).  The United States asserted that S. Eccleston's sentence was

"not unjust," and, in fact, "could have been worse."  Tr. at 39:14-24 (Walsh).  The United States

therefore asked the Court to deny S. Eccleston's motions, "primarily on the ground that he cannot

meet his burden as discussed."  Tr. at 39:19-40 (Walsh).

S. Eccleston disputed the United States' contention that he had not expressed sufficient

remorse for his crimes.  See Tr. at 40:23-41:7 (S. Eccleston).  He explained that he had written

letters to the families of his victims "on my own volition . . . .  I admit to everybody and I didn't

mean for anybody to . . . get hurt at all."  Tr. at 41:4-7 (S. Eccleston).  He continued that his crimes

were "a travesty and I live with it every day of my life . . . .  I think it's important that the Court

understands that it was not something that happened intentionally.  I had no malice in my heart.

I'm not a violent person."  Tr. at 41:10-13 (S. Eccleston).  S. Eccleston concluded by asking the

Court to release him so that he may work before he reaches retirement age and spend time with his

aging father.  See Tr. at 41:18-42:3 (S. Eccleston).

The Court then explained that it believed it had jurisdiction over this case.  See Tr. at 44:15-

25 (Court).   The Court also stated that it was "inclined to deny the motions for compassionate

release."  Tr. at 45:6-8 (Court).  The Court explained its reasoning:

> The COVID seems to be a declining issue.  Mr. S. Eccleston had it.  It's just
> something that everybody has got to deal with.  And it is in very few situations a
> compelling situation that allows early release.  I don't think his other health
> concerns are so great that he should be released early.  I agree with the Government
> he's a danger to the community.  He's been in prison for a while, and it's always
> difficult to determine how dangerous somebody is when they come out.  But
> certainly going in, and I did look at the presentence report that Judge Hansen was
> looking at.  I think anybody looking at him 25 years ago would have reached a
> conclusion he's a danger to the community and just because he's been incapacitated
> during that time, it's still difficult to look at his record.

Tr. at 45:9-46:3 (Court).   The Court concluded that this is not "a very compelling case for

compassionate release, and so I'm going to deny the . . . motions for release."  Tr. at 46:3-7

(Court).[15]

**23.    Relevant Procedural History in Related Cases.**

S. Eccleston has filed numerous lawsuits across the country in an attempt to shorten his

sentence.  The United States District Court for the District of New Mexico has issued three

Memorandum Opinion and Orders denying S. Eccleston's various motions in 2020 alone.  See

United States v. S. Eccleston, No. CIV 19-1201 JB/CG, 2020 WL 6392821 (D.N.M. Nov. 2,

---

[15]Having had time to more fully review S. Eccleston's case in drafting this opinion, the
Court has decided to reduce S. Eccleston's sentence for the reasons described in the Analysis.

2020)(Browning, J.); United States v. S. Eccleston, No. CIV 19-1201 JB/CG, 2020 WL 4336361 (D.N.M. July 28, 2020)(Browning, J.); S. Eccleston v. United States, No. 19-CV-538 RB-CG, 2020 WL 953792, at *2 (D.N.M. Feb. 27, 2020)(Brack, J.), aff'd, 819 F. App'x 624 (10th Cir. 2020), cert. denied, 141 S. Ct. 1285 (2021).  In the past twenty-four years, S. Eccleston has filed frequent unsuccessful lawsuits asking to be released from prison on several grounds in: (i) the Supreme Court, see S. Eccleston v. United States, 141 S. Ct. 1285 (2021)(denying petition for writ of certiorari); S. Eccleston v. United States, 140 S. Ct. 341 (2019)(same); In re S. Eccleston, 140 S. Ct. 341 (2019)(dismissing petition for writ of mandamus); S. Eccleston v. United States, 572 U.S. 1040 (2014)(denying petition for writ of certiorari); S. Eccleston v. United States, 562 U.S. 1035 (2010)(same); S. Eccleston v. United States, 555 U.S. 958 (2008)(same); (ii) the Tenth Circuit, see S. Eccleston v. United States, 819 F. App'x 624 (10th Cir. 2020)(concluding that S. Eccleston was not entitled to federal habeas relief, because the Tenth Circuit "concluded in its 2013 decision" that "the record of S. Eccleston's federal criminal proceedings makes clear that the district court that sentenced S. Eccleston in 1996 intended for his federal sentence to run consecutively to any state sentence he received"); United States v. S. Eccleston, 545 F. App'x 774 (10th Cir. 2013), as amended on denial of reh'g and reh'g en banc (10th Cir. Dec. 20, 2013)(denying S. Eccleston's motion under rule 36 of the Federal Rules of Criminal Procedure to "have[] his state time credited against his federal sentence," because "the district court intended S. Eccleston's federal sentence to run consecutively to his state sentence"); United States v. S. Eccleston, 521 F.3d 1249 (10th Cir. 2008)(denying S. Eccleston's § 2241 application, because "the imposition of consecutive sentences does not violate Mr. S. Eccleston's federal sentence"); United States v. S. Eccleston, 132 F.3d 43 (10th Cir. 1997)(denying S. Eccleston's appeal of his sentence, because "the enhanced sentence" under 18 U.S.C. § 924(c) "may be applied to a second conviction

which arises from the same prosecution as the first," and because § 924(c) "liability is applicable

to accomplices"); (iii) the United States Court of Appeals for the Ninth Circuit, see S. Eccleston

v. United States, 648 F. App'x 606, 607 (9th Cir. 2016)(denying S. Eccleston's habeas petition

challenging the BOP'S "discretionary denial of a *nunc pro tunc* designation pursuant to 18 U.S.C.

§ 35621(b)," because "the state court has no control over the federal sentence")(emphasis in

origin)[16]; S. Eccleston v. United States, 585 F. App'x 702 (9th Cir. 2014)(concluding that, based

on the sentencing court's "expressed preference that the sentences run consecutively, the BOP

properly denied S. Eccleston's request for nunc pro tunc designation"), reh'g granted, opinion

withdrawn (June 4, 2015), on reh'g, 648 F. App'x 606 (9th Cir. 2016); see generally S. Eccleston

v. Oregon ex rel. Oregon Dep't of Corr., 168 F. App'x 760 (9th Cir. 2006)(denying S. Eccleston's

§ 1983 claims against prison officials, because S. Eccleston had "no liberty interest in remaining

free" from three days of administrative segregation, and S. Eccleston had not established that

"prison officials were deliberately indifferent to his safety"); (iv) the United States Court of

---

[16]The Ninth Circuit further details the applicable procedural history:

> S. Eccleston argues that the Bureau of Prisons was bound by the state judgment, which provides that the state and federal sentences run concurrently. However, the original state judgment was superseded by a new judgment, which essentially gave S. Eccleston credit for his federal sentence. The stipulated order, bearing the written approval and signatures of petitioner and his lawyer, specifically states, "[b]ecause of the chronology of how the pleas and sentences were entered, and the operation of federal law, it has become clear that it is not possible for the sentences to be served concurrently." [no citation for quotation] The district court correctly held that the new state judgment does not order that the new state sentence run concurrently with the federal sentence. In any event, the state court has no control over the federal sentence. *United States v. Yepez,* 704 F.3d 1087, 1091 (9th Cir. 2012)(en banc)(per curiam); *Taylor v. Sawyer,* 284 F.3d 1143, 1151-52 (9th Cir. 2002), *abrogated on other grounds by Setser,* 132 S. Ct. at 1473.

S. Eccleston v. United States, 648 F. App'x 606, 607 (9th Cir. 2016).

Appeals for the Third Circuit, see S. Eccleston v. United States, 390 F. App'x 62, 64 (3d Cir.

2010)(affirming the BOP's denial of S. Eccleston's nunc pro tunc designation request, because the

BOP applied properly the 18 U.S.C. § 3261(b)[17] factors); (v) the United States District Court for

_____

[17]The BOP must consider the following factors:

> **(b)**     **Place of imprisonment.** -- The Bureau of Prisons shall designate the place
> of the prisoner's imprisonment, and shall, subject to bed availability, the
> prisoner's security designation, the prisoner's programmatic needs, the
> prisoner's mental and medical health needs, any request made by the
> prisoner related to faith-based needs, recommendations of the sentencing
> court, and other security concerns of the Bureau of Prisons, place the
> prisoner in a facility as close as practicable to the prisoner's primary
> residence, and to the extent practicable, in a facility within 500 driving miles
> of that residence.  The Bureau shall, subject to consideration of the factors
> described in the preceding sentence and the prisoner's preference for
> staying at his or her current facility or being transferred, transfer prisoners
> to facilities that are closer to the prisoner's primary residence even if the
> prisoner is already in a facility within 500 driving miles of that residence.
> The Bureau may designate any available penal or correctional facility that
> meets minimum standards of health and habitability established by the
> Bureau, whether maintained by the Federal Government or otherwise and
> whether within or without the judicial district in which the person was
> convicted, that the Bureau determines to be appropriate and suitable,
> considering --
>
> > **(1)**     the resources of the facility contemplated;
> >
> > **(2)**     the nature and circumstances of the offense;
> >
> > **(3)**     the history and characteristics of the prisoner;
> >
> > **(4)**     any statement by the court that imposed the sentence --
> >
> > > **(A)**     concerning the purposes for which the sentence to
> > > imprisonment was determined to be warranted; or
> > >
> > > **(B)**     recommending a type of penal or correctional facility
> > > as appropriate; and
> >
> > **(5)**     any pertinent policy statement issued by the Sentencing
> > Commission pursuant to section 994(a)(2) of title 28.

the District of New Jersey, see S. Eccleston v. United States, No. CIV 11-1352 JAP, 2011 WL

6130541, at *2-3 (D.N.J. Dec. 7, 2011)(Pisano, J.)(denying S. Eccleston's § 2241 claim regarding

---

> In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person. Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.

18 U.S.C. § 3621(b). The Ninth Circuit summarized the BOP's application of these factors to S. Eccleston's case:

> The BOP reviewed S. Eccleston's request under the relevant factors stated in section 3621(b) and relied on section 3621(b)(2), the nature of S. Eccleston's federal crimes (carjacking and related crimes); section 3621(b)(3), S. Eccleston's history and characteristics (the state convictions for murder and conspiracy for which he is currently incarcerated, as well as additional convictions for unlawful taking of a motor vehicle, aiding and abetting a carjacking, aggravated battery, assault, and other state crimes); and section 3621(b)(4), relevant statements by the sentencing court. Concerning statutory factor (4), the BOP noted that the federal judgment and commitment order was silent regarding the relationship of the federal and state sentences, so the BOP contacted the sentencing judge. See Barden[ v. Keohane, 921 F.2d [476, 483 (3d Cir. 1990)] . . . (noting that the statute wisely requires the BOP to solicit the views of the sentencing judge whenever possible). The sentencing judge responded in a letter dated January 6, 2009, indicating that it was his intent at the time of sentencing that S. Eccleston's federal sentence be served consecutively to his state sentence, and that he opposed a retroactive designation of the federal sentence. It appears from the record that the BOP duly considered S. Eccleston's request, weighed the factors, and properly exercised its discretion under section 3621(b).

S. Eccleston v. United States, 390 F. App'x 62, 64 (3d Cir. 2010).

computation of his federal sentence, because he had not exhausted his administrative remedies with the BOP); S. Eccleston v. United States, No. CIV 09-2654 JAP, 2010 WL 445662 (D.N.J. Feb. 3, 2010)(Pisano, J.)(denying S. Eccleston's appeal of the BOP's denial of his nunc pro tunc designation request, because S. Eccleston "has not established any abuse of discretion in the BOP's consideration of his request"), aff'd, 390 F. App'x 62 (3d Cir. 2010); (vi) the United States District Court for the Central District of California, see S. Eccleston v. United States, No. CV 12-3999-JSL(CW), 2013 WL 12202943, at *5 (C.D. Cal. Feb. 27, 2013)(Woehrle, M.J.)(denying S. Eccleston's habeas corpus petition with prejudice, because S. Eccleston "has not shown that the BOP committed legal error in calculating or executing his sentence, and he has not supported a claim that he is in custody in violation of the constitution or laws of the United States"), report and recommendation adopted, No. CIV 12-3999 JSL-CW, 2013 WL 12216550 (C.D. Cal. June 3, 2013)(Letts, J.), aff'd, 648 F. App'x 606 (9th Cir. 2016); (vii) the United States District Court for the District of Oregon, see generally S. Eccleston v. Oregon, No. 03-6148-KI, 2004 WL 2538304 (D. Or. Nov. 9, 2004)(King, J.)(granting summary judgment against S. Eccleston's § 1983 claims), aff'd sub nom., S. Eccleston v. Oregon ex rel. Oregon Dep't of Corr., 168 F. App'x 760 (9th Cir. 2006); (viii) the United States District Court for the District of Maryland, S. Eccleston v. Stewart, No. CIV TDC-16-1322, 2016 WL 3212080, at *3 (D. Md. June 7, 2016)(Chuang, J.)(transferring S. Eccleston's habeas petition to the Tenth Circuit); and (ix)  the United States District Court for the District of New Mexico, see United States v. S. Eccleston, No. CR 95-0014 LH, 2007 WL 9734252, at *1-3 (D.N.M. April 25, 2007)(Hansen, J.)(denying S. Eccleston's request for "an order committing him to the custody of the" BOP "with instructions to the BOP to give him credit for all time served in state custody since the imposition of his federal sentence," because there is "absolutely no evidence in the record of the underlying federal criminal prosecution that any

agreement ever was made that the federal sentence was to be served concurrent to the state sentence," and because S. Eccleston had not exhausted his administrative remedies);[18] S. Eccleston v. LeMaster, No. CIV 03-406 BB/DJS, 2003 WL 27385063 (D.N.M. July 15, 2003)(Svet, M.J.)(dismissing with prejudice as time-barred S. Eccleston's petition for habeas corpus under 28 U.S.C. § 2254 "on the grounds that he was afforded ineffective assistance of counsel and that his guilty plea was involuntary").

In 2020 alone, the Court and the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, issued three Memorandum Opinion and Orders on S. Eccleston's claims.  See United States v. S. Eccleston, 2020 WL 6392821 (denying S. Eccleston's Motion to Reconsider the Court's July, 2020 Memorandum Opinion and Order); United States v. S. Eccleston, 2020 WL 4336361 (denying S. Eccleston's Motion to Vacate Pursuant to 28 U.S.C. § 2255, because S. Eccleston "was convicted of a crime which necessarily has an element of violence such that his § 924(c) conviction is based on a proper predicate"); S. Eccleston v. United States, 2020 WL 953792, at *2 ("S. Eccleston has been challenging his federal carjacking sentence for the past 16 years.  After failing to obtain relief on direct appeal and under each habeas statute (28 U.S.C. §§ 2241, 2254, and 2255), he now asks the Court to use its equitable powers to correct his federal sentence" and denying relief because "Rule 60(b)(6) relief is not available"), aff'd, 819 F. App'x 624 (10th Cir. 2020), cert. denied, 141 S. Ct. 1285 (2021).  See also S. Eccleston v. United States, No. CV 19-1201 JB/CG, 2020 WL 1139058 (D.N.M. March 9, 2020)(Garza, C.M.J.).

**LAW REGARDING COMPASSIONATE RELEASE UNDER THE FIRST STEP**

---

[18]The Court disagrees with this holding, and discusses its rationale in the Analysis.

**ACT**

"A federal court generally 'may not modify a term of imprisonment once it has been imposed.'" Dillon v. United States, 560 U.S. 817, 819 (2010)(quoting 18 U.S.C. § 3582(c)).  The First Step Act of 2018, Pub. L. No. 115- 39132 Stat 5194 (December 21, 2018)("First Step Act"), however, amended § 3582 to expand district courts' power to reduce defendants' sentences after they have been imposed by "increas[ing] the use and transparency of compassionate release."  Before the First Step Act, 18 U.S.C. § 3582 permitted only the BOP Director to ask the court for a defendant's compassionate release.  See, e.g., United States v. Smartt, 129 F.3d 539, 541 (10th Cir. 1997)(explaining that a prisoner was not eligible for compassionate release absent motion from BOP Director).  The First Step Act adds the following language:

> [O]r upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

18 U.S.C. § 3582.  Defendants, therefore, may petition the court for compassionate release after exhausting administrative remedies.  See United States v. Gieswein, 832 F. App'x 576, 577-78 (10th Cir. 2021)(stating that "[f]ollowing the passage of the First Step Act, a district court may only consider a defendant's motion" after the defendant has exhausted the administrative remedies available via the BOP).[19]  Specifically, a defendant may seek a reduction in sentence directly from

---

[19]United States v. Gieswein is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition,

the court, provided that: (i) the defendant first seeks a reduction from the BOP; and (ii) that request has either (a) been denied; or (b) thirty days have passed since the original request. See 18 U.S.C. § 3582(c)(1)(A). A court may grant a compassionate release motion where the defendant: (i) presents extraordinary and compelling reasons which warrant a sentence reduction; (ii) a sentence reduction is consistent with applicable policy statements from the Sentencing Commission; and (iii) a sentence reduction aligns with the 18 U.S.C. §3553(a) factors to the extent that they apply. See 18 U.S.C. § 3582(c)(1)(A); United States v. Jones, 980 F.3d at 1108. Defendants must satisfy all three requirements, and "'district courts may deny compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others.'" McGee, 992 F.3d at 1043 (quoting United States v. Elias, 984 F.3d 516, 519 (6th Cir. 2021)).

### 1. Defendants in the Tenth Circuit Must Exhaust Their Administrative Remedies Before Bringing a Compassionate Release Motion Before a District Court.

The Tenth Circuit has concluded that, even amidst the COVID-19 pandemic, that the exhaustion requirement is not subject to waiver. See United States v. Johnson, No. 20-6103, 2021 WL 1053706, at *2 (10th Cir. March 19, 2021)("In this circuit, however, § 3582(c)(1)(A)'s exhaustion requirement is mandatory, rather than judicially waivable."). See also United States v. Baca, No. CR 16-1613 JB, 2020 WL 5369078, at *13 (D.N.M. Sept. 8, 2020)(Browning J.)(explaining that a defendant "must fulfill the exhaustion requirement for the Court to have

---

we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that United States v. Gieswein, and the other unpublished opinions cited here, have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

subject-matter jurisdiction"); <u>United States v. Heath</u>, No. CR-13-102-SLP, 2020 WL 1957916, at *2 (W.D. Okla. April 23, 2020)(Palk, J.)(collecting cases)(citing <u>United States v. Bell</u>, No. 16-20008-02-DDC, 2020 WL 1923086, at *2 (D. Kan. April 21, 2020)(Crabtree, J.); <u>United States v. Gonzalez</u>, No. 18-cr-00310-PAB, 2020 WL 1905071, at *2-3 (D. Colo. April 17, 2020)(Brimmer, C.J.); <u>United States v. Perry</u>, No. 18-cr-0480-PAB, 2020 WL 1676773, at *1 (D. Colo. April 3, 2020)(Brimmer, C.J.)).

Some courts outside of the Tenth Circuit, however, have determined that they can waive the exhaustion requirement.  <u>See</u>, <u>e.g.</u>, <u>United States v. Perez</u>, No. 17-CR-513-3, 2020 WL 1546422, at *2 (S.D.N.Y. April 1, 2020)(Torres, J.); <u>United States v. Colvin</u>, No. 19-CR-179, 2020 WL 1613943, at *2 (D. Conn. April 2, 2020)(Arterton, J.)("[I]n light of the urgency of Defendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the Court waives the exhaustion requirement of Section 3582(c)(1)(A).").   In <u>United States v. Raia</u>, 954 F.3d 594, 597 (3d Cir. 2020), for instance, the United States Court of Appeals for the Third Circuit characterizes § 3582(c)(1)(A)'s exhaustion requirement as "a glaring roadblock foreclosing compassionate release."  954 F.3d at 597.  The Third Circuit does not state definitively whether it believes the exhaustion requirement is jurisdictional.  It states, however, that remand to the district court "would be futile," because the defendant did not comply with § 3582(c)(1)(A)'s exhaustion requirement.  <u>United States v. Raia</u>, 954 F.3d at 597.  Some courts have interpreted this statement as the Third Circuit treating the exhaustion requirement as jurisdictional, <u>see</u> <u>United States v. Davis</u>, No. 19-CR-64-F, 2020 WL 2465264, at *2 (D. Wyo. May 13, 2020)(Freudenthal, J.)(stating that "the only circuit court opinion on this issue" concludes that the "30 day waiting period (or exhaustion of all administrative remedies) is jurisdictional")(citing <u>United States v. Raia</u>, 954 F.3d

at 597).

The United States Court of Appeals for the Fifth Circuit recently touched upon whether the exhaustion requirement is jurisdictional.  In Valentine v. Collier, 956 F.3d 797 (5th Cir. 2020), the Honorable Stephen A. Higginson, United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, suggests that courts could excuse the First Step Act's exhaustion requirement.  See 956 F.3d at 807 (Higginson, J., concurring).   In his concurrence, Judge Higginson notes that several courts have concluded that the exhaustion requirement "is not absolute and that it can be waived by the government or by the court, therefore justifying an exception in the unique circumstances of the COVID-19 pandemic."  Valentine v. Collier, 956 F.3d at 807 (citing e.g., United States v. Russo, No. 16-cr-441 (LJL), 2020 WL 1862294, at *405 (S.D.N.Y. April 14, 2020).  Judge Higginson's citation to these cases suggests that he agrees that either courts or the United States can excuse the exhaustion requirement.

In United States v. Alam, 960 F.3d 831 (6th Cir. 2020), the Honorable Jeffrey Sutton, United States Circuit Judge for the United States Court of Appeals for the Sixth Circuit, concludes that the First Step Act's exhaustion requirement is not jurisdictional: "Nothing in this administrative exhaustion requirement clearly limits our jurisdiction.  It merely imposes a requirement on prisoners before they may move on their own behalf . . ."  960 F.3d at 833.  He notes that,  the "Supreme Court has worked over the last decade or so to distinguish between jurisdictional rules (that bear on the competence of courts to hear a claim) and non-jurisdictional mandatory rules (that do not)," and that "key" differences between these two rules have emerged. See United States v. Alam, 960 F.3d at 833 (citing Arbaugh v. Y & H Corp., 546 U.S. 500, 516 (2006)).  Judge Sutton focuses on one difference: courts must raise jurisdictional defects sua sponte and cannot permit the parties to waive or ignore these defects, whereas courts must resolve

mandatory-claim-processing defects only when the parties raise them.  See 960 F.3d at 833 (citing

Gonzalez v. Thaler, 565 U.S. 134, 141 (2012); Eberhart v. United States, 546 U.S. 12, 19

(2005)(per curiam)).  Looking at the text of the exhaustion requirement, Judge Sutton concludes

that, because the provision "neither 'speak[s] in jurisdictional terms' nor 'refer[s] in any way to

the jurisdiction of the courts," the provision appears to be a claim-processing rule and functions as

a claim-processing rule.  See United States v. Alam, 960 F.3d at 833 (quoting Zipes v. Trans World

Airlines, Inc., 455 U.S. 385, 394 (1982))(alterations in United States v. Alam).

In contrast to the Third, Fifth, and Sixth Circuits, the Tenth Circuit has continued to impose

the exhaustion requirement as mandatory and not judicially waivable despite the COVID-19

pandemic.  In United States v. Johnson, the Tenth Circuit affirmed the district court's dismissal of

a prisoner's compassionate release motion because the prisoner had not exhausted her

administrative remedies.  See 2021 WL 1053706, at *1.  The Honorable Carolyn B. McHugh,

United States Circuit Judge for the Tenth Circuit, authored the opinion and explained, that,

following the First Step Act, a prisoner "may bring such a motion in the district court on her own

behalf."  2021 WL 1053706, at *1.  Judge McHugh cautioned, however, that, "[i]f the prisoner

does so, . . . she must first exhaust her administrative remedies."  2021 WL 1053706, at *1.  Judge

McHugh acknowledged that, as the defendant argued, other jurisdictions have held that the

administrative exhaustion requirement is judicially waivable in light of the COVID-19 pandemic.

See 2021 WL 1053706, at *1.  Judge McHugh clarified that, in the Tenth Circuit, the "exhaustion

requirement is mandatory, rather than judicially waivable."  2021 WL 1053706, at *1 (citing

United States v. Gieswein, 832 F. App'x 576, 577-78 (10th Cir. 2021); and United States v.

Springer, 820 F. App'x 788, 791-92 (10th Cir. 2020)).  Moreover, Judge McHugh emphasized that

"every other Court of Appeals to have addressed the issue has agreed" that the exhaustion

requirement is not judicially waivable.   2021 WL 1053706, at *2.  Consequently, Judge McHugh

concluded that, because the defendant did not "demonstrate that she satisfied § 3582(c)(1)(A)'s

mandatory exhaustion requirement, the district court properly rejected her request for relief under

the statute."  United States v. Johnson, 2021 WL 1053706, at *2 (10th Cir. March 19, 2021)

### 2.   A Defendant Must Also Satisfy 18 U.S.C. § 3582(c)(1)'s Tripartite Test to Qualify for Compassionate Release under the First Step Act.

To qualify for a reduced sentence via a compassionate release motion, a defendant must

satisfy the three elements 18 U.S.C. § 3582(c)(1) mandates:

> (1) the district court finds that extraordinary and compelling reasons warrant such a reduction; (2) the district court finds that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (3) the district court considers the factors set forth in § 3553(a), to the extent that they are applicable.

United States v. Maumau, 993 F.3d 821, 831 (10th Cir. 2021)(Briscoe, J.)("Maumau").  The Tenth

Circuit has held that there are no current applicable policy statements from the Sentencing

Commission.  See McGee, 992 F.3d at 1050 ("'Because Guideline § 1B1.13 is not applicable to

compassionate release motions brought by defendants, Application Note 1(D) cannot constrain

district courts' discretion to consider whether any reasons are extraordinary and

compelling.'")(quoting United States v. Brooker, 976 F.3d 228, 236 (2d Cir. 2020)); Maumau, 993

F.3d 821, 837 ("[T]he Sentencing Commission's existing policy statement is applicable only to

motions filed by the Director of the BOP, and not to motions filed directly by defendants").[20]  Cf.

---

[20]While the Court, as a district court, must faithfully and fully follow and apply Tenth Circuit law, the Court is puzzled by the Tenth Circuit's instruction that the district court should disregard entirely the Policy Statement of U.S.S.G. § 1B1.13.

U.S.S.G. § 1B1.13 provides in pertinent part:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a

term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that --

    **(1)**

        **(A)**    Extraordinary and compelling reasons warrant the reduction; or

        **(B)**    The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

    **(2)**    The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

    **(3)**    The reduction is consistent with this policy statement.

U.S.S.G. 1B1.13.

The application notes describe the U.S.S.G.'s conception of extraordinary and compelling reasons:

**Extraordinary and Compelling Reasons. --** Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:

    **(A)**    **Medical Condition of the Defendant.**

        **(i)**    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

        **(ii)**    The defendant is --

      **(I)**    suffering from a serious physical or medical condition,

      **(II)**    suffering from a serious functional or cognitive impairment, or

      **(III)**    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    **(B)**    **Age of the Defendant. --** The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

    **(B)**    **Family Circumstances. --**

      **(i)**    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

      **(ii)**    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

    **(D)**    **Other Reasons. --** As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

**2.**    **Foreseeability of Extraordinary and Compelling Reasons. --** For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or

anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

**3.     Rehabilitation of the Defendant. --** Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.

**4.     Motion by the Director of the Bureau of Prisons. --** . . . . The court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community.

. . . .

**Background:** The Commission is required by 28 U.S.C. § 994(a)(2) to develop general policy statements regarding application of the guidelines or other aspects of sentencing that in the view of the Commission would further the purposes of sentencing (18 U.S.C. § 3553(a)(2)), including, among other things, the appropriate use of the sentence modification provisions set forth in 18 U.S.C. § 3582(c). In doing so, the Commission is authorized by 28 U.S.C. § 994(t) to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." This policy statement implements 28 U.S.C. § 994(a)(2) and (t).

U.S.S.G. § 1B1.13.

The Court cannot and will not apply any analyses that the Tenth Circuit has forbidden.  In the Court's opinion, however, an "applicable policy statement" applying to compassionate release motions currently exists, but, under current Tenth Circuit law, the Court cannot apply it.  The question is largely -- what does the phrase "applicable policy statement" mean?  The Tenth Circuit essentially read this out of the statute, saying there are none.  See McGee, 992 F.3d at 1048.  But there is an on-point policy statement; the Tenth Circuit just does not want it to restrict the defendant's ability to be resentenced.  See McGee, 992 F.3d at 1048.  Cf. United States v. Bryant, No. 19-14267, 2021 WL 1827158, at *7 (11th Cir. May 7, 2021)("There is no question that 1B1.13 is *the* policy statement the Commission adopted to comply with this statutory mandate.").  It is hard to imagine a more "applicable" Policy Statement than the one that defines "extraordinary and compelling" reasons.  U.S.S.G. § 1B1.13.  The Tenth Circuit agrees "that Congress intended for the Sentencing Commission's policy statements to serve as guideposts for district courts under the second part of the statutory test . . . ."  McGee, 992 F.3d at 1048.  It avoids this statutory interpretation by saying that "§ 984(a)(2)(c) requires the Sentencing Commission to promulgate general policy statements regarding . . . the sentence modification provisions set forth in section . . . 3582(c) of title 18."  McGee, 992 F.3d at 1048.  "Of course, that does not make sense: if the policy statement is relevant to the motion and helpful for adjudicating the motion, then it

---

must be an 'applicable' statement under the statute." United States v. Bryant, No. 19-14267, 2021 WL 1827158, at *6 (11th Cir. May 7, 2021).

At first blush, it appears that this section must have come from the First Step Act, but no -- some version of this Policy Statement has been in the Guidelines since November 1, 2006. Congress was aware of the pre-First Step version of 18 U.S.C. § 3582(c)(1)(A), and did not change the "extraordinary and compelling" language; it merely allowed defendants to go directly to the federal court and not rely solely on the BOP to file a motion. Thus, there is no instruction in the First Step Act for the Commission to go draft new Policy Statements; Congress looked at the "applicable" policy statement when drafting the First Step Act. Under standard statutory rules of construction, Congress is presumed to know the state of the law that existed at the time it passed the First Step Act. See, e.g., Dewsnup v. Timm, 502 U.S. 410, 419 (1992)("When Congress amends the bankruptcy laws, it does not 'write on a clean slate.'")(quoting Emil v. Hanley, 318 U.S. 515, 521 (1943)); Cannon v. Univ. of Chicago, 441 U.S. 677, 696-97 ("It is always presumed that our elected officials, like other citizens, know the law."); Lindsey v. Lessee of Miller, 31 U.S. 666, 669 (1832)("When in 1807 Congress passed the law, they must be presumed to have legislated on the then existing state of things."). There is no sound reason to conclude that Congress intended to change the existing law when it did not change the language of "extraordinary and compelling" in the statute. It is unclear why federal courts and litigants cannot continue to look at the Policy Statement, at least for guidance, in this area of law and must start totally afresh. As the Honorable Andrew L. Brasher, United States Circuit Judge for the United State Court of Appeals for the Eleventh Circuit, states:

> We disagree with that reasoning. The statute's procedural change does not affect the statute's or 1B1.13's substantive standards, specifically the definition of "extraordinary and compelling reasons." The Commission's standards are still capable of being applied and relevant to all Section 3582(c)(1)(A) motions, whether filed by the BOP or a defendant. And the structure of the Guidelines, our caselaw's interpretation of "applicable policy statement," and general canons of statutory interpretation all confirm that 1B1.13 is still an applicable policy statement for a Section 3582(c)(1)(A) motion, no matter who files it.

United States v. Bryant, No. 19-14267, 2021 WL 1827158, at *1 (11th Cir. May 7, 2021).

After Booker, while the U.S.S.G. Guideline ranges are no longer binding and mandatory, courts still look, in arriving at the appropriate sentence, at the Guidelines and, in fact, have to carefully calculate the Guidelines and take them into account. See Hughes v. United States, 138 S. Ct. 1765, 1772 (2018)("After this Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Guidelines are advisory only. But a district court still 'must consult those Guidelines and take them into account when sentencing.'")(quoting United States v. Booker, 543 U.S. at 264). Even if not binding, it would seem federal courts should still be forced to look at the Policy Statement for assistance. In other areas, the courts continue to look at the Guidelines after the First Step Act was passed, even though the Commission has not had a quorum and has not changed the Policy Statement language. See, e.g., United States v. Jackson, 952 F.3d 492, 501 (4th Cir. 2020)(affirming the district court's consideration of a policy statement in a First Step Act case where the court "appropriately acknowledged that those authorities were not controlling but

merely supportive of its evaluation"); United States v. Allen, 956 F.3d 355, 358 (6th Cir. 2020)(explaining that "[t]he Sentencing Commission has informally advised that regardless of whether resentencing under the First Step Act constitutes a plenary resentencing proceeding or a more limited sentence modification proceeding, 'the Act made no changes to 18 U.S.C. § 3553(a), so the courts should consider the guidelines and policy statements, along with the other 3553(a) factors, during the resentencing.'")(quoting First Step Act, ESP Insider Express (U.S. Sentencing Comm'n, Washington, D.C.), Feb. 2019, at 1, 8, https://www.ussc.gov/sites/default/files/pdf/training/newsletters/2019-special_FIRST-STEP-Act. pdf). The Tenth Circuit says that the passage of the First Step Act should have "prompted" the Commission to revise its Policy Statement. Maumau, 993 F.3d at 836. The Tenth Circuit does not cite anything in the statute or legislative history that the Commission had to promulgate a new Policy Statement or that Congress expected a revision. See Maumau, 993 F.3d at 836. It then says that the Commission has been unable to comply with its "statutory duty of promulgat[ion]," but, again, does not cite to any statute or legislative history that says the Commission had to revise the Policy Statement. Maumau, 993 F.3d at 836. The Tenth Circuit later rejects the United States' definition of the Policy Statement, but says once again that the "commission has failed to fulfill its statutory duty to issue a post-First Step Act policy statement . . . ," once again without citing to anything in the statute or legislative history that says Congress imposed this duty. McGee, 994 F.3d at 1050.

The Court believes that the most logical interpretation, then, is that Congress knew about the Policy Statement and was telling federal courts to look at it; there is no other applicable Policy Statement. It is unlikely that Congress was referring to a nonexistent Policy Statement, and if it intended the Commission to write a new one, it could have said so. While the Tenth Circuit asserts that the Policy Statement was produced one month "before" Congress enacted the First Step Act, the fact that the Commission promulgated the Policy Statement while the First Step Act was being drafted, suggests the opposite of what the Tenth Circuit concludes; the Policy Statement is the "applicable" Policy Statement to which Congress is referencing and the only one. Moreover, the Sentencing Commission knew that the First Step Act was in progress when it updated the Policy Statement. And even if the federal courts do not, and should not, after Booker, consider the Policy Statement binding and mandatory, it is odd and unusual that the Tenth Circuit will reverse a district court for merely considering the Policy Statement. See, e.g., United States v. Carr, No. 20-1152, 2021 WL 1400705 (10th Cir. Apr. 14, 2021)(Tymkovich, C.J.)(reversing district court's compassionate release denial because it applied the Policy Statement).

A second reason that the Tenth Circuit's statutory construction is not compelling is that the Commission itself uses the word "applicable" in the Policy Statement. The Commission states that the "court may reduce a term of imprisonment . . . if, after considering the factors set forth in . . . 18 U.S.C. § 3553(a), to the extent that they are applicable . . . ." U.S.S.G. § 1B1.13. The Tenth Circuit does not appear to have a problem with the word "applicable" here, but, because it mandates that district courts ignore the Policy Statement, it also ignores Congress' order that the Court should consider three factors. It seems that the Tenth Circuit's test is, in fact, less friendly to defendants, despite its air of chastising the district court for its use of the Policy Statement. Even if the Court decides that the § 3553(a) factors merit a reduction, if the Court took up the Tenth Circuit's offer to go straight to the "extraordinary and compelling" test, it would rarely rule that factor favors the defendant. It appears that the Tenth Circuit's order takes away the

defendant's right to have the court first decide the § 3553(a) factors, which often, following a lengthy prison sentence, weigh in favor of a reduction. See 18 U.S.C. § 3582(c)(1)(a)(stating that courts should consider whether extraordinary and compelling circumstances apply "after considering the factors set forth in section 3553(a) to the extent that they are applicable").

Third, the Commission, in producing the Policy Statement, expressly was responding "to Congress' mandate to the Sentencing Commission . . ." 28 U.S.C. § 994(t) to "describe what should be considered extraordinary and compelling reasons for the sentence reduction . . . ." Section 994(t) was enacted in 1984, and the First Step Act did not change the language of § 994(t) at all -- it was updated last in 2006. By the time that Congress was enacting the First Step Act, the Commission was doing exactly what Congress told it to do, so that there was not a gap when the First Step Act became law.

The Tenth Circuit also states that it rejects the Policy Statement because applying the Policy Statement would eliminate the "catch-all" provision that Congress intended to enact. McGee, 992 F.35 at 1050. The Tenth Circuit explains:

> specifically, treating the existing policy statement as continuing to be applicable would effectively eliminate, in all cases involving motions filed directly by defendants rather than the Director of the BOP, the "Other Reasons" (i.e., "catch-all") category that the Sentencing Commission clearly intended to exist. This is because the "catch-all" category, as described in the Sentencing Commission's existing policy statement, requires a determination by the Director of the BOP that extraordinary and compelling circumstances exist in a given case. But, in a case where the defendant has moved for relief under the statute, the Director of the BOP has necessarily *not* made any such determination. This is problematic and clearly undercuts not only Congress's intent to expand the use of compassionate release,[5] but also the Sentencing Commission's intent to recognize a "catch-all" category of cases in addition to those that fall within the narrow confines of the first three categories of cases. Thus, we reject the government's position.

McGee, 992 F.3d at 1050. But it is not at all clear why a court could not consider the "catch-all" provision, too. The Policy Statement does not say a district court cannot use a catch-all. The Tenth Circuit creates one, so if a court is looking at the Policy Statement, it could use it, too. This reason is particularly salient given that the Commission specifically provides for a catch-all and, after the Tenth Circuit says courts cannot look at the Policy Statement, the Tenth Circuit then also creates a catch-all and never says from where its catch-all comes. The Tenth Circuit shows its true hand when it does not say that the Commission has violated the statute, but says "[t]his is problematic and clearly undercuts not only Congress' intent to explain the use of the compassion release, but also the Sentencing Commission's intent to recognize a 'catch-all' category of cases in addition to these that fall within these categories of cases." McGee, 992 F.3d at 1050. The Tenth Circuit seems to be saying that a catch-all should and does exist, but without the Policy Statement, it is not clear what its bounds are.

The Tenth Circuit then states:

---

> Although Congress undoubtedly knew that there would be some time lag between the time of the statutory changes it made with the First Step Act and the Sentencing Commission's issuance of a new policy statement recognizing those changes, it surely could not have known, and did not intend, that there would be a significant time lag, or that the Sentencing Commission would fail altogether to issue a new policy statement.

McGee, 992 F.3d at 1051, n.5.  This is a manufactured problem.  There is not a problem unless the Tenth Circuit creates a statutory duty that does not exist and ignores the already existing Policy Statement.  When Congress wanted new Guidelines or Policy Statements, it sure knew in the past how to order one.  See, e.g, 28  U.S.C § 994(a)(1)-(2)("The  Commission . . . shall promulgate . . . general policy statements regarding application of the guidelines or any other aspect of sentencing or sentence implementation that in the view of the Commission would further the purposes set forth in section 3553(a)(2)");  § 994(a)(2)(B)(requiring the Commission to promulgate "general policy statements regarding . . . the conditions of probation and supervised release . . . .").

The Tenth Circuit's statements demonstrate its taste for a new Policy Statement rather than one mentioned in the First Step Act.  The reader gets the feeling that the Tenth Circuit does not like the prior Policy Statement or Commission definition of "extraordinary and compelling" and wants a new one.  In doing so, it creates issues that do not exist, and prevents courts from looking at the Policy Statement at all.  McGee limits courts analyzing compassionate release applications for a time until the Tenth Circuit gets what it wants -- a new Policy Statement.

Finally, the Tenth Circuit instructs courts not to look at the Policy Statement, but does not indicate what could be "extraordinary and compelling" circumstances that are not in the Policy Statement; the Court also has not thought of other categories.  For example, in this case, Gonzales is effectively trying to fit into the "medical condition of the defendant" category of the Policy Statement.  In sum, if the Court were writing on a clean slate, which it is not, because of McGee, it would conclude that the Policy Statement does not bind district courts and the courts are free under Kimbrough v. United States to ignore it, but that it is still something that federal courts should read and consider when they get one of these compassionate release motions.  While the Policy Statement does not limit the considerations that a district court can utilize to find "extraordinary and compelling" circumstances, and a court might go beyond the Policy Statement and create new categories, the federal courts should still be permitted to look at them if they wish.  The Court is a district court and is not writing on a clean slate, however, and will follow faithfully the Tenth Circuit law and ignore the Policy Statement in ruling on Gonzales' motion for compassionate release.

Mamau, the Tenth Circuit's second published compassionate release case following the First Step Act, generates odd results contrary to Congress' intent, because it again directs courts to ignore the Policy Statement and also allows courts essentially to disregard mandatory minimums. In Maumau, it becomes evident that the three-step statutory analysis has now, in the Tenth Circuit, collapsed into a one-step judicial test.  The Tenth Circuit concludes that district courts in carrying out § 3582(c)(1)(A), a three-part statute, possess the ability to determine for themselves what constitutes "extraordinary and compelling reasons," but, because it has decided there is no "applicable" Policy Statement, there do not appear to be any boundaries. The Tenth

Circuit then says that the Commission -- neither now nor in the future -- can take away that discretion.  The Tenth Circuit never explains how, if a district court has the "independent[]" authority to define the phrase, how its discretion could ever be "inconsistent" with a Policy Statement.  Maumau, 993 F.3d at 832.  The district courts are left to guess what this could mean in the future.

The Tenth Circuit spends a lot of time talking about the difference between "define" and "describe" which is interesting, but not very informative.  Maumau, 993 F.3d at 832.  The real question is what "extraordinary and compelling" means, and the Tenth Circuit does not attempt to tackle that issue.  The Tenth Circuit's comparison of the Policy Statement to a "general statement of policy," Maumau, 993 F.3d at 833, rather than interpretive rules, is curious given that the Administrative Procedures Act, 5 U.S.C. §§ 551-50,  does not apply to the Commission, see Mistretta v. United States, 488 U.S. 361, 390-92 (1989).  In the end, the Tenth Circuit never says why a district court would ever act "inconsistent" with a Policy Statement.  Moreover, if all the Commission can do is "describe" what it thinks is "extraordinary and compelling," it is unclear why the Policy Statement does not fit the bill, and should not at least be considered if it is never even going to be binding.  Maumau, 993 F.3d at 833.

It is one thing if the Tenth Circuit intends to say that the Guidelines do not bind district courts; since Kimbrough v. United States, 552 U.S. 85, no one could deny that a district court could disagree with the Commission's promulgations.  At the same time, no one thought that courts or the Commission could ignore mandatory minimums unless Congress said mandatory minimums could be ignored.  Instead, the Tenth Circuit finds in the words "extraordinary and compelling" the ability of district courts to get rid of mandatory minimums.  Cf. Maumau, 993 F.3d at 837 ("Nothing in the district court's decision indicates that the district court granted relief to Maumau based upon its general disagreement with the mandatory sentences that are required to be imposed in connection with § 924(c) convictions.").  There is nothing in Maumau that stops a district court from imposing the stated mandatory minimum one day, and then resentencing below the mandatory minimum the next day if the defendant files a compassionate release motion.  The defendant in Mamau was released after serving ten years of a fifty-five-year sentence; he received, therefore, a sentence that was lower than both the mandatory minimums in place when he was sentenced and the mandatory minimums present in § 924(c)'s current iteration.  See generally Teague v. Lane, 489 U.S. 288, 309 (1989)("Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system.").

Respectfully, the Court doubts that is what Congress wanted when it used the words "extraordinary and compelling," which are used in the existing policy statement; neither the Commission nor Congress' use of these words suggest that district courts have the authority to have a Kimbrough disagreement with Congress and ignore mandatory minimums.  See United States v. Tomes, 990 F.3d 500, 505 (6th Cir. 2021)("We will not render § 401(c) useless by using § 3582(c)(1)(A) as an end run around Congress's careful effort to limit the retroactivity of the First Step Act's reforms.").  Minimums are not very mandatory if the resentencing court just can ignore them.

While the Tenth Circuit says that there is a three-step process in evaluating compassionate release applications, and states in Maumau that a district court must address all three steps if it intends to grant compassionate release, the Tenth Circuit again does not rely on or analyze

§ 3553(a) in its analysis, or indicate what the district court has to decide when it grants compassionate release.  See Maumau, 999 F.3d at 830 n.3.  There is, then, in effect, only one step regarding which the Tenth Circuit analyzes: "extraordinary and compelling," and the district court can decide that issue on its own.  There is no applicable policy statement.  The Tenth Circuit does not mention the § 3553(a) factors.  Hence, the bellwether is the "extraordinary and compelling" reasons, and the district court has discretion to decide what constitutes "extraordinary and compelling."  The Court is not convinced that Congress meant the Tenth Circuit's one-step, district court-by-court discretion to be the law.  Although the United States Court of Appeals for the Seventh Circuit held that the Policy Statement was not "applicable," under the statute, it also stated:

> [W]e do not see the absence of an applicable policy statement as creating a sort of Wild West in court, with every district judge having an idiosyncratic release policy.  The statute itself sets the standard: only "extraordinary and compelling reasons" justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii). The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive.

United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020). Even if the Tenth Circuit considers the Policy Statement inapplicable, it should, in the Court's view, allow district courts to consider the Policy Statement in their analysis.  By implying in McGee and Maumau that district courts cannot consider the Policy Statement at all, the Tenth Circuit has created a situation in which "every district judge ha[s] an idiosyncratic release policy."  United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020).

With respect, it is difficult to reconcile the result in Maumau with the First Step Act, given that Congress has been clear when it wants certain programs to be retroactive and when it does not want others to be retroactive.  The Honorable Timothy Tymkovich, Chief United States Circuit Judge for the Tenth Circuit, seems uncomfortable with the result, but does not shut the door to it.  See Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring)("I write separately, however, to note that our holding does not give district courts carte blanche to retroactively apply in every instance the amendments to the stacking provision in 18 U.S.C. § 924(c). Congress, after all, chose *not* to make those amendments retroactive.")(emphasis in original).  Chief Judge Tymkovich simply says that statutory changes to mandatory minimums cannot be the only reason for granting compassionate release.  See Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring)(stating that "a district court may consider the legislative change to the stacking provision only in the context of an individualized review of a movant's circumstances").  The problem is not the number of reasons a court considers; the problem is how judges' reasons should not be able to overcome Congress' mandatory minimums.  Chief Judge suggests that more pages of analysis can justify what is going on in the opinions the Honorable Mary Beck Briscoe, United States Circuit Judge for the Tenth Circuit, authored for the Tenth Circuit in McGee and Maumau. Disagreement with Congressionally imposed mandatory minimums, however, in the Court's view, should not be a

factor at all in a court's compassionate release analysis.

Last, it concerns the Court that the Tenth Circuit purports to apply an abuse-of-discretion standard in compassionate release cases, but has reversed a third of the compassionate release denials it has addressed on the merits. The Tenth Circuit, in 2019, reversed district courts on 7.1% of criminal cases and 7.5% of "U.S. Prisoner Petitions." Practitioner's Guide to the United States Court of Appeals for the Tenth Circuit at 9, Office of the Clerk, United States Court of Appeals for the Tenth Circuit (Jan. 1, 2020)(11th ed.), https://www.ca10.uscourts.gov/sites/default/files/clerk/2021PracGuideUpdate-11thEdition.pdf. See Just the Facts: U.S. Courts of Appeals, United States Courts (Dec. 20, 2016), https://www.uscourts.gov/news/2016/12/20/just-facts-us-courts-appeals#table2 (noting that nationwide, between 2011 and 2015, Courts of Appeals reversed between 5.8% and 6.9% of criminal cases and between 3.2% and 7.6% of "prisoner petitions"). The Tenth Circuit insists that it "review[s] for an abuse-of-discretion" in compassionate release cases. United States v. Pinson, 835 F. App'x 390, 393 (10th Cir. 2020). The Tenth Circuit describes this standard as a "deferential standard," and insists that it "will uphold the district court's ruling unless it relied on an incorrect conclusion of law or a clearly erroneous finding of fact." United States v. Pinson, 835 F. App'x at 394. Yet, of the twelve compassionate release denials that the Tenth Circuit has reviewed on the merits since the First Step Act's passage, it has reversed district courts on four occasions. See United States v. Avalos, No. 20-3194, 2021 WL 1921847 (10th Cir. May 13, 2021)(Briscoe, J.)(reversing district court's denial of compassionate release motion); United States v. McRae, 845 F. App'x 804 (10th Cir. 2021)(Holmes, J.)(reversing district court's denial of pro se compassionate release motion); United States v. Carr, No. 20-1152, 2021 WL 1400705 (10th Cir. Apr. 14, 2021)(Tymkovich, C.J.)(reversing district court's compassionate release denial because it applied the USSG policy statement); McGee, 992 F.3d at 1035 (Briscoe, J.)(reversing district court's denial of compassionate release motion). The Tenth Circuit has also affirmed district courts' compassionate release denials where the defendant did not exhaust administrative remedies, see United States v. Springer, 820 F. App'x 788, 792 (10th Cir. 2020)(Philips, J.)(affirming district court's denial of compassionate release motion where defendant had not complied with exhaustion requirement); United States v. Gieswein, 832 F. App'x 576 (10th Cir. 2021)(Kelly, J.)(affirming district court's denial of compassionate release motion where defendant had not complied with exhaustion requirement); United States v. Johnson, No. 20-6103, 2021 WL 1053706, at *2 (10th Cir. March 19, 2021)(McHugh, J.)("Because she has failed to demonstrate that she satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement, the district court properly rejected her request for relief under the statute."), or did not timely file an appeal, see United States v. Lara, No. 20-6133, 2020 WL 8729680, at *2 (10th Cir. Oct. 1, 2020)(Hartz, J.)(dismissing appeal of district court's denial of compassionate release motion because the defendant did not timely appeal). By contrast, the Tenth Circuit, thus far, has not reversed a district court's grant of compassionate release. See Maumau, 993 F.3d at 821 (affirming district court's grant of compassionate release motion). This undermines judicial efficiency, and is problematic for district judges who are not excited about resentencing all the people they have sentenced already. See Teague v. Lane, 489 U.S. 288, 309 (1989)("Without finality, the criminal law is deprived of much of its deterrent effect.").

This is a treacherous area for district judges. "As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is

- 70 -

United States v. Carr, No. 20-1152, 2021 WL 1400705, at *4 (10th Cir. Apr. 14, 2021)(reversing a district court where the district court relied on the policy statement because, "[a]lthough it was within the district court's discretion to conclude the application notes to U.S.S.G. § 1B1.13 still provided the best definition and description of extraordinary and compelling reasons under the circumstances," it was "not apparent the district court recognized U.S.S.G. § 1B1.13 was no longer controlling").  The Court, therefore, addresses only the compassionate release test's first and third elements of the compassionate release test when it analyzes motions defendants bring directly.

---

read the implicit, unwritten signs that the superior courts send them through their opinions." Gutierrez v. Geofreddo, No. CIV 20-0502 JB/CG, 2021 WL 1215816, at *11 (D.N.M. Mar. 31, 2021)(Browning, J.)(citing Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014)).  Here, the Tenth Circuit does not appear to apply a true abuse-of-discretion standard to compassionate release denials, and seems to be signaling that it wants district courts to grant compassionate release applications.  Although the Court has no specific statistics upon which to rely, given that the abuse-of-discretion standard is the most deferential standard of review, the Court presumes that the Tenth Circuit's reversal rate is likely -- or should be -- lower than its reversal rate averages.  See Practitioner's Guide to the United States Court of Appeals for the Tenth Circuit at 9.  Yet, when the district court denies a compassionate release motion where the defendant has exhausted his or her administrative remedies -- which, according to § 3582, it should grant only in extraordinary and compelling circumstances -- it faces a reversal rate of nearly five times the Tenth Circuit's average reversal rate.  Cf. United States v. Pinson, 835 F. App'x at 394.  Compounding the problem, the Tenth Circuit has spent a considerable amount of time telling district courts what they cannot consider when granting compassionate release motions, and little to no time explaining what extraordinary and compelling circumstances are, or how district courts should apply § 3553(a).  See Maumau, 993 F.3d at 832; McGee, 992 F.3d at 1044.  The Tenth Circuit instructs repeatedly that district courts have "discretion . . . to independently determine the existence of 'extraordinary and compelling reasons' . . . ."  Maumau, 993 F.3d at 832.  Accord McGee, 992 F.3d at 1044 (same).  Respectfully, based on the reversal rates, however, this discretion, particularly where district judges deny compassionate release applications, appears more limited than the text of the Tenth Circuit's opinions indicate.  In sum, the Tenth Circuit's lack of clear guidance, the high volume of compassionate release applications, and the Tenth Circuit's willingness to reverse district courts applying an already vague standard, reduces judicial efficiency and has created a minefield for district judges considering compassionate release applications.

Similarly, as a result of the Tenth Circuit's holdings in McGee and Maumau, the Court determines whether a defendant's case presents extraordinary and compelling circumstances without relying on policy statements from the Sentencing Commission.

### 3.     It Is Difficult for a District Court to Evaluate Accurately Medical Requests for Compassionate Release Absent Expert Testimony.

It is very difficult for the Court to decide: (i) whether the BOP's medical care has been poor; and (ii) whether that poor care has compromised the defendant's prospects of survival in a compassionate release case.  Normally, poor medical care in prison is dealt with in civil cases, and not in criminal cases.  See Ramos v. Martinez, No. CIV 17-0120 JB/GBW, 2019 WL 7049620, at *3 (D.N.M. Dec. 23, 2019)(Browning, J.)("Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain that the Eighth Amendment proscribes.").  Typically, the courts do not deal with medical care in the criminal context, but wait for a Bivens action under the Eighth Amendment.  See, e.g., Carlson v. Greene, 446 U.S. 14, 20 (1980); Estelle v. Gamble, 429 U.S. 97, 104 (1976); Richardson v. Daniels, 557 F. App'x 725, 728 (10th Cir. 2014)(affirming dismissal of a prisoner's Bivens claim which alleged that the defendants "violated his Eighth Amendment rights in connection with their response to a seizure he had," where "corrections officers responded to his seizure, he received prompt medical attention and has been given medicine to treat seizures").  The efficient solution to poor medical care in a prison setting is neither to redo a sentence nor to release the defendant.  It seems strange that we do not deal with medical protection in the criminal case unless it jeopardizes the defendant's right to effective assistance of counsel, see United States v. Boigegrain, 155 F.3d 1181, 1186 (10th Cir. 1998)("[I]t was impossible for the district court to allow the defendant to waive counsel before determining whether he was competent to stand trial,"), but, once a defendant goes to prison, courts

may use poor medical care to release a defendant, see, e.g., United States v. Beck, 425 F. Supp. 3d 573, 586 (M.D.N.C. 2019)(Eagles, J.)(granting a prisoner's compassionate release motion "given her breast cancer and the poor treatment she has received at BOP").  Instead, Bivens actions are a more suitable remedy to problems with prison medical care, rather than compassionate release motions.

Moreover, it is difficult for a district court to compare medical care.  Often, a defendant, when released, has no medical insurance, and his or her care is problematic.  It is not clear how the Court should compare the care in a medical BOP Facility with care on the outside, particularly where the Court must speculate regarding the quality of medical a defendant might receive once released.  Further, it is very difficult for a district court to know, without the discovery and experts it has in a civil case, whether the defendant is the problem or whether the facility is the problem. See generally Nicholson v. Evangelical Lutheran Good Samaritan Soc'y, Inc., No. CV 16-0164 JB/KK, 2017 WL 3127799, at *29 (D.N.M. July 21, 2017)(Browning, J.)(stating that, in a medical malpractice case, the plaintiff must "use expert medical testimony," because, where "the cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion,' a plaintiff must introduce expert medical testimony that establishes causation")(quoting Woods v. Brumlop, 1962-NMSC-133, ¶ 15, 377 P.2d 520, 523 and citing O'Banion v. Owens Corning Fiberglass Corp., 968 F.2d 1011, 1013 (10th Cir. 1992)(affirming an order that excluded evidence of cancer where plaintiff presented no evidence "from a qualified medical expert stating that there is a reasonable medical probability the Plaintiff will have a cancer condition from his asbestos related disease").  The Court should proceed with caution when it encounters the thin record that often exists after criminal cases.  Tossing a stack of medical records at the Court is not very helpful without expert testimony and a true adversarial process.  On this

basis, the Court cannot evaluate meaningfully whether the defendant has asked properly for help, whether the facility has denied improperly that care, and how severe the health condition is.  Unless the parties are willing to wade deep and present the Court with a robust evidentiary record, the Court is left with the uneasy feeling that it is dealing with a pro se prisoner's complaint that is often seen in <u>Bivens</u> actions -- skeptical that the situation is as bad as the pro se prisoner says it is.

## ANALYSIS

The Court "generally 'may not modify a term of imprisonment once it has been imposed.'" <u>Dillon v. United States</u>, 560 U.S. 817, 819 (2010)(quoting 18 U.S.C. § 3582(c)).   In 2018, Congress created an exception to this general rule and allowed defendants who had exhausted their administrative remedies to petition district courts directly for compassionate release where "extraordinary and compelling reasons warrant such a reduction" in a defendant's sentence. 18 U.S.C. § 3582(c)(1)(A)(i) .   "[A] district court may thus grant a motion for reduction of sentence . . . only if three requirements are met: (1) the district court finds that extraordinary and compelling reasons warrant such a reduction; (2) the district court finds that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (3) the district court considers the factors set forth in § 3553(a), to the extent that they are applicable." <u>Maumau</u>, 993 F.3d at 821.  The Tenth Circuit has held that there are no current applicable policy statements from the Sentencing Commission that apply to defendant-filed compassionate release motions.  See <u>United States v. McRae</u>, 845 F. App'x 804, 806 (10th Cir. 2021)(explaining that "when a prisoner, not the BOP Director, files a compassionate-release motion, this policy statement doesn't apply"); <u>McGee</u>, 992 F.3d at 1050 ("'Because Guideline § 1B1.13 is not applicable to compassionate release motions brought by defendants, Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and

compelling.'")(quoting <u>United States v. Brooker</u>, 976 F.3d 228, 236 (2d Cir. 2020)); <u>Maumau</u>, 993 F.3d at 821 (10th Cir. 2021)(concluding "that the Sentencing Commission's existing policy statement is applicable only to motions filed by the Director of the BOP, and not to motions filed directly by defendants"). <u>Cf.</u> <u>United States v. Carr</u>, No. 20-1152, 2021 WL 1400705, at *4 (10th Cir. Apr. 14, 2021)(reversing a district court where the district court relied on the policy statement because, "[a]lthough it was within the district court's discretion to conclude the application notes to U.S.S.G. § 1B1.13 still provided the best definition and description of extraordinary and compelling reasons under the circumstances," it was "not apparent the district court recognized U.S.S.G. § 1B1.13 was no longer controlling"). The Court, therefore, addresses only the threshold administrative exhaustion requirement and the first and third elements of the compassionate release test in its analysis.

As a threshold matter, the Court concludes that S. Eccleston has satisfied § 3582's administrative exhaustion requirement. Turning to the merits, S. Eccleston presents two primary arguments in favor of his compassionate release motion. <u>See</u> Second Amended Motion at 10-23. First, S. Eccleston contends that his medical circumstances, including his pre-existing conditions and the prevalence of COVID-19 at the federal prison facility in which he is housed, favor his release. <u>See</u> Second Amended Motion at 10. Second, S. Eccleston argues that a combination of factors, including his successful rehabilitation while in prison, the length of his sentence, his young age when he committed the crime, and his belief that his state and federal sentences would run concurrently, amount to extraordinary and compelling circumstances which favor his release from prison. <u>See</u> Amended Motion at 19-23. The Court concludes that S. Eccleston does not merit compassionate release on the basis of his medical conditions, because his medical conditions are relatively common and well managed by the BOP, and, therefore, do not present extraordinary and

compelling circumstances.  See Medical Records Supplement at 1-31.  Regarding S. Eccleston's

second argument, the Court holds that S. Eccleston is entitled to a reduction in his sentence

because: (i) his case presents extraordinary and compelling circumstances; and (ii) the § 3553(a)

factors have been met.  See Maumau, 993 F.3d at 821.  Accordingly, because S. Eccleston has

exhausted his administrative remedies and satisfied 18 U.S.C. § 3582, the Court reduces S.

Eccleston's sentence to 228 months.

## I. ECCLESTON HAS SATISFIED § 3582'S ADMINISTRATIVE EXHAUSTION REQUIREMENT, BECAUSE HE FILED A REQUEST FOR COMPASSIONATE RELEASE WITH THE WARDEN MORE THAN THIRTY DAYS BEFORE HE FILED THE AMENDED MOTION AND THE SECOND AMENDED MOTION.

The parties and the Court agree that S. Eccleston "has exhausted his administrative

remedies as required by the statute as more than 30 days have lapsed since he filed his request with

the Warden of FCI Fort Dix."  Second Response at 7.  See Second Amended Motion at 5; Tr. at

16:15-23 (McConnell).  A defendant may file a compassionate release motion in federal court after

he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons

to bring a motion the defendant's behalf or the lapse of 30 days from the receipt of such a request

by the warden of the defendant's facility, whichever is earlier."  § 3582(c)(1)(A)(i).  See United

States v. Johnson, 2021 WL 1053706, at *2 ("In this circuit, however, § 3582(c)(1)(A)'s

exhaustion requirement is mandatory, rather than judicially waivable.").  A defendant "must fulfill

the exhaustion requirement for the Court to have subject-matter jurisdiction."  United States v.

Baca, 2020 WL 5369078, at *13.[21]  Here, S. Eccleston filed a request for compassionate release

---

[21]The administrative exhaustion requirement in the First Step Act does little to assist the district judges.  A defendant need only file a one-page document with the Warden of his or her prison requesting release.  See 18 U.S.C. 3581(c)(1).  If the Warden does not respond within thirty days, the defendant may file suit in district court.  Where the Warden issues a denial, the Warden typically does not provide detailed reasons for this denial.  See, e.g., Response to Inmate Request

with the Warden, Ortiz, on July 21, 2020. See Inmate Request to Staff at 1 (dated July 21, 2020), filed February 10, 2021 (Doc. 339-3). S. Eccleston also filed an earlier compassionate release request that was denied on April 21, 2020. The Court, therefore, must deny the Motion, because S. Eccleston filed the Motion on April 15, 2020, before he had received a denial of his request or waited thirty days from when he made the request, and thus did not exhaust his administrative remedies.[22] S. Eccleston's "requests were either denied or ignored," however, "prior to the filing of" the Amended Motion and the Second Amended Motion. Tr. at 16:15-23 (McConnell). Accordingly, the Court concludes that S. Eccleston has exhausted successfully his administrative remedies as required by § 3582(c)(1)(A)(i), and the Court therefore considers the Amended Motion and the Second Amended Motion on the merits.

## II.   ECCLESTON'S CASE PRESENTS EXTRAORDINARY AND COMPELLING

---

to Staff Member at 1 (informing Gonzales that "concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence"). Again, if the Warden denies the request, this enables the defendant to file in district court. The Court is left with an administrative record that is around two pages at most, and acts only to demonstrate that the defendant followed the statute's exhaustion prescription. See 18 U.S.C. 3581(c)(1). The administrative review process, therefore, does nothing, or almost nothing, to develop the factual record before a case reaches the Court. The case invariably will reach the Court, because the BOP either ignores or denies virtually all compassionate release requests. See Reductions in Sentence Requests March through May 2020, the Marshall Project, https://www.themarshallproject.org/documents/7217918-Reduction-in-Sentence-Requests-March-Through-May (last visited May 31, 2021)(providing data from the BOP demonstrating that between March, 2020, and May, 2020, the BOP denied ninety-eight percent of compassionate release requests). Accordingly, the administrative exhaustion process in compassionate release cases is essentially useless. This lack of help from the BOP further exacerbates the burden on the Court. A more robust administrative review process, before an administrative law judge would assist the Court in dealing with its crush of criminal cases, which has expanded recently as a result of compassionate release motions.

[22]This has no practical effect on S. Eccleston's case, because he restates all of the arguments he made in the Motion in the Amended Motion and the Second Amended Motion.

**CIRCUMSTANCES.**

S. Eccleston's case presents the following factors which, when considered together, constitute extraordinary and compelling circumstances supporting reducing his sentence: (i) when S. Eccleston signed the Plea Agreement, he reasonably believed, based upon the Plea Agreement's text and advice from both his lawyer and State Judge Allen, that his federal and state sentences would run concurrently, which, if true, would have reduced significantly his time incarcerated, see State Sentencing Tr. at 10:12-13 (Allen, J.), but his sentences ran consecutively; (ii) the Court finds, by a preponderance of the evidence, that S. Eccleston will not reoffend if released, and, therefore, is no longer a danger to society, because (a) his current age; (b) the length of time he has spent in prison; (c) the education he obtained in prison; and (d) his lack of disciplinary history in prison, all decrease significantly his likelihood of reoffending; (iii) S. Eccleston's robust rehabilitative efforts and detailed release plan -- including his plans to reside with his father on a farm in rural New York, and his proposed career as a dental hygienist for which he has studied while incarcerated -- have prepared him to re-enter successfully society with the assistance of supervised release; (iv) S. Eccleston has no prison disciplinary history, which is rare for persons who have been incarcerated for twenty-five years; (v) although S. Eccleston's crime was very violent, S. Eccleston was eighteen when he committed the offense at issue[23] and suffered from drug and mental health problems, which have been addressed satisfactorily via BOP programming -- S. Eccleston's drug treatment provider with the BOP stated that S. Eccleston "has demonstrated cognitive and behavioral changes in line with offenders who have successfully reentered society as productive citizens," Betts Letter at 1; and (vi) S. Eccleston has demonstrated continuous

---

[23]Today, S. Eccleston is forty-five.  See Second Amended Motion at 28.

remorse for his behavior.  The Court disagrees, however, with S. Eccleston's argument that his medical concerns and the changes to § 924(c) represent extraordinary and compelling circumstances weighing in favor of his release.  See Second Amended Motion at 26-28.

### A.   ECCLESTON IS NOT ELIGIBLE FOR COMPASSIONATE RELEASE ON THE BASIS OF HIS MEDICAL CONDITIONS, BECAUSE THEY DO NOT PRESENT EXTRAORDINARY AND COMPELLING CIRCUMSTANCES.

The Court will "proceed with caution when it encounters the thin record that often exists after criminal cases.  Tossing a stack of medical records at the Court is not very helpful without expert testimony and a true adversarial process."  United States v. Gonzales, No. CR 14-0922 JB-1, 2021 WL 2210647, at *23 (D.N.M. June 1, 2021)(Browning, J.).  The Court concludes that S. Eccleston's medical difficulties do not present extraordinary and compelling circumstances, because the record indicates that the BOP manages effectively his chronic conditions, and because his experience contracting COVID-19 is a common one.  See Medical Records Supplement at 1-31.  Based upon the record before it, the Court finds that the S. Eccleston will not contract COVID-19 again in prison, and, even if he does, he will not become severely ill.  As the Court has stated previously, "cases in which COVID-19 is a factor for compassionate release require more than speculative complications."  United States v. Baca, 2020 WL 5369078, at *15.  Moreover, as S. Eccleston admits, at present, he is a "mostly healthy 45-year-old."  Second Amended Motion at 28.  The Court, therefore, concludes that S. Eccleston's incarceration does not create a serious risk of medical harm.

First, S. Eccleston already has contracted COVID-19, see Medical Records Supplement at 24, and this fact, coupled with the COVID-19 vaccine's increasingly widespread availability through the BOP, means his chances of contracting COVID-19 again are relatively low, see, e.g. United States v. Purry, No. CR 14-0332, 2020 WL 5909793, at *2 (D. Nev. Oct. 6,

2020)(Dorsey, J.)(explaining that, in a compassionate release case, "a possibility [of reinfection] that is unconfirmed by science is insufficient to create an extraordinary and compelling circumstance justifying" a defendant's).  See also United States v. Read-Forbes, 843 F. App'x 131, 134 (10th Cir. 2021)(dismissing a compassionate release appeal as moot where the defendant had contracted COVID-19 already, because "the courts can no longer do anything to prevent her from getting her initial infection"); Reinfection with COVID-19, Centers for Disease Control and Prevention (Oct. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html [https://perma.cc/W54E-WTZ3] (noting that, although "cases of reinfection with COVID-19 have been reported," they "remain rare").  Fort Dix, where S. Eccleston is incarcerated currently, has 2,848 total inmates, and 1,485 inmates -- more than half of the total inmate population -- have been vaccinated fully against COVID-19.  See COVID-19: Coronavirus, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 4, 2021); FCI Fort Dix, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/ftd/ (last visited June 4, 2021).  Accordingly, the Court finds, by a preponderance of the evidence, that S. Eccleston will not contract COVID-19 again.

Second, even if S. Eccleston were to contract COVID-19 again, S. Eccleston "is not necessarily at elevated risk for COVID-19 complications . . . , so the Court cannot justify soundly compassionate release on the bases of these circumstances."  United States v. Baca, 2020 WL 5369078, at *15.  S. Eccleston notes that he "has a history of medical issues including asthma, Hepatitis C, hypertension, Bell's Palsy,[24] and respiratory issues, including bronchitis and

---

[24]Bell's palsy is a facial nerve disorder that "may range from mild twitching to full paralysis of the muscles on one side of the face."  Danette C. Taylor, Bell's Palsy & Other Facial Nerve Problems, MedicineNet (Dec. 15, 2020).

pneumonia, and is in chronic care."  Second Amended Motion at 11.  Of S. Eccleston's medical conditions, "asthma, if it's moderate to severe," and "pulmonary hypertension (high blood pressure in the lungs)" "can make you more likely to get severely ill from COVID-19."  People with Certain Medical Conditions, Centers for Disease Control and Prevention (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html  S. Eccleston's medical records do not mention his asthma, so the Court cannot determine whether it is mild, moderate, or severe.  See Medical Records Supplement at 1-31.  S. Eccleston's medical records also do not indicate that his hypertension is pulmonary.  See Medical Records Supplement at 23 (classifying S. Eccleston's hypertension as "Benign Essential").  Based on the record, the Court cannot conclude soundly that S. Eccleston has any medical conditions that make him more likely to become severely ill if he contracts COVID-19 again.  See Medical Records Supplement at 1-31; People with Certain Medical Conditions, Centers for Disease Control and Prevention (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  The Court is sympathetic to the difficulties that prisoners may encounter when managing chronic medical conditions while incarcerated.  See, e.g., United States v. Gonzales, 2021 WL 2210647, at *31 (noting that a BOP facility's "neglect of inmates' healthcare is troublesome").  In this case, however, the evidence does not demonstrate that the BOP is providing S. Eccleston with poor medical care, and the Court declines to speculate that S. Eccleston would receive better care outside prison.  See United States v. Gonzales, 2021 WL 2210647, at *3 ("It is not clear how the Court should compare the care in a medical BOP Facility with care on the outside, particularly where the Court must speculate regarding the quality of medical a defendant might receive once released."); Medical Records Supplement at 1-31.  Moreover, S. Eccleston's experience

contracting COVID-19 is, unfortunately, common rather than extraordinary.  See COVID Data Tracker, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#global-counts-rates (last visited May 20, 2021)(noting that, as of May 20, 2021, there have been 32,825,625 COVID-19 cases in the United States).   Accordingly, the Court concludes that S. Eccleston's health concerns do not present extraordinary and compelling circumstances warranting his release from prison.

### B.   THE CHANGES TO THE MANDATORY MINIMUMS ASSOCIATED WITH § 924(C) ARE NOT EXTRAORDINARY OR COMPELLING CIRCUMSTANCES.

The Court concludes that prospective statutory changes generally do not result in extraordinary and compelling circumstances warranting compassionate release.  See Van Skiver v. United States, 952 F.2d 1241, 1245 (10th Cir. 1991).[25]  See also Gonzalez v. Crosby, 545 U.S. 524, 536 (2005)(Scalia, J.)(concluding that "not every interpretation of the federal statutes setting

---

[25]The Tenth Circuit has "held that '[a] change in the law or in the judicial view of an established rule of law' does not justify relief under Rule 60(b)(6)," and, therefore, does present "extraordinary circumstances."  Van Skiver v. United States, 952 F.2d at 1245 (alteration in Van Skiver v. United States)(quoting Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958)). Similar to the First Step Act's compassionate release provision, rule "60(b)(6) gives the court a 'grand reservoir of equitable power to do justice in a particular case.'" Pierce v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(quoting 7 Moore, Federal Practice at p. 308 (1950 ed.)). Specifically, Rule 60(b)(6) allows plaintiffs in civil cases to seek relief from a final judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).  In Klapprott v. United States, 335 U.S. 601 (1949) the Supreme Court granted rule 60(b)(6) relief, concluding that the "petitioner's allegations set up an extraordinary situation which cannot fairly or logically be classified as mere 'neglect' on his part." Klapprott v. United States, 335 U.S. at 613 (citing the briefing). Subsequently, in Ackerman v. United States, the Supreme Court denied relief under rule 60(b)(6), explaining that "Klapprott was a case of extraordinary circumstances." Ackermann v. United States, 340 U.S. 193, 199 (1950).   Because rule 60(b)(6) relief requires "extraordinary circumstances," and because both rule 60(b)(6) and § 3582 grant courts broad discretion to shorten criminal defendants' sentences, the Court looks to 60(b)(6) case law as helpful guidance when assessing the § 3582 analysis' "extraordinary and compelling circumstance" prong.  Fed. R. Civ. P. 60(b)(6).

forth the requirements for habeas provides cause for reopening cases long since final").  Here, the Court concludes that the changes to 18 U.S.C. § 924(c) since S. Eccleston's conviction do not justify relief under 18 U.S.C. § 3582(c)(1)(A), because S. Eccleston's stacked sentence was not "relatively rare," Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring), or "'very unusual or remarkable,'" United States v. Gonzales, 2021 WL 2210647, at *28 (quoting New Oxford American Dictionary 614 (3d ed. 2010)), because it was mandatory at the time he was sentenced, and because thousands of other defendants were sentenced under § 924(c)'s former version; (ii) Congress chose not to make the § 924(c) changes retroactive; and (iii) S. Eccleston's sentence, therefore, does not overcome the general presumption that "change[s] in the law" do not present "extraordinary circumstances," Van Skiver v. United States, 952 F.2d at 1245.

At the time of S. Eccleston's convictions, § 924(c) included a "stacking" provision that required S. Eccleston's sentencing judge, Judge Hansen, to impose a thirty-year sentence for S. Eccleston's use of a firearm during his underlying offenses.  See Maumau, 993 F.3d at 824.  At the time S. Eccleston's sentence was imposed, § 924(c) provided:

> Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment . . . if the firearm is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, to imprisonment for ten years . . . . In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years . . . .

18 U.S.C. § 924(c)(1)(1996).

Under the First Step Act, however, a mandatory minimum of twenty-five years applies only "[i]n the case of a violation of this subsection that occurs after a prior conviction under this

subsection has become final." 18 U.S.C. § 924(c). If S. Eccleston were sentenced today, therefore, for the same crimes, under 18 U.S.C. § 924(c)(1)(B)(i), a mandatory minimum sentence of ten years would apply to Count 2, and a mandatory minimum sentence of ten years would also apply to Count 6, which should run consecutively. Were S. Eccleston sentenced today, therefore, his mandatory minimum as to Count 2 and Count 6 would have been twenty years rather than thirty years.[26] Nonetheless, that S. Eccleston's sentence would be shorter were he sentenced today is not extraordinary and compelling.

First, in passing the First Step Act, although Congress made some provisions in the new statute retroactive, it did not make the updated mandatory minimums in 18 U.S.C. § 924(c) retroactive. See United States v. Hunt, 793 F. App'x 764, 766-67 (10th Cir. 2019)(stating that "[i]n § 403(b) of the First Step Act, Congress plainly addressed subsection (a)'s retroactivity, strictly limiting its backward reach to those offenses "committed before the date of enactment" for which "a sentence . . . has not been imposed as of that date")(quoting 132 Stat. at 5222). See also De Niz Robles v. Lynch, 803 F.3d 1165, 1169 (10th Cir. 2015)("We know that legislation is rarely afforded retroactive effect . . . . [T]he presumption that legislation operates only prospectively is nearly as old as the common law."). In Maumau, the Tenth Circuit upheld a compassionate release sentencing reduction where:

> the district court's decision indicates that its finding of "extraordinary and compelling reasons" was based on its individualized review of all the circumstances of Maumau's case and its conclusion "that a combination of factors" warranted relief, including: . . . the "incredible" length of his stacked mandatory sentences

---

[26]S. Eccleston's Guidelines sentence for Counts I and V would still be 57 to 71 months if he were sentenced today. Accordingly, were S. Eccleston sentenced today for the same crimes, his Guideline imprisonment range would be 297 months (120 + 120 + 57) to 311 months (120 + 120 + 71). When he was sentenced, his Guideline imprisonment range was 417 months to 431 months. S. Eccleston's bottom of the Guideline sentence today would be 120 months, or ten years, lower than his bottom of the Guideline sentence in 1996 when he was sentenced (417 to 297).

under § 924(c); the First Step Act's elimination of sentence-stacking under § 924(c); and the fact that Maumau, "if sentenced today, . . . would not be subject to such a long term of imprisonment."[27]

Maumau, 993 F.3d at 837 (quoting the record). The Honorable Timothy Tymkovich, Chief United States Circuit Judge for the Tenth Circuit, concurred in the opinion, but wrote separately "to note that our holding does not give district courts carte blanche to retroactively apply in every instance the amendments to the stacking provision in 18 U.S.C. § 924(c)." Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring). Chief Judge Tymkovich emphasizes that "[a] long sentence derived from stacking cannot, by itself, be an 'extraordinary and compelling' reason for sentence reduction." Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring). Chief Judge Tymkovich concludes that "[h]ad it relied only on its distaste for Maumau's long stacked sentence, the district court would have substituted its own judgment for that of Congress and thus abused its discretion." Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring). If Congress did not make the amendments to the stacking provision in 18 U.S.C. § 924(c) retroactive, the Court is reluctant to make it apply in this case and call it an "extraordinary and compelling" reason; if Congress wished, it knew how to apply the amendments retroactively. Cf. United States v. Hunt, 793 F. App'x at 766-67.

Second, the Court concludes that the changes to § 924(c) since S. Eccleston was sentenced are not extraordinary and compelling, because "the imposition of a sentence that was not only

---

[27]Judge Tymkovich, writing in concurrence, described the extraordinary and compelling factors in a slightly different manner: "(1) Maumau's extraordinarily long sentence, especially in comparison to the significantly shorter sentences Maumau's co-defendants received for substantially similar conduct; (2) the government's plea offer before trial was only 10 years; and (3) Maumau's young age at the time of his sentence." Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring).

permissible but statutorily required at the time is neither an extraordinary nor a compelling reason to now reduce that same sentence." Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring). Likewise, here, Judge Hansen imposed the statutorily required sentence for S. Eccleston's firearm offenses. See Federal Sentencing Tr. at 7:3-6 (Storment). The Court agrees that S. Eccleston received a "long stacked sentence," under the former statute. Maumau, 993 F.3d at 838. Nonetheless, thousands of criminal defendants were sentenced under the former statute. See Quick Facts: Section 924(c) Firearms Offenses at 1, United States Sentencing Commission (2012), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick -facts/Quick_Facts_Section_924c_Offenders.pdf (stating that, in 2008, there were 2,395 § 924(c) offenders, and, in 2012, there were 2,189 § 924(c) offenders)("Section 924(c) Firearms Offenses"). Between 2008 and 2012, of the thousands of defendants convicted of § 924(c) offenses, 99.4% of defendants sentenced under § 924(c) were sentenced to imprisonment. Section 924(c) Firearms Offenses at 1. Accordingly, the Court concludes that: (i) because thousands of defendants were sentenced under the previous iteration of § 924(c) -- and, therefore, S. Eccleston's stacked sentence is not "relatively rare," Maumau, 993 F.3d at 838; (ii) because Congress chose not to make the provision reducing § 924(c)'s mandatory minimums retroactive; and (iii) because "change[s] in the law" do not present "extraordinary circumstances," Van Skiver v. United States, 952 F.2d at 1245, S. Eccleston's stacked sentence is not "extraordinary and compelling," Maumau, 993 F.3d at 838. See De Niz Robles v. Lynch, 803 F.3d at 1171 ("[W]hen it comes to Congress, we know its handiwork is presumptively prospective").

### C.   ECCLESTON'S CASE PRESENTS EXTRAORDINARY AND COMPELLING CIRCUMSTANCES FOR SIX REASONS.

The Court has identified six factors which constitute extraordinary and compelling

circumstances supporting S. Eccleston's compassionate release from prison.  See supra Analysis

§ II.  The Court discusses five of the factors, including S. Eccleston's likelihood of reoffending,

his rehabilitative efforts, his age at the time of the offense, his lack of disciplinary history in prison,

and his successful drug and mental health treatment, in detail below, because these factors also

relate to § 3553(a).  See supra Analysis § III.  In this section, the Court will focus on S. Eccleston's

reasonable, but incorrect, belief when he signed his State and federal Plea Agreements that his

state and federal sentences would run concurrently, which is the most prominent of the seven

factors and the one that ultimately persuades the Court to find extraordinary and compelling

circumstances merit a sentence reduction.

When S. Eccleston was sentenced, "courts of appeals [we]re divided on the question

whether a district court may require its sentence to be served consecutively to a state sentence that

will be imposed in the future."[28]   Romandine v. United States, 206 F.3d 731, 738 (7th Cir.

---

[28]Section 3584, which governs "multiple terms of imprisonment," provides:

**(a)**      **Imposition of concurrent or consecutive terms.** -- If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively, except that the terms may not run consecutively for an attempt and for another offense that was the sole objective of the attempt. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively. Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently.

**(b)**      **Factors to be considered in imposing concurrent or consecutive terms.** -- The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a).

2000)(Easterbrook, J.).  The Tenth Circuit, writing before Judge Hansen imposed S. Eccleston's sentence, explained that there is "no language in section 3584(a) prohibiting a district court from ordering that a federal sentence be served consecutively to a state sentence that has not yet been imposed." United States v. Williams, 46 F.3d 57, 59 (10th Cir. 1995).  But see United States v. Thiefault, 279 F. App'x 452, 453 (9th Cir. 2008)("'Congress did not vest federal courts with the authority to impose a federal sentence to run consecutive to a state sentence that has not yet been imposed.'" (quoting United States v. Clayton, 927 F.2d 491, 492 (9th Cir. 1991))).  The Supreme Court later resolved this split in United States v. Setser, where it explained that a federal district court has the "discretion to order that" a defendant's federal "sentence run consecutively to his anticipated state sentence . . . ." Setser v. United States, 566 U.S. 231, 244-45 (2012).

S. Eccleston's belief that his state and federal sentences would run concurrently was reasonable, however, because: (i) information S. Eccleston received from his counsel, Mr. Reginald Storment, his State Plea Agreement, State Judge Allen's statements at his State sentencing hearing; (ii) S. Eccleston's State J&C specified explicitly that S. Eccleston's state and federal sentences should run concurrently; and (iii) nothing in S. Eccleston's federal sentencing hearing or federal Plea Agreement contradicted the idea that S. Eccleston's State and Federal sentences would run concurrently.  First, in S. Eccleston's State Plea Agreement, dated May 3, 1996, S. Eccleston "agrees that the defendant's term of imprisonment shall run concurrently with

---

       **(c)**     **Treatment of multiple sentence as an aggregate.** -- Multiple terms of imprisonment ordered to run consecutively or concurrently shall be treated for administrative purposes as a single, aggregate term of imprisonment.

18 U.S.C. § 3584.

any other term of imprisonment he receives as a result of the presently pending charges in Federal Court." State Plea Agreement at 1. S. Eccleston's federal Plea Agreement, also dated May 3, 1996, does not discuss S. Eccleston's State sentence. See Federal Plea Agreement at 1-8. When S. Eccleston signed the both the State and Federal Plea Agreements, Mr. Storment "believed . . . his federal and state sentences would run concurrent." Reginald Storment Letter at 3. At S. Eccleston's federal sentencing hearing, held on October 29, 1996, at 11:03 a.m., neither Judge Hansen nor Mr. Storment discussed S. Eccleston's State sentence. See Federal Sentencing Tr. at 13:16-15:5 (Hansen, J.). Judge Hansen stated that he "adopt[ed] the factual findings and guideline applications in the presentence report," Federal Sentencing Tr. at 14:1-4 (Hansen, J.), and the PSR itself acknowledged that S. Eccleston's State "plea agreement indicates the state sentence will run concurrently with the sentence he receives in Federal Court on the current charges," PSR ¶ 51, at 10. Later the same day, at S. Eccleston's State sentencing hearing, on October 29, 1996, at 1:35 p.m., Mr. Storment stated that "part of the plea agreement was that the sentence in this case be run concurrently to the federal time." State Sentencing Tr. at 6:24-7:1 (Storment). Subsequently, Judge Allen stated that S. Eccleston's "sentence will run concurrent with that which you're serving in the federal penitentiary." State Sentencing Tr. at 10:12-13 (Allen, J.). S. Eccleston's State J&C, filed November 7, 1996, likewise stated that S. Eccleston's State sentence would run "concurrent with the Federal Prison Sentence defendant is now serving." State J&C at 2. S. Eccleston's Federal Judgment, filed November 12, 1996, was silent regarding S. Eccleston's State sentence. See Federal Judgment at 1-7. S. Eccleston, therefore, had no reason to believe his state and federal sentences would run consecutively. See S. Eccleston Aff. ¶ 8, at 2 (noting that he "faces an additional 10 years in prison based solely on the accident of custody").

The Tenth Circuit, analyzing a § 2241 application S. Eccleston filed, concluded that S.

Eccleston was not entitled to relief on this basis:

> Mr. S. Eccleston asserts that he is entitled to serve his sentence in the custody of the BOP and that his federal and state sentences must be served concurrently. Yet nothing in his federal sentence suggests that it is to be served before or concurrently with any state sentence or that he is to serve his sentences in federal custody. Although Mr. S. Eccleston's state sentence provides for concurrent service of the federal and state sentences, the state court's decision cannot alter the federal-court sentence. As we stated in *Bloomgren v. Belaski,* 948 F.2d 688, 691 (10th Cir. 1991), the determination of whether a defendant's "federal sentence would run consecutively to his state sentence is a federal matter which cannot be overridden by a state court provision for concurrent sentencing on a subsequently-obtained state conviction."

United States v. S. Eccleston, 521 F.3d 1249, 1253-54 (10th Cir. 2008). Although the Tenth Circuit's decision binds the Court, this case presents a compassionate release application, rather than a § 2241 application. Moreover, while Judge Hansen, under Tenth Circuit law at the time, had the authority to impose S. Eccleston's federal sentence consecutively to a future State sentence, situations in which criminal defendants agree to State plea agreements expressly stating that the sentences will run concurrently and they do not, are "relatively rare." Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring).[29] As in Klapprott v. United States, S. Eccleston's circumstances "set up an extraordinary situation which cannot fairly or logically be classified as mere 'neglect' on his part." Klapprott v. United States, 335 U.S. at 613 (quoting the briefing). See S. Eccleston Aff. ¶ 8, at 2 (stating that S. Eccleston "has been diligently pursuing ways to correct the deficiency"); supra Procedural Background § 24 (summarizing S. Eccleston's extensive litigation on the issue). The facts here "reveal far more than a failure" to assess the Plea Agreements

---

[29]If it were writing on a clean slate, the Court would conclude that, although Judge Hansen had the authority to state whether S. Eccleston's federal sentence could be imposed consecutively to his State sentence, Judge Hansen declined to exercise this authority, because he did not address S. Eccleston's State sentence at the Federal Sentencing Hearing or in the Federal Judgment. See Once BOP sent him a letter, however, and responded the way he did, it is hard for the Court to say that he did not exercise his authority to run them concurrently.

carefully "due to inadvertence, indifference, or careless disregard of consequences." Klapprott v. United States, 335 U.S. at 613.  While the Court would have done what Judge Hansen did on the morning of October 29, 1996, and not discussed the State sentencing that was about to occur in the afternoon, what it would not have done is, when the BOP sent Judge Hansen a letter asking about his intention that morning, sent it back stating that it intended the sentences to run consecutively.  See United States v. S. Eccleston, 545 F. App'x at 776 (explaining that "the record contains a quotation from a letter the district court wrote to the Bureau of Prisons stating, '[i]t was my intent at sentencing that the federal sentence be served consecutively to [S. Eccleston's] state sentence and this remains my position'")(alteration in United States v. S. Eccleston).  The Court would not have responded to the letter.  The Court would have had no intention whether the sentences should run concurrently or consecutively.  It would leave the issue of concurrent sentencing to the State; in the Court's view, although it has the power under Setser to do otherwise, it is for the State court to decide what to do with the State sentence if the State is going second. While the Court has the authority to run a sentence concurrently to a future state sentence, it would not have exercised that authority.  Also, the Court does not think the BOP should have sent a letter to Judge Hansen, because Judge Hansen said nothing at the federal sentencing hearing, and seeing the State Plea Agreement, it made a mistake by sending the letter to Judge Hansen and then referring to that letter to the extent that it then ran the federal sentence consecutively.  In sum, if federal Courts of Appeal could not agree, at the time S. Eccleston's sentence was imposed, whether a federal sentencing court has the authority to decide whether its sentence should be imposed concurrently or consecutively to a future State sentence, a criminal defendant advised by his attorney and a State Judge that his sentences would run concurrently cannot be expected to assume otherwise.  The Court concludes, therefore, that, on the basis of this and other factors, S.

Eccleston's case presents extraordinary and compelling circumstances, because the situation is "'very unusual'" and has "'evoke[ed]'" the Court's "'interest [and] attention'" in an "'overwhelming'" way, United States v. Gonzales, 2021 WL 2210647, at *28 (quoting New Oxford American Dictionary 353, 614 (3d ed. 2010))(describing the definitions of "extraordinary" and "compelling"), given that S. Eccleston's reasonable misunderstanding "reveal[s] far more than a failure" to assess the Plea Agreements carefully "due to inadvertence, indifference, or careless disregard of consequences," Klapprott v. United States, 335 U.S. at 613.

## III.   SECTION 3553(A) SUPPORTS REDUCING ECCLESTON'S SENTENCE, BECAUSE A REDUCED SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO COMPLY WITH SECTION 3553(A)(2)'S PURPOSES.

Sections 3553(a) describes the factors courts should consider when sentencing defendants.

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2)   the need for the sentence imposed --

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B)   to afford adequate deterrence to criminal conduct;

> (C)   to protect the public from further crimes of the defendant; and

> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3)   the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for --

    (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines --

        (i)    issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

        (ii)    that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

. . . .

(5)    any pertinent policy statement --

    (A)    issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    (B)    that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Court evaluates these factors in the third step of assessing S. Eccleston's motion for compassionate release, and concludes that they weigh in favor of reducing S. Eccleston's sentence.

> **A.    ECCLESTON'S CRIME WAS VERY SERIOUS, BUT THE COURT FINDS THAT HE WILL NOT REOFFEND, BECAUSE HE HAS MADE IMPRESSIVE EFFORTS TO REHABILITATE HIMSELF, HE HAS NO PRISON DISCIPLINARY HISTORY, AND HE IS MUCH OLDER NOW THAN WHEN HE COMMITTED THE UNDERLYING OFFENSE.**

Regarding the first factor, "the nature and circumstances of the offense," § 3553(a)(1), are very serious. Carjacking and robbery, particularly where a firearm is involved, are major problems in our society -- and especially in Albuquerque, where S. Eccleston's offense occurred. In Albuquerque in 2016, there were 1,957 instances of robbery and 7,710 auto-thefts. See Uniform Crime Reports, City of Albuquerque, https://www.cabq.gov/police/public-reports/annual-reports/uniform-crime-reports (last visited April 23, 2021).[30] See also PSR ¶ 20, at 6. Moreover, as the Tenth Circuit has explained, "no reasonable jurist could debate whether armed carjacking is a crime of violence." United States v. Kundo, 743 F. App'x 201, 203 (10th Cir. 2018). See United States v. Folse, No. CR 15-2485 JB, 2019 WL 826965, at *14 (D.N.M. Feb. 21, 2019)(Browning, J.)(concluding that carjacking is a crime of violence). In the course of his crime, S. Eccleston and his co-Defendant, Martinez, pointed guns at a man, Boyle, in order to steal

---

[30]In Albuquerque, robberies ranged between 940 and 1957 from 2008 to 2016, while automobile thefts ranged from 2,743 to 7,710 from 2008 to 2016. See Uniform Crime Reports, City of Albuquerque, https://www.cabq.gov/police/public-reports/annual-reports/uniform-crime-reports (last visited April 23, 2021). In 2019, Albuquerque was ranked first in the nation for carjackings, and in 2018 Albuquerque was ranked first. See 2019 Hot Spots Vehicle Theft Report, National Insurance Crime Bureau, https://www.nicb.org/media/2083/download (last visited May 21, 2021). In 2019, Albuquerque's vehicle theft rate was 697.05 per 100,000. See 2019 Hot Spots Vehicle Theft Report, National Insurance Crime Bureau, https://www.nicb.org/news/news-releases/2019-hot-spots-vehicle-theft-report (last visited May 21, 2021).

Boyle's car.  See PSR ¶ 10, at 4.  When the car became low on gas, S. Eccleston and Martinez again pointed their guns at a woman, Kuepers, and a man, Henkemeyer, so that they could take the woman's purse and the man's wallet and use the stolen items to purchase gas for the car.  See PSR ¶¶ 10, 21, at 4, 6.  The financial impact on the victims was minimal.  See PSR ¶ 17-19, at 5. Specifically, Keupers lost $80.00, Henkemeyer lost $50.00, and Boyle had no losses given that he was driving a rental vehicle which was later recovered.  See PSR ¶ 17-19, at 5.  Henkemeyer and Keupers both reported anxiety and nightmares as a result of the robbery.  See PSR ¶ 17-18, at 5. Boyle stated that he "felt very helpless when the incident occurred and that it was a very scary experience."  PSR ¶ 19, at 5.  Boyle noted, however, that he did not suffer from any long-term problems as a result of the crime.  See PSR ¶ 19, at 5.  None of the victims had sought counseling, nor did they feel they would need counseling in the future.  See PSR ¶ 17-19, at 5.  Further, none of the victims sustained any physical injuries.  See PSR ¶ 17-19, at 5.  At the time of the crime, S. Eccleston "has been awake for days and was taking a lot of alcohol and methamphetamine which affected [his] judgment."  PSR ¶ 22, at 6.  In sum, the underlying offense was violent, scared the victims, and resulted in loss of property, but, ultimately, did not physically harm the victims or require them to attend counseling.  See PSR ¶ 17-19, at 5

"[T]he history and characteristics of the defendant" before Judge Hansen imposed S. Eccleston's sentence also weighs against lowering his sentence.  18 U.S.C. § 3553(a)(2).  S. Eccleston had pending charges for stealing vehicles, as well as residential burglary, which were dismissed as part of State Plea Agreement.  See PSR ¶¶ 54-55, at 11.  See also PSR ¶¶ 46-50 (describing burglary and embezzlement charges when S. Eccleston was a juvenile).  Additionally, S. Eccleston committed another violent offense and pled guilty to second-degree murder in State court.  See PSR ¶ 51, at 10.  In New Mexico, a defendant commits second-degree murder "if in

performing the acts which cause the death, he knows that such acts create a strong probability of death or great bodily harm to that individual or another." N.M.S.A. § 30-2-1(b). S. Eccleston's conduct, however, was not "willful, deliberate, and premeditated," nor does it "indicat[e] a depraved mind regardless of human life," as New Mexico's first-degree murder statute requires. N.M.S.A. § 30-2-1(b).

S. Eccleston's post-conviction "history and characteristics," however, weigh heavily in favor of S. Eccleston's release. S. Eccleston was eighteen when he committed these extremely violent crimes. Today, he is forty-five. S. Eccleston has done much while incarcerated to rehabilitate himself and to prepare himself for his reentry into society. Moreover, in over twenty-five years of incarceration, S. Eccleston has no disciplinary history. See Motion at 3; Amended Motion at 5; Betts Letter at 1. Additionally, S. Eccleston entered prison with a tenth-grade education. See PSR at 1 (no paragraph numbering). While in prison, he has completed his high school diploma, see New Mexico State Board of Education Diploma at 14, and received an Associate of Theology degree from Titus Baptist Seminary, see Titus Baptist Seminary Diploma at 13. Moreover, S. Eccleston completed the BOP's Nonresidential Drug Abuse Program. See Betts Letter at 1. Following the program, S. Eccleston's treatment provider, Betts, a drug treatment specialist who is employed by the BOP, wrote:

> He was active in all treatment groups disclosing about his substance abuse and criminal history. He was very candid regarding the negative impact his substance use and criminal activity has had on him, his family, and society as a whole. He often expressed remorse for these things and developed several plans of action to continue to maintain his sobriety while incarcerated and sustain it upon his release. In groups, he served in a mentor like capacity for the other participants providing them with supportive constructive feedback. He helped to create a positive uplifting atmosphere encouraging healthy choices and decisions.

> He was observed by staff as well as his peers as being highly respected having consistently demonstrated himself as an individual who is focused on

positive lifestyle changes and not reoffending.  Furthermore after serving over 24 years of incarceration, he has no documented history of institutional misconduct and or discipline.

He has demonstrated cognitive and behavioral changes in line with offenders who have successfully reentered society as productive citizens. Based on his rehabilitative progress, it is recommended that he be considered for his request.

Betts Letter at 1.  S. Eccleston also has taken courses through the BOP to prepare himself for reentry into society, including: (i) a mock job fair; (ii) a job fair preparation course; (iii) a release procedures course; (iv) an employment skills course; (v) a substance relapse prevention course; (vi) a victim impact counseling program; (vii) a job preparation workshop; (viii) a drug relapse workshop; (ix) anger management; (x) stress management; and (xi) a parenting program.  See Inmate Needs Plan at 16.  Additionally, S. Eccleston has taken educational and vocational classes from the BOP including coursework in history, Spanish, and commercial wiring.  See Inmate Needs Plan at 16.

In addition to taking advantage of the BOP's programming, S. Eccleston has involved himself with programming outside of prison in order to better himself.  S. Eccleston became engaged with the American Friends Service Committee ("AFSC") Prison Watch, see Kerness Letter at 5 ("[T]he agency has known Mr. S. Eccleston for the past ten years via multiple letters and dialogue.  He reached out to our organization for self-improvement materials which this office supplies to people in prisons throughout the United States.") and Fair Shake, Kastensen Letter at 4 (noting that Fair Shake is a "national reentry organization"); worked for years with a writing coach to improve his writing abilities, see Letter from Dave Trottier at 6 (dated July 30, 2020), filed February 10, 2021 (Doc. 339-5)("Trottier Letter")(stating that Trottier has "been a writer, teacher, and writing coach for over 30 years, and it's on that basis that Sebastian initially contacted me years ago.  We are not related . . . .  If you are looking for an example of someone who has

become rehabilitated, I believe Sebastian is the man").  S. Eccleston has made significant progress toward completing a dental hygienist certification, which he hopes will serve as his career following his prison term.  See Second Response at 3.  Overall, S. Eccleston has made impressive efforts to rehabilitate himself using both the BOP's resources and outside resources.

**B.      A REDUCED SENTENCE REFLECTS THE OFFENSE'S SERIOUSNESS, PROMOTES RESPECT FOR THE LAW, PROVIDES JUST PUNISHMENT, AFFORDS ADEQUATE DETERRENCE, PROTECTS THE PUBLIC, AND PROVIDES ECCLESTON WITH NEEDED TRAINING AND CARE.**

The factors § 3553(a)(2) describes weigh in favor of reducing S. Eccleston's sentence.  As an initial matter, the Court finds, by a preponderance of the evidence that S. Eccleston will not reoffend because of his age, length of time spent in prison, the education he obtained in prison, and his lack of disciplinary history in prison.  The Court examines the Sentencing Commission's findings regarding recidivism.  In a recent study, the Sentencing Commission explained that offenders who had served sentences longer than 120 months were thirty to forty-five percent less likely to recidivate than offenders who had served shorter prison terms.  See Length of Incarceration and Recidivism at 30, United States Sentencing Commission (April 2020).  S. Eccleston has already served more than 240 months, or double the sentence the study considers.  In addition, when studying age and recidivism, the Sentencing Commission concludes that "[a]ge exerted a strong influence on recidivism across all sentence length categories.  Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed."  United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders at 3, (Dec. 2017)("Aging and Recidivism").  Moreover, "[i]n general, the Commission found that total adult arrests for federal offenders were highest in the 20-24 age group, and declined sharply thereafter."  Aging and

Recidivism at 11.  Offenders between forty and forty-nine, like S. Eccleston, years old had an average of 43.2% recidivism rate.  Aging and Recidivism at 22.  Offenders between forty and forty-nine who, like S. Eccleston, had completed college had an average 21.2% recidivism rate.  Aging and Recidivism at 22.  Five years after release, 32.5% of offenders over forty years old had been rearrested.  Aging and Recidivism at 27.  Additionally, according to the National Institute of Justice, "the prevalence of offending tends to increase from late childhood, peak in the teenage years (from 15 to 19) and then decline in the early 20s."  From Juvenile Delinquency to Young Adult Offending, National Institute of Justice (March 10, 2014), https://nij.ojp.gov/topics/articles/juvenile-delinquency-young-adult-offending.  S. Eccleston's primary offenses occurred when he was eighteen.  See PSR ¶ 2, at 2. Regarding the nature of S. Eccleston's offense, the Sentencing Commission has generally concluded that firearms offenders recidivate more frequently than offenders whose crimes did not involve firearms.  See United States Sentencing Commission, Recidivism Among Federal Firearm Offenders at 2, (June 27, 2019)("Firearm Offender Recidivism").  Nonetheless, "[s]ection 924(c) offenders," like S. Eccleston, "generally recidivated less frequently, for less serious crimes, and after a longer crime-free period than other firearms offenders."  Firearm Offender Recidivism at 2.  Further, although the Court could find, and the parties did not provide, any data linking prison disciplinary history with recidivism, the Court concludes, using logic, that a prisoner like S. Eccleston who has no disciplinary history despite decades of incarceration is less likely to reoffend, because such a prisoner has gone decades without committing any violent acts or violating any rules.  Consequently, the Court concludes that, based on S. Eccleston's age now and at the time of the sentence, the length of his sentence, the education he obtained in prison, and his lack of prison disciplinary history, he will not reoffend and is not a risk to the public.

C.     **SECTIONS 3553(A)(3)-(4) FAVOR A SHORTER SENTENCE, BECAUSE, IF SENTENCED TODAY, ECCLESTON WOULD BE SUBJECT TO LOWER MANDATORY MINIMUMS.**

Regarding the third and fourth factors under § 3553(a), at the time S. Eccleston was sentenced, Judge Hansen sentenced S. Eccleston at the low end of the Guideline range. See Federal Sentencing Tr. at 14:1-15:9 (Hansen, J.).[31]  Both "the kinds of sentences available," and "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission . . . subject to any amendments made to such guidelines" support a reduction in S. Eccleston's sentence, because, under the current law, S. Eccleston would be subject to a

---

[31]Judge Hansen stated S. Eccleston's sentence as follows:

> The Court adopts the factual findings and guideline applications in the presentence report and finds that there is no need for an evidentiary hearing as there are no disputed facts.  The Court finds that as to Counts I and V, the offense level is 23 and the criminal history category is III, establishing a guideline imprisonment range of 57 to 71 months.  As to Counts II and VI, the Court finds that there is a mandatory sentence of 127 months and 240 months, respectively, to run consecutively to each other and consecutive to any other sentence imposed for a minimum mandatory sentence of not less than 360 months.  The Court takes further judicial notice that the defendant committed two separate violent acts while armed with a handgun and has a history of violent behavior.  The sentence imposed will reflect the sentencing goals of punishment, deterrence, and protection of the public.  Therefore, pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court as to each of Counts I and V of indictment 95-14 LH that the defendant, Sebastian Lee S. Eccleston, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 57 months, said sentences to run concurrently.  As to Counts II and VI of indictment 95-14 LH, the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 120 months and 240 months, respectively, to run consecutively to each other for a total of 360 months and to run consecutively to Counts . . . I and V for a total period of imprisonment of 417 months.  Upon release from confinement, the defendant shall be placed on supervised release for a term of three years as to each of Counts I, II, V, and VI, said terms to run concurrently.

Oct. 1996 Tr. at 14:1-15:9 (Hansen, J.).

significantly lower sentence and would have been released already from prison.  § 3553(a)(3)-(4).

See United States v. Pollard, No. CR 10-633-1, 2020 WL 4674126, at *9 (E.D. Pa. Aug. 12,

2020)(Beetlestone, J.)(comparing the sentences available today for the defendant's crime with the

sentences available when the defendant was sentenced).  If sentenced today for his federal crimes,

S. Eccleston would face a mandatory minimum of ten years in prison for both Counts II and VI of

the Second Superseding Indictment, for a total mandatory minimum of twenty years.  See

18 U.S.C. § 924(c)(1)(A)(ii) (providing that a defendant who, "during and in relation to any crime

of violence, . . . uses or carries a firearm . . . shall, in addition to the punishment provided for such

crime of violence . . . if the firearm is brandished, be sentenced to a term of imprisonment of not

less than 7 years").  As to Counts I and V, S. Eccleston's offense level would be 23 and his criminal

history category would be III, as it was at the time of sentencing.  See PSR ¶ 47, at 9.  His Guideline

imprisonment range as to Counts I and V would therefore be 57 to 71 months if he were sentenced

today.  See PSR ¶¶ 49-51, at 9-10.  Accordingly, if sentenced today at the low end of the Guideline

range, S. Eccleston's imprisonment term would be 297 months, or 24.75 years.  See U.S.S.G. Ch.

5, Pt. A.  If sentenced at the top of the Guideline range, S. Eccleston's imprisonment term would

be 311 months, or 25.92 years.  As of June 4, 2021, S. Eccleston had served approximately 303

months, or 25.25 years in custody.[32]  In 1996, Judge Hansen sentenced S. Eccleston to 417 months,

120 months -- or ten years -- longer than the sentence he would receive today if sentenced at the

low end of the Guidelines.  S. Eccleston's 1996 sentence is 106 months longer, or 8.83 years

longer, than his sentence would be today at the top of the Guideline range. S. Eccleston's current

release date is March 29, 2036.  See Second Response at 3 (citing Find an Inmate, Bureau of

---

[32]As discussed above, some of this was considered State custody.

Prisons, https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited June 8, 2021). If S. Eccleston had been sentenced under current sentencing policies to the bottom of the Guideline range and his sentences had run concurrently, therefore, he would have been already released from prison. Accordingly, the fourth factor weighs favor of reducing S. Eccleston's sentence.

### D.   U.S.S.G. § 5H1.1 WEIGHS IN ECCLESTON'S FAVOR, BECAUSE ECCLESTON WAS EIGHTEEN WHEN HE COMMITTED THE UNDERLYING OFFENSE.

As to the fifth factor, the Court examines any relevant policy statements in effect when S. Eccleston was sentenced and concludes that they favor shortening S. Eccleston's sentence. See U.S.S.G. § 5H1.1. The Sentencing Commission's policy statement on age is the only relevant policy statement, because S. Eccleston committed the underlying offense at the age of eighteen. See PSR at 1 (no paragraph numbering).   At the time S. Eccleston was sentenced, the policy statement stated: "Age (including youth) is not ordinarily relevant in determining whether a departure is warranted." See U.S.S.G. § 5H1.1 Commentary.   In 2010, however, the Sentencing Commission amended the policy statement to read: "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." See U.S.S.G. § 5H1.1. The Sentencing Commission explained the 2010 amendments to U.S.S.G. § 5H1.1:

> As amended, these policy statements generally provide that age; mental and emotional conditions; and physical condition or appearance, including physique, "may be relevant in determining whether a departure is warranted, if [the offender characteristic], individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." The Commission adopted this departure standard after reviewing recent federal sentencing data, trial and appellate court case law,

scholarly literature, public comment and testimony, and feedback in various forms
from federal judges.

U.S.S.G. § 5H1.1 Commentary (citing U.S.S.G. §§ 5H1.1 (Age), 5H1.3 (Mental and Emotional

Conditions), and quoting 5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or

Abuse; Gambling Addiction)).  Because the Sentencing Commission based these amendments on

data, feedback, and public comment it gathered, the Court concludes that it should consider S.

Eccleston's age at the time he committed the offense; although not "ordinarily" relevant at the time

of sentencing, S. Eccleston's young age remains unusual.  See U.S.S.G. § 5H1.1 Commentary.  S.

Eccleston was eighteen at the time of the offense conduct, when his brain was not developed fully,

and his impulse control was below that of an older adult.  See Sara B. Johnson, Robert W. Blum,

& Jay N. Giedd, Adolescent Maturity and the Brain: The Promises and Pitfalls of Neuroscience

Research in Adolescent Health Policy, 45 J. Adolescent Health 216-221 (2009)(stating that "there

is little empirical evidence to support age 18, the current legal age of majority, as an accurate

marker of adult capacities").  Accordingly, the Court concludes that U.S.S.G. § 5H1.1 weighs in

favor of a lower sentence for S. Eccleston.

### E.   ECCLESTON'S SENTENCE IS HIGHER THAN AVERAGE FOR PERSONS CONVICTED OF SIMILAR CRIMES.

Regarding the sixth factor, "the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.

§ 3553(a)(7), the Court evaluates both: (i) the average sentence for similar crimes; and (ii) the

sentence S. Eccleston's co-defendant received, because the PSR indicates that "based on the

offense conduct, it appears that the defendant and his co-Defendant were equally culpable in the

offense," PSR ¶ 29, at 7; id. ¶ 34, at 8.  The Court concludes that S. Eccleston's sentence was

longer than sentences for similar defendants who committed similar crimes.  First, persons

convicted of robbery receive at least some prison time in 98.6% of all cases.[33]  In 2019, persons convicted of firearms[34] received at least some prison time in 94.3% of cases.  See United States Sentencing Commission Quarterly Report 15, (Sept. 30, 2019)("Quarterly Report").  Also in 2019, persons convicted of robbery[35] received a Guidelines sentence in 39.2% of cases, an upward departure in 1.6% of cases, a downward departure in 5.5% of cases, and a downward variance in 39.5% of cases.  See Quarterly Report at 22.  Persons convicted of firearms offenses received a Guidelines sentence in 54.5% of cases, an upward departure in 0.7% of cases, a downward

---

[33]This data is from 2019.  No similar data was available from 1996, when S. Eccleston was sentenced. The Court also assessed the Sentencing Commission Annual Report from 1996.  The data in this report was more limited regarding sentencing ranges for specific crimes, however, so the Court focused its analysis primarily on the 2019 report.  The 1996 Annual Report supports the Courts general conclusion, however; it notes that "[f]or bank robbery offenses, the public was more likely to recommend punishment shorter than provided by the guidelines.  In addition, survey respondents were more likely to recommend longer punishment when the scenario included injury to a victim."  See 1996 Annual Report at 7.  S. Eccleston committed a carjacking in which no one was injured.  The Court considers the 1996 report's statements about public opinion, because public opinion was important in the Commission's creation of Guideline ranges.

[34]This Quarterly Report provides:

> *Firearms* includes unlawful receipt/possession/transportation of firearms, ammunition, or explosive material; prohibited transactions involving firearms or ammunition; possession of guns/explosives on aircraft; unlawful trafficking, etc., in explosives; possession of guns/explosives in federal facility/schools; use of fire or explosives to commit felony; use of firearms or ammunition during crime; improper storage of explosive materials; and failure to report theft of explosive materials. This category includes offenders sentenced under §§2K1.1, 2K1.2, 2K1.3, 2K1.5, 2K1.6, 2K2.1, 2K2.2, 2K2.3, 2K2.4, 2K2.5, 2K2.6, and 2K3.2 of the *Guidelines Manual.*

Quarterly Report at 47 (italics in the original).

[35]This report provides: "*Robbery* includes bank robbery, Hobbs Act robbery, post office robbery, other robbery, and carjacking. This category includes offenders sentenced under §2B3.1 of the *Guidelines Manual*."  Quarterly Report at 47 (italics in the original).

departure in 3.6% of cases, and a downward variance in 34.5% of cases. See Quarterly Report at 22. Persons convicted of robbery served a mean sentence of 109 months or a median sentence of 92 months. Quarterly Report at 14. Persons convicted of firearms sentences received a mean sentence of 50 months and a median sentence of 39 months. Quarterly Report at 14. With S. Eccleston's two firearm counts to be served consecutively and his robbery counts to be served concurrently, the mean sentence for his crimes today would be 209 months and his median sentence today would be 170 months. The Court, therefore, concludes that S. Eccleston's sentence was significantly longer than sentences for similar defendants who committed similar crimes.

Next, the Court examines S. Eccleston's contention that his federal co-Defendant Martinez' sentence was 200 months less than his sentence, although Martinez had "higher criminal history, being the principal in the crimes alleged, and also being charged as a felon in possession in addition to the charges that Mr. S. Eccleston faced." Reply at 6. The Court concludes that the length of Martinez' sentence is a neutral factor. First, the PSR, upon which the Court relies for its findings of fact, states that S. Eccleston and Martinez "were equally culpable in the offense"; thus, the Court disagrees with S. Eccleston's argument that Martinez was the principal. PSR ¶ 29, at 7; id. ¶ 34, at 8. S. Eccleston is correct that Martinez' criminal history category, IV, was higher than S. Eccleston's criminal history category, III. See Transcript of Hearing at 3:13-16 (taken Feb. 2, 1996)(Hansen, J.), filed December 12, 1996 (Doc. 286)("Martinez Tr."). Unlike S. Eccleston, however, Martinez pled guilty to one § 924(c) violation, rather than two. See Martinez Tr. at 3:17-19 (Hansen, J.). As Judge Hansen stated at Martinez' sentencing hearing:

> The Court finds that as to Counts I, VII and X, that the offense level is 27 and the Criminal History Category is IV, establishing a guideline imprisonment range of 100 to 125 months. As to Count II, the Court finds that there's a mandatory sentence of 120 months to run consecutively to any other sentence imposed. However, pursuant to Rule 11 (e)(1)(C) of the Federal Rules of Criminal Procedure,

the Court accepts the plea agreement which includes a specific guideline imprisonment range of 198 to 217 months in prison as the Court is satisfied that the agreed sentencing range departs for justifiable reasons.

Martinez Tr. at 3:13-25 (Hansen, J.). The Court concludes Judge Hansen gave Martinez a lower sentence based upon Martinez' Plea Agreement and the fact that Martinez pled guilty to only one § 924(c) violation; Martinez, therefore, was not "found guilty of similar conduct" to S. Eccleston. 18 U.S.C. § 3553(a)(7). See Martinez Tr. at 3:13-25 (Hansen, J.). Accordingly, the fact that Martinez' sentence was much lower than S. Eccleston's weighs neither in favor of nor against reducing S. Eccleston's sentence.

### F.   ECCLESTON PAID RESTITUTION AS JUDGE HANSEN ORDERED.

At the federal sentencing hearing, Judge Hansen ordered S. Eccleston to "make restitution" to the victims of the underlying offense. Federal Sentencing Tr. at 16:4-13 (Hansen, J.). S. Eccleston has paid the required restitution to the victims, Keupers and Henkemeyer. See Tr. at 32:18-20 (McConnell). Because S. Eccleston has paid restitution, § 3553(a)(7) weighs in S. Eccleston's favor.

S. Eccleston has managed to put together a constellation of circumstances, that together, constitute extraordinary and compelling reasons. Having reviewed the § 3553(a) factors, the Court concludes that a reduction in his sentence is warranted. Nonetheless, S. Eccleston committed an extremely serious and violent crime -- carjacking -- that remains a major problem in Albuquerque. The Court cannot justify a sentence of time served, because this would not reflect the seriousness of S. Eccleston's offense. The sentence that Judge Hansen gave for the crime should be served, somehow, in state or federal custody, but the Court concludes that the total sentences running consecutively is unfair, because Eccleston's current sentence is excessive in the aggregate. The Court will therefore reduce S. Eccleston's sentence from 417 months to 228 months, to reflect the

time S. Eccleston served in State prison.  He should serve 417 months somehow, but not more than 417 months.

      **IT IS ORDERED** that: (i) the Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A), filed April 15, 2020 (Doc. 307), is denied; (ii) the Amended Motion for Sentence Modification Pursuant to 18 U.S.C. § 3582(c)(1)(A) and Under the First Step Act and the Cares Act, filed December 14, 2020 (Doc. 335), is granted in part and denied in part; (iii) the Defendant Sebastian Eccleston's Amended and Supplemental Motion for Reduced Sentence Pursuant to the First Step Act and 18 U.S.C. § 3582, filed February 10, 2021 (Doc. 339), is granted in part and denied in part; and (iv) Defendant S. Eccleston's previously imposed federal sentence of 417 months is reduced to 228 months, and he is resentenced to 228 months.

 

                                                      _____
                                                      UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred A. Federici
  Assistant United States Attorney
David M. Walsh
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Carter B. Harrison, IV
Harrison & Hart, L.L.C.
Albuquerque, New Mexico

-- and --

Alicia M. McConnell
Business Law Southwest LLC
Albuquerque, New Mexico

> *Attorneys for the Defendant*